1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
2

3   IN RE:                          .   Chapter 7
                                    .
4   W.J. BRADLEY MORTGAGE CAPITAL   .   Case No. 16-11049 (KG)
    LLC, *et al.*,                  .
5                                   .   Courtroom No. 3
                                    .   824 Market Street
6                                   .   Wilmington, Delaware 19801
                                    .
7              Debtor.              .   September 7, 2016
    . . . . . . . . . . . . . . . . .   11:00 A.M.
8

9                   TRANSCRIPT OF HEARING
               BEFORE HONORABLE KEVIN GROSS
10             UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For Chapter 7 Trustee:   Ronald Gellert, Esquire
                             GELLERT SCALI BUSENKELL & BROWN LLC
13                           1201 N. Orange Street, Suite 300
                             Wilmington, Delaware 19801
14
    ECRO:                    GINGER MACE
15
    Transcription Service:   Reliable
16                           1007 N. Orange Street
                             Wilmington, Delaware 19801
17                           Telephone:  (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
18
    Proceedings recorded by electronic sound recording:
19  transcript produced by transcription service.

20

21

22

23

24

25

APPEARNACES (Continued):

For Texas Capital Bank:   Jason Rodriguez, Esquire
                          HIGIER ALLEN & LAUTIN
                          2711 North Haskell Ave., Suite 2400
                          Dallas, Texas 75204

                          Matthew Austria, Esquire
                          WERB & SULLIVAN
                          300 Delaware Avenue
                          Wilmington, Delaware 19801

For Bright Keys of
Oakridge Homeowners
Association, Inc.:        Adam Hiller, Esquire
                          HILLER & ARBAN, LLC
                          1500 N. French Street
                          Wilmington, Delaware 19801

For WJB Loan LP:          Lee Attanasio, Esquire
                          SIDLEY AUSTIN LLP
                          787 Seventh Avenue
                          New York, New York 10019

                          William Bowden, Esquire
                          ASHBY & GEDDES, P.A.
                          500 Delaware Avenue, 8th Floor
                          Wilmington, Delaware 19899

For DWF IV S 1300 El Camino, LLC,
DWF IV San Ramon, LLC
Shops at Slatten Ranch, L.P.:
                          Thomas Driscoll, Esquire
                          Bifferato, LLC
                          1007 N. Orange Street, 4th Floor
                          Wilmington, Delaware 19801

TELEPHONIC APPEARANCE:

In *Propria Persona*:     Jody Trammell, *Pro Se*
                          512 Montgomery Road
                          Sevierville, Tennessee 37876

## INDEX

Page

AGENDA OF MATTERS:

    Item Number 2:
    Motion of Brightkeys of Oakridge
    Homeowners  Association, Inc. (Relief from Stay)

    By Mr. Gellert                                         5
    By Mr. Hiller                                          5


    Item Numbers 3, 4, and 5:
    Motions for Relief from Stay to Terminate Leases

    By Mr. Gellert                                         6
    By Mr. Driscoll                                        7


    Item Number 8:
    Motion of Ms. Trammell to Compel the Debtor to Grant
    Plaintiff a Release of Lien or Provide Payoff Amount

    By Mr. Gellert                                         8
    By Ms. Trammell                                       10


    Item  Number 1:
    Motion of WJB Loan LP

    By Ms. Attanasio                                      14
    By Mr. Gellert                                        31
    By Mr. Rodriguez                                      40

    RULING                                                52


EXHIBITS:

Loan LP #1 - Declaration of Peter Harrison              30

1      (Proceedings commence at 11:00 a.m.)

2      (Call to order of the Court)

3           THE COURT:  Good morning, everyone.  You may be

4  seated.

5           ALL:  Good morning, Your Honor.

6           THE COURT:  Thank you.  Good morning.

7           Mr. Gellert, good morning.

8           MR. GELLERT:  Good morning, Your Honor, Ronald

9  Gellert from Gellert Scali Busenkell & Brown on behalf of the

10  Chapter 7 Trustee.

11           Your Honor, there's several items going forward on

12  the agenda today.

13           THE COURT:  Yes.

14           MR. GELLERT:  But I was thinking it might be a

15  good idea to take them a little bit out of order to dispose

16  of the ones that I think are pretty much resolved.

17           THE COURT:  Okay.

18           MR. GELLERT:  So that sort of the bigger argument

19  one can kind of wait for the end, and then other people can

20  get on their way.

21           THE COURT:  All right.  That's fine.

22           MR. GELLERT:  Great.

23           So I think that would bring us to item number two,

24  which is the motion of Brightkeys of Oakridge Homeowners

25  Association.

1          THE COURT:  Yes.

2          MR. GELLERT:  For relief from the stay.

3          Your Honor, that matter -- the informal objection

4  that the Trustee posed was effectively that while we have no

5  objection to that relief sought, we don't know that we

6  actually own that loan and, therefore, have the authority to

7  sign off on the easement that they'd like us to do as part of

8  the Homeowners Association.

9          So I think that the solution there will be a

10  revised form of order, which basically says to the extent

11  that the Trustee or W.J. Bradley owns this loan and,

12  therefore, has the ability to sign off on this easement, we

13  will do so.  And that way, it gives them a little bit more to

14  take the ball down the road and exercise their easement

15  rights.

16          But I know that Mr. Hiller is here.  I don't know

17  if he had anything to add.

18          THE COURT:  Mr. Hiller, good morning.

19          MR. HILLER:  Good morning, Your Honor, Adam Hiller

20  on behalf of Brightkeys.

21          Your Honor, Mr. Gellert correctly summarized where

22  we stand.  We hope to get a proposed revised proposed form of

23  order to the Court as soon as possible after today's hearing.

24          THE COURT:  All right.  Thank you, Mr. Hiller.

25          All right.  Mr. Gellert.

1        MR. HILLER:  Your Honor, that is the only matter

2  I'm here and may I pleased be excused?

3        THE COURT:  You may.

4        MR. HILLER:  Thank you.

5        THE COURT:  Yes, sir.

6        MR. GELLERT:  Thank you, Your Honor.

7        Your Honor, items three, four and five relate to

8  motions for relief from stay to terminate leases or deem them

9  have been terminated prior to the petition date.  And this is

10 another situation where the Trustee has no objection to that,

11 but certainly wanted to make sure that there was an order

12 saying yes, go ahead and take over -- retake these premises.

13       The only minor objection we had to this was to the

14 extent that there was personal property on the premises, we

15 had to work out an arrangement whereby they would be entitled

16 to take that personal property for a small fee.  We did this

17 similarly in a Colorado lease.  Your Honor is nodding, so

18 maybe he recalls.

19       THE COURT:  Yes.  I think it was $2,000.00 as I

20 recall.

21       MR. GELLERT:  Yes.  It was a de minimis amount;

22 basically something that would give the Trustee a little bit

23 of something for his trouble.

24       The one issue that arose was in one of the lists

25 of personal property in the San Mateo premises, there was

1  listed some computer equipment and some server equipment.  We

2  ran into some issues about making sure that the data was

3  preserved and/or properly wiped, especially considering --

4           THE COURT:  The personal --

5           MR. GELLERT:  Residential mortgages.

6           THE COURT:  Yes.

7           MR. GELLERT:  It turns out that the San Mateo does

8  not have that property so the San Mateo property -- which one

9  is that?

10        (participants conferring)

11          MR. GELLERT:  But the number four item, San Ramon,

12 actually then did have some servers and the like.  So the

13 parties have agreed that the landlord will ship, box up and

14 ship the servers to the Trustee and then deduct from the

15 $2,000.00 whatever it cost to do that.  That way we can

16 preserve the data and make sure that consumer information is

17 protected at the same time.

18          THE COURT:  All right.

19          MR. GELLERT:  But that's the only wrinkles which

20 relate to items three, four and five.

21          And, Your Honor, counsel is here.  I don't want to

22 speak for him, so.

23          MR. DRISCOLL:  Good morning, Your Honor.  For the

24 record, Tom Driscoll from the Bifferato firm on behalf of the

25 three landlords.

1        And Mr. Gellert's representations to the Court are

2    accurate with respect to our motions.

3        THE COURT:  All right.  So I'll be receiving a

4    revised form of order then, is that correct?

5        MR. DRISCOLL:  I think that -- I thought actually

6    the one attached was good, but I'll talk with Mr. Gellert and

7    confirm that.

8        THE COURT:  All right.  And, you know, if it can

9    be modified with some handwriting, that's fine too.

10       MR. DRISCOLL:  Okay. Great.  Thank you, Your

11   Honor.

12       THE COURT:  All right.  Mr. Driscoll, thank you,

13   sir.

14       MR. GELLERT:  Your Honor, the other item before

15   item number one is item number six.

16       THE COURT:  Yes.

17       MR. GELLERT:  I don't know if anybody in Court or

18   on the phone with respect to that one.

19       THE COURT:  I think -- is Jody Trammell on the

20   telephone?  Her name is listed here, but I don't see her on -

21   - I don't hear her.

22       MS. TRAMMELL:  Yes, sir, this is Jody Trammell.  I

23   am present.

24       THE COURT:  Oh, Ms. Trammell, good morning.

25       MR. GELLERT:  Great.  I don't know if Your Honor

1   if you want to take this one before.

2        THE COURT:  Yes, I think we should.

3        MR. GELLERT:  Okay.  Your Honor, this is the

4   motion of Ms. Trammell to compel the Debtor to grant

5   Plaintiff a release of lien or provide a payoff amount.  Your

6   Honor, and we'll give the --

7        THE COURT:  And Ms. Trammell has been very

8   persistent.

9        MR. GELLERT:  Yes.  Many correspondence and I see

10  the frustration involved with her efforts.  And, Your Honor,

11  I think what we're prepared to do from our perspective and

12  since the time of the motion we've been trying to go through

13  our records and find whatever we could find with respect to

14  this.  And it appears that this one is certainly a

15  peculiarity in that it looks like W.J. Bradley may have been

16  servicing this themselves as opposed to the subservicing that

17  they had been doing, but basically they do for every single

18  loan they have out there.

19       We're trying to confirm this, but we think this is

20  the case.  As a result what we're inclined to do is to go

21  through this, look through this, and work with Ms. Trammell

22  in terms of the payoff amount.  And what we would propose to

23  this Court is that we would suggest the payoff amount working

24  with Ms. Trammell.  And then notice that on effectively a

25  9019 for those parties who think that they have, to the

1 extent that they believe they have an interest in this

2 particular loan, can come in and, you know, state whatever

3 piece that they have to do with respect to that.

4          And that will enable us to, you know, have Ms.

5 Trammell, you know, get some resolution on this.  But it is

6 her motion, so I probably have said too much before she had

7 the opportunity to talk.

8          THE COURT:  That's fine, Mr. Gellert.

9          MR. GELLERT:  So let me cede the podium.

10          THE COURT:  Ms. Trammell, I've read your papers

11 and I've gone through all that you've been doing to get the

12 payoff or to satisfy the mortgage or whatever it is you need,

13 and you've been very persistent and you've been very patient.

14          What the Debtor is suggesting is working with you

15 and resolving it on what is called a Rule 9019 motion, which

16 is a settlement motion, assuming the two of you can agree --

17 the Debtor and you on the amount.  Noticing that out and then

18 anyone who would object can object.  But in the meantime, it

19 would be more than likely that it would be a foregone

20 conclusion.

21          MS. TRAMMELL:  Okay.  And is there a certain

22 amount of time we can expect to get that done in?

23          THE COURT:  That is an excellent question, Ms.

24 Trammell and let me ask the Debtor how much time you think

25 you need.  Mr. Gellert?

1          MR. GELLERT:  It appears we could probably get a

2 proposal to her within a week.

3          THE COURT:  Within a week?

4          MR. GELLERT:  Yes.

5          THE COURT:  All right.

6          MS. TRAMMELL:  Okay.

7          THE COURT:  Well I think that's about as good as

8 we can get at this point.  And let me just suggest this to

9 you, Ms. Trammell.

10          If you haven't heard from the Debtor today being

11 September 7th, let's say by the 16th, then you should call my

12 Chambers and we will arrange for a teleconference.

13          MS. TRAMMELL:  All right.  Okay.  That sounds fair

14 to me.  That sounds great.

15          THE COURT:  All right.  So at least you're getting

16 some work done by the Debtors and hopefully this will resolve

17 itself.

18          MS. TRAMMELL:  Okay.  That sounds great.  I would

19 love to get it resolved.

20          THE COURT:  Absolutely.  Well thank you, Ms.

21 Trammell.

22          MS. TRAMMELL:  Thank you.

23          THE COURT:  If you like to remain on the phone,

24 you may; otherwise, you can get off.  And as I say if you

25 haven't heard from the Debtors by the 16th, you'll call

1  Chambers.

2          MS. TRAMMELL:  Okay.  That sounds great.  Thank

3  you.  And I will excuse myself if that's okay with you all.

4          THE COURT:  That is fine.  Thank you, Ms.

5  Trammell.

6          MS. TRAMMELL:  Thank you.

7          THE COURT:  Good day to you.

8          MS. TRAMMELL:  Bye-bye.

9          THE COURT:  Bye-bye.

10          MR. GELLERT:  Thank you, Your Honor, that takes

11  care of all the other --

12          THE COURT:  Yes, in short order.

13          MR. GELLERT:  I appreciate you accommodating that,

14  and I appreciate counsel accommodating that as well.

15          Your Honor, this is the motion of WJB Loan.  It's

16  their motion and I'll cede the podium.

17          THE COURT:  All right.  Thank you, Mr. Gellert.

18          Good morning, Mr. Bowden.

19          MR. BOWDEN:  Good morning, Your Honor.  May I

20  please the Court Bill Bowden of Ashby & Geddes for WJB Loan

21  LP.

22          THE COURT:  Yes.

23          MR. BOWDEN:  Your Honor, I'm joined today, Your

24  Honor, by Ms. Attanasio who you might recall from our last

25  hearing.

1          THE COURT:  I do.

2          MR. BOWDEN:  At Sidley Austin.  Also Ms.

3  Attanasio's partner, John Hutchinson, also from Sidley

4  Austin.

5          MR. HUTCHINSON: Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Hutchinson.

7          MR. HUTCHINSON:  Good to see you again.

8          THE COURT:  Good to have you here.

9          MR. BOWDEN:  And both are admitted *pro hac vice*,

10 Your Honor.

11         THE COURT:  All right.

12         MR. BOWDEN:  And with that, I'll turn the lectern

13 over to Ms. Attanasio.

14         THE COURT:  That will be fine, Mr. Bowden.  Good

15 to see you.

16         MR. BOWDEN:  Thank you, Your Honor.

17         THE COURT:  Ms. Attanasio, good morning.

18         MS. ATTANASIO:   Good morning, Judge.

19         THE COURT:  The facts are complicated.  I don't

20 know that it is as complicated as it necessarily appears to

21 be.

22         MS. ATTANASIO:  I think it is not and hopefully I

23 can help streamline things this morning.

24         THE COURT:  All right.  Thank you.

25         MS. ATTANASIO:  For the record, Your Honor, Lee

1  Attanasio, Sidley Austin, on behalf of WJB Loan LP.  Mr.

2  Bowden introduced Mr. Hutchinson who I believe is known to

3  the Court.  Also here today is Peter Harrison, who's admitted

4  the declaration that was filed with the motion that brought

5  us here today.

6          THE COURT:  Yes.

7          MS. ATTANASIO:  That motion, Your Honor, seeks the

8  determination that Loan LP's participation interest in

9  certain of the Debtors' loans are not property of the estate.

10  And then as a remedy to impose a constructive trust to

11  protect those interests and also seeks some additional

12  information that we've had some difficulty securing up until

13  now.  For the record, that motion was filed at docket number

14  96.

15          Your Honor, as set forth in the motion, Loan LP,

16  my client, is a limited partnership that was formed for the

17  purpose of investing in qualifying loans and participation

18  rights in such loans.  To affect those purchases, Loan LP

19  entered into a participation agreement.  That agreement was

20  filed as Exhibit B to Mr. Harrison's declaration.

21          Loan LP has a variety of rights and claims in

22  these cases, both under the participation agreement, the

23  partnership agreement, claims at law.  But the motion it

24  filed, Your Honor, was very, very narrow.

25          THE COURT:  Yes.

1     MS. ATTANASIO:  It seeks a determination only as

2  to its participation and only as to participation in loans

3  that are not subject to a warehouse lending facility with

4  Texas Capital Bank, TCB.

5     THE COURT:  Right.

6     MS. ATTANASIO:  And it's worth noting, Your Honor,

7  that that facility is different from the EFH facility that

8  was referenced, and I'll get to that in a moment.

9     But, again, the focus of this motion is really

10  only on the loans that are not subject to the TCB warehouse.

11     THE COURT:  Good.

12     MS. ATTANASIO:  And we tried very hard to work

13  with both the Trustee and TCB in advance of this hearing.

14  And while we made some progress, ultimately, the Trustee

15  filed a fairly broad brush objection, which I'll address.

16  And TCB filed a more limited objection.

17     We have continued to have conversations with

18  counsel for TCB.  And may have resolved those issues subject

19  to working out some language.  And I'll get to that at the

20  end of the presentation as well.

21     And we have, of course, Your Honor, filed a reply.

22     THE COURT:  Yes.

23     MS. ATTANASIO:  To both of those objections.

24     But before I launch into the substance of the

25  motion in light of the Trustee's objection, Your Honor, I'm

1  going to start with the procedural issue that's been raised.

2  THE COURT:  All right.

3  MS. ATTANASIO:  Of course, we recognize that Your

4  Honor was not providing legal advise --

5  THE COURT:  I'll be more careful from now on.

6  MS. ATTANASIO:  As part of the colloquy in June.

7  THE COURT:  Right.

8  MS. ATTANASIO:  But, nonetheless, Your Honor, I

9  think as a result of that colloquy, it was absolutely crystal

10  clear to everyone in this Courtroom that Loan LP was going to

11  file a motion.  And that was three months ago, Your Honor.

12  THE COURT:  That's right.

13  MS. ATTANASIO:  And the motion was filed, we did

14  exactly what we said we were going to do and that motion was

15  filed seven weeks ago.

16  This couldn't be of any surprise to anyone, nor

17  could it possibly cause any harm or prejudice to the Trustee.

18  In fact, I've had many, many conversations and

19  correspondences with Mr. Gellert and there has been no

20  suggestion until the objection was filed that there was any

21  procedural issue or impropriety.

22  THE COURT:  And, of course, no one said to me at

23  that hearing when I used the word motion, Judge.  You said

24  motion, but it really ought to be an adversary proceeding.

25  MS. ATTANASIO:  That's right, Your Honor.

1   And really the case law is clear that that's

2   what's critical here is whether there has been due process.

3   THE COURT:  Right.

4   MS. ATTANASIO:  And, of course, the Trustee has

5   had complete due process here.

6   Frankly, to the extent the Trustee felt that there

7   was some need of discovery, and I certainly don't believe

8   there is, he could have sought that discovery at any time.

9   THE COURT:  That's right.

10   MS. ATTANASIO:  And no mention was ever made of

11   that.

12   So, Your Honor, I think timing is in no sense an

13   issue here.  In fact, you know, to the contrary, Your Honor,

14   it seems to me that the relief we sought in this motion is

15   actually quite well timed in light of the fact that the

16   Trustee has recently filed a sale motion that covers several

17   of the loans.

18   So, Your Honor, we would like very much to be

19   supportive of that sale motion, but it is important that in

20   doing so, we understand where the loans, in which we claim a

21   participation interest, how those are being dealt with and

22   whether our participation interest is, in fact, being

23   protected in the context of that sale process.

24   THE COURT:  Okay.

25   MS. ATTANASIO:  And so we think, Your Honor, it's

1  very important that that issue be determined now.

2          Frankly, Your Honor, it's not entirely clear to me

3  that the motion is the type of motion that is even covered by

4  the 7001 adversary because it is not, as the Trustee

5  repeatedly states in his objection, a motion seeking a

6  determination of secured status or priority.  And that really

7  gets to the heart the substance here, Your Honor, because

8  Loan LP is not a creditor in respect of this motion enforcing

9  claim rights.

10          The law is absolutely clear that the holder of a

11  participation, the relationship between that holder and the

12  lead lender is not that of Debtor/creditor.  And we cited,

13  for example, Your Honor, the Drexel case at 113 B.R. 830,

14  which itself cites Supreme Court precedent for this

15  proposition and other cases.

16          The lead lender here, which is the Debtor,

17  transferred an undivided ownership interest in these loans.

18  The participated interest isn't collateral.  It is a separate

19  property interest and it is owned by Loan LP.  And that

20  distinction, Your Honor, is so critical that in the

21  bankruptcy context, it was actually codified at Section

22  541(d).

23          THE COURT:  Right.

24          MS. ATTANASIO:  That section makes clear that this

25  very type of participation interest is excluded from property

1   of the estate.  The section deals specifically with interest

2   in which the Debtor "holds only legal title and not an

3   equitable interest such as 'an interest in a mortgage sold by

4   the Debtor, but as to which the Debtor retains legal title to

5   service.'"

6            Your Honor, this is very clear explicit statutory

7   language and it covers exactly the situation we have here.

8   And there's case law that goes through the very analysis that

9   we think is appropriate here.  We've cited that.  It is the

10  Columbia Pacific Mortgage case at 20 B.R. 259.  Again, the

11  Court there analyzed specifically the participation interest

12  at issue, how they fit within Section 541(d) of the Code, and

13  then ruled that the holder of those interest was entitled to

14  80 percent, its participation value, of proceeds that were

15  then being held by the Debtor in escrow.

16           The Trustee's objection fails to address this case

17  or any other case that we cited.  Surprisingly, Your Honor,

18  the Trustee doesn't even mention Section 541(d).

19           THE COURT:  How do we determine the percentage?

20           MS. ATTANASIO:  Your Honor --

21           THE COURT:  Held by Loan LP.

22           MS. ATTANASIO:  We have the specific percentages

23  as to each loan.  And we have each loan identified by a loan

24  number as to which, I think as between ourselves and Mr.

25  Gellert.  I don't think there's any dispute as to the loans

1 we're talking about.  But I do think, Your Honor, and Mr.

2 Rodriguez mentioned this in advance, it would be useful, I

3 think, to actually identify the loans we're talking about,

4 you know, if we get to the point of an order today.  And

5 we're happy to do that.

6           As to each of those loans, we can also identify

7 the specific percentage of the participation.  As we put

8 forward in our papers, those percentages range from

9 approximately 85 to 99 percent.

10           THE COURT:  Right.

11           MS. ATTANASIO:  So it's a substantial ownership

12 interest.

13           THE COURT:  Yes.

14           MS. ATTANASIO:  So I think, Your Honor --

15           THE COURT:  And how many loans are there, Ms.

16 Attanasio?

17           MS. ATTANASIO:  That are the subject of this

18 motion.

19           THE COURT:  Yes.

20           MS. ATTANASIO:  There are five extent loans, Your

21 Honor, that still are being held by the Trustee.  There are

22 also two additional loans that were sold prepetition.  Again,

23 these are also loans that were not subject to the TCB

24 warehouse.

25           They were sold prepetition.  The proceeds from

1   those loans, which should have gone, at least to the extent

2   of the defined purchase price, to my client was instead used

3   by the Debtor prepetition for other purposes.  Part of the

4   relief we seek here, Your Honor, is, in fact, to try and get

5   information to see if we can trace those proceeds and recover

6   them.  But as to the property that is currently being held,

7   it is five months.

8              THE COURT:  Okay.

9              MS. ATTANASIO:  And I think, Your Honor, the only

10  real question here is whether the participation agreement

11  that we have submitted and which governs these interest is a

12  true participation.  To evaluate that question, Courts look

13  at four factors: whether money is advanced by a participant

14  to a lead lender, whether the participant's right to

15  repayment arises only when the lead lender is paid, whether

16  only the lead lender can seek legal recourse against the

17  underlying here mortgage borrower, and whether the document

18  itself is evidence of the party's true intention.

19             We cited a number of cases for that including In

20  Re Acro Finance at 357 B.R. 785.  I'm going to start with the

21  last of those four prongs, Your Honor, because I think it's

22  actually dispositive here.  And that is whether the document

23  itself is evidence of the party's intention.

24             THE COURT:  Okay.

25             MS. ATTANASIO:  Whether a participation exists is

1 a question of state law.  Here, that law is California.

2 Under California law, principles of contract interpretation

3 require the Court to follow objective intent as evidenced by

4 the words of the contract, rather than any subjective intent.

5 And that is set forth in Cedars Sinai cited in our papers.

6       Here, the contract could not be more clear.  It is

7 obviously labeled a participation agreement.  The terms

8 reflected throughout the document refer to a purchase and a

9 sale, a purchaser, a seller.  The document in the preamble

10 identifies specifically that the intent of the parties is to

11 purchase and to sell interest in these loans.  And there is

12 no contrary language that would suggest any, you know that

13 this is a loan or a lending or a borrower.  Those terms do

14 not appear.

15       The remaining substantive terms also track the

16 test for participation in that money was advanced by Loan LP

17 to the so-called lead lender, which is the Debtor here.

18 Payment is received by Loan LP under the terms of that

19 agreement only when the seller, the Debtor here, sells the

20 loan.  And Loan LP has no rights to go against the underlying

21 mortgage Debtors.

22       All of these tests are satisfied here, Your Honor,

23 but the Trustee makes no effort in its objection to review

24 the participation agreement at hand, to analyze the legal

25 standard, or to deal with the substance of the matter before

1  you.  Instead, what the Trustee appears to do is focus on

2  Loan LP's UCC filing.  And somehow equate those filings with

3  Loan LP claiming a security interest here.  And then having

4  set up that straw man, the Trustee claims that the security

5  interest is flawed.

6          This argument not only misunderstands the nature

7  of participation agreements, but it also misunderstands the

8  structure of the UCC in this regard.  Under the UCC, again,

9  California is the relevant commercial code.

10          THE COURT:  That's right under the participation

11  agreement.

12          MS. ATTANASIO:  That's correct.

13          THE COURT:  Yes.

14          MS. ATTANASIO:  There are two, I think, provisions

15  that are directly relevant.  One is that a sale of accounts

16  payment intangibles or notes, exactly what we have here, that

17  sale transaction is covered by the UCC; not particularly

18  earth-shattering or exciting, but it lets you know that the

19  UCC covers the transaction that is not merely a security

20  interest but a sale transaction.  It doesn't change the

21  nature of the transaction.  It just indicates that the UCC

22  covers it and that's at Section 9109.

23          Those sales, again, of a payment intangible or a

24  note, are perfected automatically with no need of a UCC

25  financial statement.  That is at UCC 9308.  Here, UCC

1  financing statements were filed, Your Honor, but they were

2  filed protectively as is often the case in these

3  transactions, but they were also filed for another important

4  reason, which is that the participation agreement has a very

5  broad brand of a security interest, Section 802 of the

6  participation agreement.

7         And so the UCC was appropriate to pick up other

8  assets in which we might claim a separate security interest.

9  Those assets are not the subject of this motion, Your Honor,

10  which deals only with our participation rights.  This is

11  simply not a case of a late UCC or preference challenges or

12  anything of the like.  And I think the Trustee has really

13  missed the legal argument here altogether.

14         In fact, the Trustee focuses almost the entirety

15  of his legal argument on the requirements for establishing a

16  constructive trust.  But not one of the cases cited by the

17  Trustee deals with participation interest.  And I think

18  that's probably not surprising because where you have a true

19  participation interest, as we do here, there's no need to

20  establish a constructive trust.  The legal framework is such

21  that that property is not property of the estate.  And the

22  constructive trust can be used, as we asked the Court to do,

23  to protect that property interest.  But it is not something

24  that needs to be separately established in the way that some

25  of the cases cited by the Trustee required.

1          And this is exactly what the Court did in the

2    Columbia Pacific case that I referenced above.  And I think

3    it's worth noting, Your Honor, that part of the reason we

4    sought this particular remedy is because right now, putting

5    aside any cash proceeds that may be held by the Trustee, and,

6    again, we don't have any information to determine that, but

7    hopefully we'll get that.

8               THE COURT:  Right.

9          MS. ATTANASIO:  As to the loans themselves, Your

10   Honor, we hold an undivided ownership interest in a portion

11   of those loans.  Until they are sold, we can't break that

12   apart and somehow get our own property.  And, therefore, our

13   suggestion, Your Honor, was simply that upon a determination

14   that that participation is not property of the estate.

15         The loan, or at least our portion of it, would

16   continue to be held by the Trustee, but in trust for us until

17   such time as its sold.  Again, Your Honor, the timing is

18   particularly relevant, because these loans are going to be

19   sold, at which point there will be proceeds, which can be

20   allocated by reference to our participation interest, at

21   which point a constructive trust is, of course, no longer

22   necessary.

23              THE COURT:  Right.

24         MS. ATTANASIO:  The remainder of the Trustee's

25   arguments, Your Honor, are even further afield, I would say,

1  then the flawed UCC argument.  Some of the issues that are

2  raised in the objection are, for example, that an

3  intercreditor agreement --

4           THE COURT:  Right --

5           MS. ATTANASIO:  -- may have some impact on this

6  dispute.

7           In the first instance, Your Honor, that's a third

8  party agreement that deals with rights as between -- frankly,

9  it's not even Loan LP, but it deals with entities, not the

10  Debtors is the easiest way to put it.  The Trustee then, I

11  think, incorrectly cites the intercreditor agreement, which I

12  don't think has any bearing on this dispute, and doesn't even

13  attach it.

14           I don't think it's in any way relevant to the

15  relationship as between Loan LP and the Debtor, now the

16  Trustee.  And it was for that reason, obviously, that we

17  certainly didn't raise it, and I assume the reason the

18  Trustee didn't include it.

19           The Trustee also makes reference to participation

20  confirmations.

21           THE COURT:  Yes.

22           MS. ATTANASIO:  And --

23           THE COURT:  Which you've attached to your reply.

24           MS. ATTANASIO:  And, in fact, Your Honor, the

25  original confirmation agreement was attached to Mr.

1  Harrison's original declaration.

2          THE COURT:  Yes.

3          MS. ATTANASIO:  We have provided additional

4  information that shows the confirmations as they relate to

5  all five loans.  Now as it happens, three of the loans were

6  part of the original confirmation anyway.  But to be

7  complete, we've attached the additional data.

8          But, again, Your Honor, I think the question

9  before the Court is the more narrow one, which is whether

10  these are, in fact, participations, and we believe it's quite

11  clear that they are.

12          As to whether sort of the implied threats of

13  investigations or claims, maybe that has to do with the

14  original redemption of certain interests that was made back

15  in December, Your Honor, the Trustee will do whatever

16  investigations it needs to do.  And, frankly, to the extent

17  there were improper redemptions in December, I suspect Loan

18  LP was harmed by any money that went out just as much as any

19  other party might have been, at least as to our claims

20  outside of these participations.

21          But, again, I don't think any of that has any

22  bearing on the narrow legal issue here, which is the question

23  of the scope of property of the estate.  And on that, Your

24  Honor, I think the statutory framework and the case law we

25  have cited is absolutely clear that Loan LP has an ownership

1  interest in its participation that is outside the scope of

2  property of the estate.  We also believe that any proceeds of

3  those loans against the extent they are sold or to the extent

4  we can trace proceeds of prior loans are similarly not

5  property of the estate.  And we would ask that the Court

6  enter an order on that legal issue.

7         I will note, Your Honor, in connection in

8  particular with the two loans sold prepetition, but, more

9  broadly, we have also asked in our motion to get an order

10  requiring that some information be provided.  We have worked

11  long and hard with Mr. Gellert and have really hit on --

12         THE COURT:  Can he provide the information?  Is it

13  there for him to provide?

14         MS. ATTANASIO:  The answer is I'm not sure, Your

15  Honor.  Certainly, there's some information he does not

16  currently have.  I believe that and understand that.  I don't

17  know the full scope of what the Trustee has or what the

18  Trustee has obtained from the Debtor, has obtained from

19  LenderLive, could obtain from those parties.  I don't know.

20         What we have proposed, Your Honor, is a very

21  specific list of information we are interested in that was

22  attached to our reply.

23         THE COURT:  Right.

24         MS. ATTANASIO:  We have also proposed that

25  information -- that the order provide only that that

1  information be turned over to us as and when the Trustee

2  receives it.  Obviously, the Trustee can't provide us with

3  what it doesn't have.  But I think in light of the more

4  narrow focus, it is certainly absolutely within the Trustee's

5  power to cooperate in these regards.  And it's very important

6  for us to be able to try and find the proceeds of our

7  property that were diverted pre-bankruptcy.

8           THE COURT:  Yes.

9           MS. ATTANASIO:  Similarly, Your Honor, we narrowed

10 the list of information that we were hoping to obtain from

11 TCB, again, by reference to a schedule.  We've had some

12 conversations, including this morning, with TCB's counsel.

13 And what we, obviously, I'll let him speak to this.  But I

14 think what we are able to do in terms of the form of any

15 order the Court is willing to enter is make very clear that

16 the loan subject to the order are identified so that it is

17 clear they are not the loans in which his client has an

18 interest, which is absolutely the intent here.

19          THE COURT:  The warehouse loans, if you will.

20          MS. ATTANASIO:  That's correct.

21          THE COURT:  Yes.

22          MS. ATTANASIO:  And, further, to make clear that

23 we are only seeking the limited information on the schedule

24 we attached.  And that while I understand that counsel and

25 TCB may be generally supportive of working with us in that

1  regard, I think it would be subject to two things.

2          One making sure that the Debtor would not stand in

3  the way of them providing Debtor information.  I assume we

4  can work that out with the Debtor today.  But also making

5  sure that once they've pulled this information, they may need

6  to deal with us on perhaps issues of confidentiality or the

7  like.  And we're happy to work with them on that.  And we

8  would just propose, Your Honor, that if an issue does come

9  up, we would come back to the Court.

10          THE COURT:  Sure.

11          MS. ATTANASIO:  Your Honor, I think that's the

12  substance of my presentation.  At this point in time, we

13  would like to move Mr. Harrison's declaration into evidence.

14          THE COURT:  And Mr. Harrison is in the Courtroom?

15          MS. ATTANASIO:  He is, Your Honor.

16          THE COURT:  Available to testify, if necessary?

17          MS. ATTANASIO:  He is.

18          THE COURT:  Does anyone object to the introduction

19  into evidence of Mr. Harrison's declaration?

20      (No verbal response)

21          THE COURT:  Hearing no one, it is admitted as --

22          MS. ATTANASIO:  Thank you, Your Honor.

23          THE COURT:   We'll call that Loan LP 1.

24      (Loan LP Number 1, Declaration of Peter Harrison,

25  admitted)

1           MS. ATTANASIO:  Perfect.

2           And then, Your Honor, obviously, if you have any

3  questions I'm happy to answer them now and, obviously,

4  reserve the right to return to the podium if Mr. Gellert says

5  anything I need to address.

6           THE COURT:  All right. Very well.  Thank you, Ms.

7  Attanasio.

8           MS. ATTANASIO:  Thank you.

9           THE COURT:  Thank you.

10           Mr. Gellert, it's your turn.

11           MR. GELLERT:  Thank you, Your Honor.

12           I think I'm not too particularly concerned about

13  the procedural concerns.  I do note it's kind of interesting

14  Exhibit M of their brief attaches a letter in which they

15  state that they're going to file a complaint to the

16  determination of this relief.  So it's a little disingenuous

17  to say everybody knew it was going to be a motion.  Even they

18  know it was supposed to be a complaint.  And they, In fact,

19  in their May 20th letter to me stated that, so I'll let that

20  be what it is.

21           But, Your Honor, this really revolves around a

22  situation of what facts are out there are known and not

23  known.  And I don't mean to muddy the waters, because,

24  obviously, we want to get to some resolution here.  But I

25  wanted to call the Court's attention to December 9th of 2015,

1   which was a big day at W.J. Bradley.

2           As we've already referenced to Your Honor and is

3   the subject of an investigation by the special litigation

4   counsel to the Trustee, there was a stop redemption

5   transaction on December 9th, 2015 of no less than $16 million

6   dollars provided back to one of the largest shareholders and

7   directors of the company.

8           On the same day, that's when the participation

9   agreement between the Debtors and WJB Loan was entered.  On

10  the same day as the intercreditor agreement between WJB

11  Loan's affiliate or parent, EF Holdings, who is the Debtors'

12  secured creditor.  There could be other transactions that

13  day.  These are things that we're still working through.

14          So a lot of this case is going to concern those

15  transactions.  But what's most important to recognize from

16  this is that from those transactions on that day about, more

17  than four million dollars of the money that was provided by

18  WJB Loan, possibly as part of the participation agreement or

19  what have you, went to fund the redemption of the stock.

20          So when we look at -- later when we get, just a

21  bit later when we get into this true participation, and I

22  think that's an important factor.  One that I don't know that

23  we fully know all the facts about, but certainly it's a very

24  interesting situation.

25          So this money goes to --

1          THE COURT:  Let's assume you find some wrongdoing

2    here in that redemption.

3          MR. GELLERT:  Sure.

4          THE COURT:  And wouldn't you have a remedy at that

5    time?

6          MR. GELLERT:  Well if they've taken the money of

7    the loan --

8          THE COURT:  Right --

9          MR. GELLERT:  After we sell them, then it's going

10   to be hard to go back and claw that back.  But more

11   importantly, I think, Your Honor, I think that this

12   demonstrates that they don't have a true participation.

13          And why I say that and we look at what true

14   participation was -- well let me go back to a little bit more

15   of the facts, if I may, just to set this up.

16          THE COURT:  Sure.

17          MR. GELLERT:  But it's interesting that of the

18   loans that were noted, the loans held for cash, the five

19   loans, none of the loans are actually -- they were all

20   originated well before this transaction happened.

21          Now W.J. Bradley, not necessarily in the business

22   of buying originated loans.  It originates its own loans.  So

23   let's keep that backdrop.  Of the loans, November 4th --

24   these were originated November 4th, 2015, October 22, 2015.

25   January 8th, 2015, almost a year before this transaction, and

1  June 28th, 2013, and as far as loan ends in 0160, we don't

2  even have that information when it was originated.  But all

3  of these loans were originated well, well, well before this

4  transaction was entered into.

5          Now I know Mr. Corrine is investigating the stock

6  redemption and investigating what role WJB Loan or MIMS had

7  in it.  So we'll probably learn more.  But as we're starting

8  to get more information on this, we're starting to see that

9  there actually is some potential relationship.

10          And now let me get into what the issue is with the

11  true participation and whether -- why we think it's probably

12  not a true participation.

13          As was mentioned by counsel the standard prong

14  one, money was advanced to a lead lender.  Now money is

15  advanced to a lead lender.  That's a curious word to word

16  advanced because, obviously, to our that could have been

17  provided, given, handed, whatever loan.  Advance is a word

18  that we think was meant to provide money to the lead lender

19  to go purchase loans, go originate loans of which they could

20  be a participant.

21          So at the very least, we think that there's a very

22  strong indication that this, in fact, was not an advancement

23  of funds to originate loans, but that -- and I'll get to the

24  sophisticated transaction that appears to have happened here.

25  And, Your Honor, what we believe at this point was that W.J.

1  Loan or MIMS was part of this overall stock repurchased

2  transaction where they provide money to the Debtor for the

3  stock purchase transaction.  In return, in exchange, the

4  collateral return for that loan was this participation.

5          So it's not really a true participation.  It's

6  actually a loan that's collateralized by an interest in these

7  loans held for cash.

8          THE COURT:  But the participation agreement

9  doesn't say that at all.

10         MR. GELLERT:  Well, of course, because why did it

11 happen.  If you said -- if you write in a document the sky is

12 blue and it's not, does that make the sky, you know, blue.

13 No.  Of course not.

14         But the transactions if you look at how they set

15 up, they set up all in the same day.  The money comes in.

16 The money goes to the stock redemption.  They get this

17 collateral based on this participation agreement.  And why is

18 it in the function of a participation agreement?  Because

19 they're able to then take it outside of EF Holding's

20 interest, then take it outside of the estate and the

21 bankruptcy, which they know the possibility could be coming.

22         So the only way they're going to provide that

23 money is not in a subordinated position, but a position where

24 they can probably take a priority interest in it.  So at the

25 very least, and maybe we're barking up the wrong tree, but,

1   Your Honor, this is why we have hired this person.  And this

2   is why we're investigating the transaction.  It's very

3   curious if all of these transactions happen on the same exact

4   day and that they get these rights in already previously

5   originated, previously owned loans.  Participation is in

6   loans to go and buy or originate new loans, not previously

7   existing ones.

8           So we're not really sure if they even make prong

9   one.  And, of course, prong four, Your Honor, you want to

10  look at intentions.  What is the intention of the

11  transaction.  Just because it says, oh well it's a

12  participation agreement.  I'm not sure if that really should

13  carry the day.  If we really look at the true intentions

14  behind the transaction, it may very well reveal that this

15  transaction was a way to collateralize a loan provided to

16  W.J. Bradley on the stock redemption.

17          So I don't think it's -- unfortunately, it's not

18  as cut and dry as to whether this is a true participation.

19  We think that this is disguise financing, or it could be.

20  And it's sophisticated, and it's clever.  But I don't think

21  it gets around the fact that all these things happened the

22  same day and it's a disguise financing.

23          Your Honor, we got into the issue of whether this

24  was secured or not only because it seemed to be a sort of a

25  fallback position, I guess.  Well if it's not a participation

1  agreement then we're secured.  And that's why we mentioned

2  that it's not secured.  But the reality is the self-

3  effectuating UCC sections that are mentioned are mentioned --

4  yes, they're secured in the participation that they

5  themselves invested in, not the loan itself that they're

6  seeking to have the proceeds held in constructive trust. So I

7  think there's a distinction there.

8              They have a security interest in the

9  participation, but not the underlying loan.  They can't in a

10  true participation agreement, they can't have direct interest

11  in loan.  They can only have interest in the participation.

12  So I don't know that that self-effectuating security interest

13  under the UCC sections that were quoted actually applies

14  here.

15              THE COURT:  Do you have any authority to indicate?

16  I didn't see any in these papers.

17              MR. GELLERT:  Not at the moment, no.

18              Your Honor, this is sort of, from our perspective,

19  there's been kind of a very fluid as information comes in.

20  Your Honor, I have information demonstrating that they or

21  that the loans were originated, if that's helpful.  I present

22  that as a demonstrative aide.  I don't have someone to verify

23  that because I'd have to have subpoenaed someone to come for

24  that purpose because, obviously, the Trustee himself can't

25  subpoena, I can't verify that.

1          THE COURT:  Right.

2          MR. GELLERT:  But if it's helpful to the Court, I

3    can demonstrate documents that we've recovered that

4    demonstrate that the origination date well proceeded the date

5    of the December 9th transaction when the participation was

6    entered into.

7          Your Honor, in the whole, I think that the point

8    of our argument is that it's a premature request in that

9    there seems to be a number of factors that may very well

10   indicate that their participation interest is not, in fact,

11   true to disguise financing and then not even perfect it.

12   And, therefore, we think that this -- the imposition of a

13   constructive trust before those things are fully vetted is

14   premature.

15         Your Honor, our motion to sell the loans

16   specifically states that the Trustee intends to hold the

17   assets of the proceeds thereof until final determination of

18   the respective rights.  That's something I think that Your

19   Honor knows the Chapter 7 Trustee takes very seriously.  And

20   there's no risk that he's going to dissipate the proceeds or

21   even comingle the proceeds thereof.

22         And I think to the extent that we're talking about

23   prejudice of -- well let's take a step back and evaluate

24   these things and see how this truly plays out.  I don't think

25   this is prejudice because the Trustee has already suggested

1  and noted in that motion that he intends to do it that way

2  and hold those proceeds and protect those proceeds.

3          THE COURT:  How many of these loans are being

4  sold?

5          MR. GELLERT:  We have seven; five of which are

6  subject to this.

7          THE COURT:  All right.

8          MR. GELLERT:  Somebody else might be claiming an

9  interest in one as well.  So, again, that's another one of

10  those situations where we feel it's best to liquidate these

11  things to try and maximize the value now, and then try and

12  figure out where the proceeds should go.

13          THE COURT:  Okay.

14          MR. GELLERT:  But, Your Honor, that's sort of the

15  sum and substance of our argument as to why it's a premature

16  situation and why, in fact, the participation might not be

17  true and, therefore, shouldn't be granted today.

18          THE COURT:  All right.

19          MR. GELLERT:  Thank you.

20          THE COURT:  Thank you, Mr. Gellert.

21          TCB.  Good morning, sir.

22          MR. AUSTRIA:  Good morning, Your Honor.

23          THE COURT:  Yes.

24          MR. AUSTRIA:  Matthew Austria of Werb & Sullivan

25  on behalf of Texas Capital Bank.

1          THE COURT:  Good to see you,  yes.

2          MR. AUSTRIA:  Good to see you, Your Honor.

3          I have my co-counsel here Jason Rodriguez of

4  Higier Allen & Lautin.  With Your Honor's indulgence, I'd

5  like to cede the podium to him.

6          THE COURT:  All right.  No indulgence, it's a

7  pleasure.  Mr. Rodriguez, good morning.

8          MR. RODRIGUEZ:  Again, it's a pleasure being

9  before you.

10          As you're probably aware, TCB filed a fairly

11  limited objection.

12          THE COURT:  Yes.

13          MR. RODRIGUEZ:  Selfishly just to protect its

14  potential rights or interest.  Our issues were basically

15  three.  The first was the scope or the lack of defined scope

16  of what was actually being requested.  Understanding the way

17  it was written, the loans held for cash wasn't particularly

18  identified, although the concept was.  The scope of potential

19  discovery being sought against anybody and also just sort of

20  reserve rights regarding the adversary for a contested

21  matter.

22          I don't know if Your Honor cares one way or the

23  other.  We don't particularly care whether or not this is

24  heard as an adversary contested matter.  We just like to

25  reserve the rights to the extent that we ultimately have to

1  come up with a participation argument to do it in an

2  adversary or contested matter.

3          With regard to the --

4          THE COURT:  And I'll address that, Mr. Rodriguez.

5          MR. RODRIGUEZ:  Okay.

6          THE COURT:  I will, yes.

7          MR. RODRIGUEZ:  And to the more -- the heart of

8  the objection, I've talked to Ms. Attanasio, and I know I've

9  butchered your name.  I'm very sorry.

10          I think we sort of have an agreement to agree as

11 is often the case in discussions just prior to Your Honor

12 coming on the bench.  The scope issue, as I understand it, is

13 being addressed by incorporating the five loans as identified

14 on Exhibit K of the declaration.

15          THE COURT:  Right.

16          MR. RODRIGUEZ:  And that's the limit of the loans

17 that we're talking about with regard to the relief being

18 sought in terms of the declaration rights and the

19 constructive trust request.

20          And in addition, as Ms. Attanasio suggested,

21 perhaps, that we could or, I guess, I suggested to her, and I

22 think she's agreeable to it is that we come at the issue from

23 the opposite direction as well and say not only are these the

24 only loans, but, you know, notwithstanding that none of the

25 loans have anything to do with TCB's participation.  And to

1  sort of bookend the issue such that TCB's interest are

2  totally out and the loans are directly identified.  And in

3  that case, I don't think we really have any interest in those

4  particular loans.

5           THE COURT:  And your interest is in the warehouse

6  loan?

7           MR. RODRIGUEZ: That's exactly right, Your Honor.

8           THE COURT:  Yes.

9           MR. RODRIGUEZ:  And with regard to the request for

10 discovery, the Loan LP's reply included, you know, several

11 line item five, I guess, particular scope or identifiable

12 categories of documents.  TCB is willing to provide, I think,

13 reasonably those documents.

14           We have a couple of problems.  The first is some

15 of them are going to be Debtor documents, which bank secrecy

16 laws prevent us from providing, absent their consent.

17 Obviously, if Debtor -- the Trustee agrees to let us provide

18 those, you know, we don't really care.

19           Some of them potentially could be, and forgive me

20 I just haven't gone through in any great detail because when

21 we got those documents in and my bank rep has been on

22 vacation; some of them potentially could be other account

23 holders.  I just don't know.  Some of them may be

24 confidential information as to the bank.

25           I'm not standing here to try to be roadblock to

 1   the request for discovery of the Debtors' documents.  I just

 2   need the ability to object and come back.  I think Ms.

 3   Attanasio has addressed that and said these are the documents

 4   we want.  If there's any sort of disagreement, we'll just

 5   come back to you.

 6          A point I haven't brought up with Ms. Attanasio I

 7   think is that we'd like a little bit more time just to be

 8   able to work through it.  You know, I've suggested 30 days.

 9   I know they want it as quickly as possible.  It's just a

10   matter of marshalling this stuff and putting it together.

11          So that --

12          THE COURT:  We'll hear what Ms. Attanasio has to

13   say about the timing.

14          MR. RODRIGUEZ:  So to my initial comment, we sort

15   of got an agreement to agree.  Assuming that can all be put

16   into language in a proposed order to the extent Your Honor is

17   willing to grant it, then I think that's going to resolve

18   what our issues are, our limited objection.

19          I suppose if worse comes to worse and we can't

20   come up with the language, we'll have to come back to you,

21   Your Honor.

22          THE COURT:  All right.  All right.  I'll hear what

23   Ms. Attanasio has to say.

24          Why don't you address TCB first.

25          MS. ATTANASIO:  I was going to do just that, Your

1   Honor.

2            THE COURT:  Because it's fresh on our minds.

3            MS. ATTANASIO:  Exactly.

4            And I do think that we have an agreement with

5   counsel that, of course, will need to be reflected in some

6   language.  But we have no problem, as I indicated,

7   identifying the specific loans such that it is clear there,

8   not loans in which TCB has an interest.

9            We are also happy to provide a timeframe by which

10  they can provide those documents to us.  Again, I'm assuming

11  that the Debtor will be cooperative in that regard so that's

12  not a roadblock.

13           And in terms of the timing, I guess I would

14  suggest that to the extent there are any non-objectionable or

15  non-confidential type documents if we could get those in that

16  30-day timeframe.  And then we can work out any issues with

17  the remainder of whether, you know, cooperatively or coming

18  back to the Court thereafter.  But sort of do it on a rolling

19  basis, Your Honor.

20           THE COURT:  Okay.

21           MS. ATTANASIO:  And we're happy to work with them

22  on language for that.

23           THE COURT:  Very well.  I think that will be fine.

24  I think Mr. Rodriguez will be easy to work with.

25           MS. ATTANASIO:  Your Honor, as to the Trustee's

1  presentation.

2             THE COURT:  Yes, yes.

3             MS. ATTANASIO:  Honestly, Your Honor, I'm not sure

4  I heard anything that changes the legal framework that I

5  think is dispositive here.

6             I think the only two of the legal prongs that were

7  addressed were the money advanced prong.

8             THE COURT:  Right.

9             MS. ATTANASIO:  And to be very honest, I'm not

10 surely I followed exactly what the argument was.

11            THE COURT:  Well the loans --

12            MS. ATTANASIO:  Advanced is a term of art.

13            THE COURT:  Right.

14            MS. ATTANASIO:  And it is used, I think, to

15 suggest money being provided to a lead lender in exchange for

16 the sale of a participation interest.  I don't think it's

17 much more complicated than that.

18            THE COURT:  And these can be preexisting loans.

19            MS. ATTANASIO:  Absolutely.

20            THE COURT:  Yeah.

21            MS. ATTANASIO:  They could be funding for new

22 loans in which we would take a participation or they could

23 simply be a way to buy a participation in an existing loan.

24            THE COURT:  Right.

25            MS. ATTANASIO:  Thereby providing funds that the

1  lead lender would then use to originate new loans.  So, you

2  know, I don't think the timing is particularly relevant.

3          The other point, I believe, he referenced is that

4  the fact that the document, I guess, prong four.  The fact

5  that the document is called a participation agreement doesn't

6  mean it is so.  California law would suggest otherwise,

7  absent anything to the contrary, none of which exists in the

8  document or has been identified by Mr. Gellert.  The document

9  is exactly what it says it is.  And with those unambiguous

10 terms, I don't think there's any more that needs to be done.

11          There are two other points I'll mention very

12 briefly, Your Honor.  One is the intercreditor agreement.

13 And I don't know if it would be helpful to have the Court

14 take a look at it.  I have it with me.  There's a particular

15 provision that I think may, you know, help clear away some of

16 the brush in this regard, if that would be useful.

17          THE COURT:  Mr. Gellert, any objection from you?

18          MR. GELLERT:  Yeah, Your Honor, I don't actually

19 have a full copy.

20          MS. ATTANASIO:  I have that to --

21          THE COURT:  I don't have one.

22          MR. GELLERT:  To highlight how much documents the

23 estate does not have, we don't even have a copy ourselves.

24          THE COURT:  Okay.

25          MS. ATTANASIO:  May I approach, Your Honor?

1          THE COURT:  Yes, you may, Ms. Attanasio.  Thank

2    you.

3          MS. ATTANASIO:  And, Judge, I'd like to point you

4    specifically to paragraph 1(a), which begins at the very

5    bottom of paragraph two.

6          THE COURT:  All right.

7          MS. ATTANASIO:  Again, this is a document that is

8    -- the parties are a little bit confusing, but for ease of

9    reference, the senior lenders here are what we've been

10   referring to as EFH.  And the senior lenders acknowledge and

11   agree that notwithstanding any provisions of the senior loan

12   with the Debtor -- okay, again, that would be Mortgage

13   Capital -- the senior lender shall have no security interest

14   in any assets of the SPV.  The SPV are, in fact, the

15   partnership Loan LP here including without the limitation,

16   all participations held by an SPV.

17          This agreement, as Mr. Gellert points out, was

18   done at or about the same time as the participation

19   agreement.  And Ellington was very clear that their deal did

20   not affect the participation that were held by Loan LP.

21          Again, Your Honor, I don't think it could be much

22   more clear that this agreement does not affect in any way,

23   other than, frankly, to support what the parties intended,

24   which was that Ellington would have no interest in properties

25   owned by the SPV.

1          The last point I will make, Your Honor, unless you

2    have any questions is simply to address the investigation

3    point.

4          THE COURT:  And my question would relate to that

5    and the fact that the redemption agreement was the same day

6    as the participation agreement.

7          MS. ATTANASIO:  Again, Your Honor, I think not

8    particularly uncommon where a company may be entering into

9    new transactions and at the same time cleaning up their

10   capital structure, providing funding to equity, whatever they

11   were doing.  Honestly, Your Honor, to the extent that that

12   redemption, and it's a substantial dollar amount --

13          THE COURT:  Yes.

14          MS. ATTANASIO:  -- was improper.  As I mentioned

15   before, we will be more than happy for the Trustee to

16   investigate that transaction and bring money back into the

17   estate.

18          I don't think, however, that simply by saying it

19   Mr. Gellert is able to tie the participation agreement which,

20   by all accounts, was used to purchase interest in loans, all

21   of which were identified in the lengthy schedules both on the

22   closing date and thereafter.

23          I don't think that by saying that somehow that $4

24   million dollars went from WJB Loan to Mortgage Capital, the

25   Debtor, and suddenly out as part of a redemption, I don't

1  think that makes it so.  Among other things, money is

2  fungible.  But the fact of the matter is the only evidence

3  from the participation transaction document itself is that

4  that money was used exactly as it was contemplated for the

5  purchase of ownership interest in mortgage loans.

6          And, Your Honor, I think, again, whatever

7  investigations the Trustee intends to do, I don't think they

8  have anything to do with the narrow legal issue before you.

9          THE COURT:  All right.  Thank you, Ms. Attanasio.

10         MS. ATTANASIO:  Thank you.

11         THE COURT:  Anything further from you, Mr.

12  Gellert?

13         MR. GELLERT:  Your Honor, I just wanted to

14  clarify, I guess, our position on the transaction.

15         THE COURT:  Yes.

16         MR. GELLERT:  In suggesting that's not a true

17  participation, the theory, of course it's only a theory, and

18  the idea that I'm testifying from the podium to suggest

19  otherwise is incorrect.  And, Your Honor, that's why I

20  mentioned twice, at least, that Mr. Corrine was investigating

21  this and this is the prevailing theory.  And I even did

22  acknowledge maybe we're barking up the wrong tree, but this

23  is what it kind of looks like right now.

24         It looks like money came in that day from WJB

25  Loan, money went out the same day on the stock redemption.

1  Then in exchange for receiving additional money into W.J.

2  Bradley, W.J. Bradley gave this participation interest to WJB

3  Loan, which is actually disguised financing.  That's what

4  we're saying, that's how the transaction worked.

5          THE COURT:  And I know you're at a disadvantage,

6  Mr. Gellert, in this case.  Matters are coming before you on

7  a daily basis, but what you've just said is its surmise, is

8  it not?

9          MR. GELLERT:  We can only do that.

10          THE COURT:  Right.

11          MR. GELLERT:  Especially where we're at today.

12  You know, we have someone who has sought for the Debtors'

13  attorneys to hand over their entire file with respect to

14  these transactions, most specifically to these transactions,

15  so that we can fully understand what's going on here.  And so

16  we can only surmise and we can only take a guess.  And we are

17  hamstrung by that, but there's so much coincidence here that

18  it's not so farfetched to think that that's how the

19  transaction was intended to be set up.  And that's what's

20  being investigated and that's what may be our out.

21          And so the question is what happens is if we grant

22  this relief today and what happens if we sell the loans and

23  the proceeds go out before the Trustee is actually able to

24  make a full determination of that, bring the actions that are

25  necessary to bring.  And so that's why we are saying that

1  this might be a premature exercise because we might be

2  chasing money down the road that could have been maintained

3  in the estate all along instead of being distributed upon

4  sale or held in some other way.

5           So that's sort of the trouble that we're having is

6  well, if we don't preserve it now and we let it go upon sale

7  then what good is it bringing an action later on other than

8  just having the right to chase somebody.  And I think that's

9  a prejudice to the estate.  On the other hand, it's not a

10 prejudice to any other party for us to hold proceeds until

11 the determination can be made and that's what why we're

12 suggesting I don't think that there's a prejudice because the

13 Chapter 7 Trustee is going to hold those funds, he's already

14 said he's going to hold those funds, and will hold those

15 funds.

16          THE COURT:   Let me ask you this question.

17          MR. GELLERT:  Sure.

18          THE COURT:  If this is a true participation

19 agreement, is there a basis to your objection?

20          MR. GELLERT:  Well, I guess that predisposes that

21 none of the transactions that we --

22          THE COURT:  Right.

23          MR. GELLERT:  I mean their entitled to their

24 portion and I think that's fine, but, obviously, we're not

25 there yet.  And it might be premature to make that

1  determination that its true participation.  That is sort of

2  what we're concerned about.

3          THE COURT:  Okay.

4          MR. GELLERT:  But I think your right.  I mean, I

5  don't think there's any doubt that 541 says what it says and

6  allows the true participant to obtain those assets outside

7  the estate.  I would certainly recognize that section, but

8  I'm not sure that it's the case here.

9          THE COURT:  All right.  Thank you, Mr. Gellert.

10         Well, you know, I recognize that the Chapter 7

11  Trustee is performing an investigation, has questions about

12  the nature of the participation agreement and whether it's

13  really a loan agreement and the mortgages are collateral for

14  the loan, but I've got to deal with this today.  And I have a

15  motion that's been well presented and well prepared.  So I'm

16  going to proceed to decide this today.

17         First thing I want to do is just address whether

18  this should be proceeding by a contested matter, the motion,

19  or an adversary proceeding.  And I understand the Trustee's

20  position here as presented in the Trustee's papers.  And it's

21  true that Federal Rule of Bankruptcy Procedures 7001(1)

22  provides that adversary proceedings are to recover money or

23  property.  Federal Rule of Bankruptcy Procedure 7001(2) is to

24  determine the validity, priority or extent of a lien.  And

25  even Federal Rule of Bankruptcy Procedure 7001(9) is to

1  obtain a declaratory judgment.

2         And the Court did tell Loan LP to file a motion,

3  which it did.  But in Tully Construction Company vs.

4  Canonsburg Environmental Associates, Ltd., a decision of the

5  Sixth Circuit Court of Appeals in 1996, the Sixth Circuit

6  found that it was harmless error that the Bankruptcy Court

7  permitted the matter to proceed by motion rather than

8  adversary proceeding; and that's the case here.

9         Loan LP had discovery available to it if it wished

10 -- not Loan LP, I'm sorry.  The Trustee could have taken

11 discovery and surely the Court would have given the Trustee

12 time to take that discovery.  And the Trustee could have

13 spoken up and told the Court that this should be by adversary

14 proceeding rather than by motion.  When I mention motion, and

15 I'm not making a big deal about that, but we're now two

16 months down the road here, even three months from when I used

17 the reference to motion.  And I'm going to decide this on the

18 motion rather than require that an adversary proceeding be

19 filed, which would just, I think, unfairly create delay to

20 Loan LP.

21        The issues before the Court on their face appear

22 very complex and fact intensive, but the issues are not

23 really that complicated and the Court can dispose of the

24 motion of Loan LP now by granting it relief against W.J.

25 Bradley Mortgage Capital, LLC which I'll refer to as W.J.

1  Mortgage.

2          And let me just begin my discussion this way, you

3  know.  We have Section 541(d), and I've got to go to my iPad

4  here for some notes, and I've got to find them.  The motion

5  involves a participation agreement between Loan LP and WJB

6  Mortgage dated December 9th, 2015 whereby Loan LP purchased

7  WJB's mortgage loan interests.

8          Through the participation agreement, Loan LP was

9  entitled to principal recovery and payments of interests on a

10  monthly basis.  Further, the participation agreement provided

11  that if WJB Mortgage sold or transferred qualifying mortgage

12  loans, subject to participation, under the participation

13  agreement, WJB Mortgage was required to repurchase

14  participation from Loan LP at the repurchase price defined in

15  the participation agreement.

16          On February 26th, 2016 WJB Mortgage was provided

17  with notice of an event of default for failure to purchase

18  additional qualifying mortgage loans or to deposit the

19  repurchase prices for loans sold as of March 11th, 2016.  WJB

20  Mortgage was provided with an additional notice of default on

21  March 11th, 2016 and Loan LP terminated WJB Mortgage's rights

22  under the participation agreement on March 17th, 2016.

23          The Court does find here that Loan LP's

24  participations are true participations governed by the

25  participation agreement and, therefore, are not property of

1   WJB Mortgage's estate.  In a true participation agreement

2   money is advanced by a participant to a lead lender; that we

3   have here.  The participant's right to prepayment arises when

4   the lead lender is paid; also we have that.  Only the lead

5   lender can seek legal recourse against the borrower and the

6   document is evidenced of the party's true intentions.

7          Those factors are found in Bayer Corp. vs.

8   Mascotech, Inc., the In Re AutoStyle Plastics bankruptcy at

9   269 F.3d. 726 at pages 736 to 737; a decision by the Sixth

10  Circuit in 2001 citing In Re Coronet Capco, a decision by the

11  Southern District of New York Bankruptcy Court, B.R. 78 at

12  page 82.  Each of these prerequisites is clearly in place

13  here.

14         Next, Section 541(d) of the Bankruptcy Code

15  provides that, and I have to go back to my notes, that where

16  a Debtor holds property for another party with at least a

17  portion of the equitable interest in the property, the

18  portion in which the non-Debtor has the equitable interest is

19  not property of the estate and that can be found at in

20  Medallion Bank vs. Oak Rock Financial, LLC out of the In Re

21  Oak Rock Financial bankruptcy, a decision by the Bankruptcy

22  Court for the Eastern District of New York in 2014.

23         Its reference is 2014 Westlaw 11070995.  It was

24  reverse remanded on other grounds not applicable here.  And

25  the Court found that under Section 541(d) participated in

1  loans were not property of the estate.

2         Here, the Court finds that WJB Mortgage's interest

3  in what we are calling, I guess it's the sold loans, is that

4  right, Ms. Attanasio?  Is that the five that you're referring

5  to?

6         MS. ATTANASIO:  Those are unsold.

7         THE COURT:  The unsold.  Okay.  The unsold loans

8  held for cash.

9         MS. ATTANASIO:  Correct.

10         THE COURT:  And the proceeds of the unsold loans

11  held for cash and of the sold loans held for cash as well.

12  Those are the two, is that right?

13         MS. ATTANASIO:  Those are the two that we referred

14  to, Your Honor, yes.

15         THE COURT:  Yes.  Right.  Are limited to the

16  portions of the loans held for cash outside Loan LP's

17  participation.  Further, the Court is going to impose a

18  constructive trust on the unsold loans held for cash,

19  proceeds of the unsold loans held for cash, and the proceeds

20  of the sold loans held for cash to the extent of Loan LP's

21  participation.

22         And for that proposition, I cite to In Re Drexel

23  Burnham Lambert Group, Inc., a decision of the Southern

24  District of New York Bankruptcy Court in 1990, 113 B.R. 830

25  at page 844.  I think that a constructive trust is

1  appropriate here to protect Loan LP's interest, participation

2  interest.

3          And, finally, WJB Mortgage will be ordered to pay

4  proceeds on account of any loans held for cash to Loan LP to

5  the extent of Loan LP's participation interests; that's on an

6  ongoing basis.  And I will enter an appropriate order

7  reflecting those rulings.

8          Mr. Gellert, did you wish to be heard?

9          MR. GELLERT:  Yes, Your Honor, if I may.

10          THE COURT:  Yes, please.

11          MR. GELLERT:  Your Honor, with respect to the

12  order, I don't know if you were going to use the order that

13  was provided, but I just had a couple concerns that the order

14  as it is drafted and maybe we can just address that.

15          THE COURT:  Ms. Attanasio, were you going to

16  present a different form of order?

17          MS. ATTANASIO:  I think we'll need to do that,

18  Your Honor, given the other discussions I've had.

19          THE COURT:  Right.  Okay.

20          MS. ATTANASIO:  And so we are happy to work with

21  both Mr. Gellert and Mr. Rodriguez to do that.

22          THE COURT:  All right.  That's fine.  Thank you.

23          MR. GELLERT:  Thank you, Your Honor.

24          THE COURT:  All right.  Does anyone else have

25  anything further to say?  All right.

1          Well, with that I thank you all for a good motion

2    and a good argument.  And I wish you a safe travel.  And

3    we'll stand in recess.

4          ALL:  Thank you, Your Honor.

5          THE COURT:  Good afternoon, everyone.

6      (Court Adjourned)

7

8

9

10                        CERTIFICATE

11   We certify that the foregoing is a correct transcript from

12   the electronic sound recording of the proceedings in the

13   above-entitled matter.

14
     /s/Mary Zajaczkowski                    September 8, 2016
15   Mary Zajaczkowski, CET**D-531

16

17

18

19

20

21

22

23

24

25