**<u>EXHIBIT A</u>**
**Partnership Agreement**

**THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE FEDERAL OR STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE LIMITED PARTNERSHIP INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.**

---

**SECOND AMENDED AND RESTATED**

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**WJB LOAN LP**

**December 9, 2015**

---

TABLE OF CONTENTS

**ARTICLE I GENERAL PROVISIONS** ...............................................................**2**

    Section 1.01   Formation; Continuation..............................................2
    Section 1.02   Name............................................................................2
    Section 1.03   Purpose.........................................................................2
    Section 1.04   Place of Business; Registered Office and Agent for Service of Process ..........................................................................2
    Section 1.05   Liability of Partners ....................................................2
    Section 1.06   Fiscal Year and Fiscal Periods...................................3
    Section 1.07   Series of Interests ......................................................3

**ARTICLE II DEFINITIONS**..........................................................................**3**

**ARTICLE III COMPOSITION, ADMISSIONS AND ALLOCATIONS**.............**7**

    Section 3.01   Contributions of the General Partner .........................7
    Section 3.02   Admission of Additional or Substitute General Partners............8
    Section 3.03   Contributions of the Limited Partner .........................8
    Section 3.04   Admission of the Limited Partner...............................9
    Section 3.05   Capital Accounts; Allocations ..................................10
    Section 3.06   Valuation...................................................................10
    Section 3.07   Liabilities .................................................................10

**ARTICLE IV MANAGEMENT OF PARTNERSHIP** .................................**11**

    Section 4.01   Actions of the General Partner..................................11
    Section 4.02   Powers of the General Partner ..................................11
    Section 4.03   Activities of the General Partner and Affiliates........12
    Section 4.04   Restrictions on the Limited Partner ..........................12
    Section 4.05   Expenses of the Partnership......................................12
    Section 4.06   Management Fee ........................................................13
    Section 4.07   Representations and Warranties of the General Partner ............13
    Section 4.08   Affirmative Covenants of the General Partner .........15
    Section 4.09   Negative Covenants of the General Partner...............18
    Section 4.10   Indemnification by the General Partner.....................19
    Section 4.11   Collateral Oversight .................................................20

**ARTICLE V DISTRIBUTIONS**....................................................................**20**

    Section 5.01   Distribution Policy....................................................20
    Section 5.02   Distributions in Cash.................................................21
    Section 5.03   Withholding Taxes; Reimbursement for Payments on Behalf of a Partner ....................................................................21

**ARTICLE VI TERM AND DISSOLUTION OF THE PARTNERSHIP**...............................22

    Section 6.01   Term of Partnership ........................................................22
    Section 6.02   Early Dissolution of the Partnership ...............................22
    Section 6.03   Removal of the General Partner .......................................24
    Section 6.04   Procedure on Winding Up ...............................................24
    Section 6.05   No Restoration of Deficit Capital Account Balances ................25

**ARTICLE VII PAYMENTS TO AND BY A PERSON WHO HAS CEASED TO BE A PARTNER**...............................26

    Section 7.01   Payments on Death, Bankruptcy or Incompetency of any Partner or Removal of the General Partner ................................................26

**ARTICLE VIII TRANSFERABILITY OF INTERESTS OF LIMITED PARTNERS**...............................26

    Section 8.01   Transfers of LP Interests. ...............................................26

**ARTICLE IX BOOKS, RECORDS AND REPORTS**...............................27

    Section 9.01   Maintaining Books of Account ........................................27
    Section 9.02   Books .............................................................................27
    Section 9.03   Custody of Partnership Assets ........................................27
    Section 9.04   Reports .........................................................................27

**ARTICLE X TAX MATTERS**...............................28

    Section 10.01  Tax Capital Account Allocations; Tax Allocations ................28
    Section 10.02  Tax Matters Partner.......................................................30
    Section 10.03  Tax Elections ...............................................................31
    Section 10.04  Code §83 Safe Harbor Election ......................................31
    Section 10.05  Tax Returns ..................................................................31

**ARTICLE XI MISCELLANEOUS PROVISIONS**...............................32

    Section 11.01  Amendment of Agreement.............................................32
    Section 11.02  Confidentiality ..............................................................32
    Section 11.03  Partner Representations and Warranties .........................32
    Section 11.04  Notices and Consents....................................................32
    Section 11.05  Power of Attorney .........................................................33
    Section 11.06  Binding Effect of Agreement..........................................33
    Section 11.07  Severability of Provisions ..............................................33
    Section 11.08  Effective Date ...............................................................33
    Section 11.09  Assignment by General Partner .....................................33
    Section 11.10  Interpretation................................................................33
    Section 11.11  Applicable Law..............................................................33
    Section 11.12  Counterparts.................................................................33

## SECOND AMENDED AND RESTATED
## LIMITED PARTNERSHIP AGREEMENT
## OF
## WJB LOAN LP

This SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF WJB LOAN LP (the "Agreement"), dated as of December 9, 2015 (the "Effective Date"), is made and entered into by and among WJB GENERAL PARTNER, LLC, a Delaware limited liability company, as the general partner (the "General Partner"), W.J. BRADLEY COMPANY MERCHANT PARTNERS, LLC, as the initial limited partner (the "Withdrawing Limited Partner"), and MIMS MASTER FUND, L.P., a Delaware limited partnership, as a limited partner (together with it successors and assigns, the "Limited Partner"). The General Partner and the Limited Partner are collectively referred to herein as the "Partners."

WHEREAS, pursuant to (a) the filing of the Certificate of Limited Partnership on November 5, 2015 with the Secretary of State of Delaware (the "Certificate"), and (b) the provisions of the Delaware Revised Uniform Limited Partnership Act (as amended from time to time, the "Partnership Act"), WJB LOAN LP, a Delaware limited partnership (the "Partnership") was formed as a limited partnership under the laws of the State of Delaware;

WHEREAS, the Partnership was originally governed pursuant to that certain Limited Partnership Agreement of WJB LOAN LPA, dated as of November 6, 2015, by and between W.J. Bradley Mortgage Capital, LLC and the Withdrawing Limited Partner (the "Original Agreement");

WHEREAS, on November 30, 2015, W.J. Bradley Mortgage Capital, LLC assigned all of its partnership interest in the Partnership to the General Partner and withdrew from the Partnership;

WHEREAS, the Original Agreement was amended and restated in its entirety pursuant to that certain Amended and Restated Limited Partnership Agreement of WJB LOAN LPA, dated as of November 30, 2015, by and between the General Partner and the Withdrawing Limited Partner (the "Amended Agreement");

WHEREAS, the Withdrawing Limited Partner wishes to withdraw from the Partnership, the General Partner wishes to consent to such withdrawal, and the General Partner and the Limited Partner desire to amend and restate the Amended Agreement in its entirety and set forth certain rights and obligations relating to their respective partnership interests in the Partnership; and

WHEREAS, this Agreement amends and restates the Amended Agreement in its entirety and supersedes the Amended Agreement with effect from the date hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

## ARTICLE I

## GENERAL PROVISIONS

Section 1.01   Formation; Continuation.  The Partnership has been formed as a limited partnership pursuant to and in accordance with the Partnership Act and the rights and liabilities of the Partners shall be as provided in the Partnership Act except as herein otherwise expressly provided.  The General Partner has caused to be filed the Certificate with the Secretary of State of the State of Delaware in accordance with the terms of the Partnership Act.  The term of the Partnership commenced upon the filing of the Certificate with the Secretary of State of the State of Delaware (the date of such filing is referred to herein as the date of "formation" of the Partnership) and shall continue until dissolution of the Partnership in accordance with the provisions of Article VI hereof.  The General Partner shall execute and file any amendments to the Certificate as may be required by the Partnership Act and any other instruments, documents or certificates that, in the opinion of the General Partner, may from time to time be required by the laws of the State of Delaware or any other jurisdiction in which the Partnership determines to do business or that the General Partner may deem necessary or appropriate to effectuate, implement and continue the valid existence and business of the Partnership.

Section 1.02   Name.  The name of the Partnership shall be "WJB LOAN LP."  The General Partner may change the Partnership's name only with the Limited Partner's prior written consent.

Section 1.03   Purpose.  The Partnership is organized for the principal purposes of (a) investing in Investments, (b) managing and supervising such Investments, and (c) engaging in such other activities incidental or ancillary thereto as the General Partner deems necessary or appropriate and to which the Limited Partner has consented in writing.  The Partnership may invest assets directly only and cannot invest through any other vehicle for any reason without the prior written consent of the Limited Partner.

Section 1.04   Place of Business; Registered Office and Agent for Service of Process. The General Partner shall maintain a principal office at 6465 Greenwood Plaza Blvd., 5th Floor, Centennial, CO 80111, or at such other place or places as the General Partner may from time to time designate, and the registered office of the Partnership in the State of Delaware shall be located at Vcorp Services, LLC, 1811 Silverside Road, Wilmington, Delaware 19810.  The registered agent of the Partnership for service of process at such office shall be Vcorp Services, LLC, and the registered office of the Partnership in the State of Delaware shall be located at 1811 Silverside Road, Wilmington, Delaware 19810.

Section 1.05   Liability of Partners.  The Limited Partner shall not be liable for any debts, liabilities, contracts or obligations of, and shall have no obligation to contribute capital to, the Partnership in excess of the Limited Partner's Commitment.  Each limited partnership interest in the Partnership (an "Interest"), when purchased by the Limited Partner in accordance with the terms of this Agreement, shall be fully paid and non-assessable.  Except to the extent required by

this Agreement or the Partnership Act or other applicable law or ruling or as expressly provided herein, the Limited Partner shall not have any obligation to eliminate any deficit balance from any Capital Account.

Section 1.06   <u>Fiscal Year and Fiscal Periods</u>.  The fiscal year of the Partnership ("<u>Fiscal Year</u>") shall end on December 31 of each year.   A fiscal period ("<u>Fiscal Period</u>") shall commence on (i) the first day of each calendar month; (ii) on the date of any Capital Contribution; and (iii) on each other day as determined by the General Partner in its sole discretion.

Section 1.07   <u>Series of Interests</u>.  The Partnership may issue Interests in one or more series ("<u>Series</u>") from time to time.  Such Series may be issued with differing economic, liquidity or other terms, <u>provided</u> that the establishment of such Series will not occur without the consent of the existing Limited Partner.

## ARTICLE II

## DEFINITIONS

"**1940 Act**" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"**Agreement**" has the meaning assigned to such term in the Preamble.

"**Approved Counterparty**" means (a) Parent, (b) each counterparty selected by the General Partner with the written consent of the Limited Partner or (c) each warehouse lender either existing as of the Effective Date or which the General Partner and/or the Partnership enter into a warehouse credit facility with after the Effective Date with the written consent of the Limited Partner.

"**Assets**" means the assets held by the Partnership, including cash, accrued interest and the market value of all Investments.

"**Base Rate**" means, on any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"**Borrower NPPI**" has the meaning assigned to such term in Section 11.02 of this Agreement.

"**Business Day**" means, any day other than (i) a Saturday or a Sunday, or (ii) a legal holiday in the State of New York or the State of California, or (iii) a day on which banks in the State of New York or the State of California are authorized or obligated by law or executive order to be closed.

"**Capital Account**" has the meaning assigned to such term in Section 3.05 of this Agreement.

"**Capital Contribution**" means, with respect to any Partner, the amount of cash or property, including Investments, contributed by such Partner to the Partnership, net of any liabilities assumed by the Partnership from such Partner in connection with such contribution, all in accordance with Section 3.03 and Section 3.06 of this Agreement.

"**Cause Event**" means an event set forth in Section 6.02(a) or Section 6.02(b) of this Agreement.

"**Certificate**" means the Certificate of Limited Partnership establishing the Partnership as a limited partnership in the State of Delaware.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commitment**" means, with respect to each Partner, the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Partner, as specified on Schedule A, as Schedule A may be modified from time to time pursuant to the terms of this Agreement.

"**Discretionary Contribution**" has the meaning assigned to such term in Section 3.03(b).

"**Distribution Date**" has the meaning assigned to such term in Section 5.01(c).

"**Effective Date**" has the meaning assigned to such term in the Preamble.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Fiscal Period**" has the meaning assigned to such term in Section 1.06 of this Agreement.

"**Fiscal Year**" has the meaning assigned to such term in Section 1.06 of this Agreement.

"**GAAP**" means generally accepted accounting principles in effect from time to time in the United States of America and applied on a consistent basis.

"**General Partner**" has the meaning assigned to such term in the Preamble.

"**General Partner Commitment**" has the meaning assigned to such term in Section 3.01 of this Agreement.

"**GP Interest**" has the meaning assigned to such term in Section 3.01 of this Agreement.

"**GP Ongoing Commitment Threshold**" has the meaning assigned to such term in Section 3.01 of this Agreement.

"**Interest**" means an interest in the Partnership, and may either refer to an LP Interest or a GP Interest, as applicable.

"**Interest Income**" means interest income from Investments held by the Partnership, including on margin collateral held by third parties, but shall not include, for the avoidance of doubt, Investment Proceeds.

"**Investment Guidelines**" means the Partnership's investment guidelines, limitations and restrictions as set forth on Schedule B hereto, which Schedule B may be amended from time to time by the General Partner with the written consent of the Limited Partner.

"**Investment Proceeds**" means all cash, securities and other property received by the Partnership in respect of any Investment or portion thereof (excluding any portion thereof that constitutes the Investment), but not including Interest Income.

"**Investment Certificate**" has the meaning assigned to such term in the Investment Guidelines attached hereto as Schedule B.

"**Investments**" means the approved investments of the Partnership as set forth in the Investment Guidelines attached hereto as Schedule B.

"**IRS Notice**" has the meaning assigned to such term in Section 10.04(a) of this Agreement.

"**Limited Partner**" has the meaning assigned to such term in the Preamble.

"**Liquidating Share**" means, with respect to any removed, deceased, dissolved, bankrupt or incompetent Partner, the aggregate value of the Capital Account(s) that relate to such Partner's Interest as of the date in question after giving effect to all adjustments, including, in the case of a removal of the General Partner pursuant to Section 6.03, any remaining obligation arising from any Investment entered into by the Partnership that has not yet been settled, any expenses related to such Investment and any distributions required to be made to the Limited Partner pursuant to Article IV in connection with such Investment or Section 6.04(c).

"**Liquidator**" has the meaning assigned to such term in Section 6.04(a) of this Agreement.

"**LP Interest**" has the meaning assigned to such term in Section 3.03 of this Agreement.

"**Maintenance Margin**" means the incremental margin payments required to be made by the Parent or the General Partner as a result of fluctuations in the value of an Investment; provided that any increased account level minimums required by a broker in order to maintain an account that invests on a margined basis shall not be "Maintenance Margin" for purposes hereof.

"**Margin Account**" has the meaning assigned to such term in the Investment Guidelines attached hereto as Schedule B.

"**Minimum Investment Period**" means the period beginning on the Effective Date and ending on the date that is one hundred eighty (180) days following the Effective Date.

"**Non-Public Information**" means, with respect to the Limited Partner, the General Partner or the Parent, information regarding the Parent or the Partnership (including information regarding any Person in which the Partnership holds, or contemplates making, any Investment) or the identity of any partner in the Limited Partner pursuant to this Agreement, but does not include information that (i) was publicly known at the time such Person received such information pursuant to this Agreement, (ii) subsequently becomes publicly known through no action or inaction by such Person or (iii) is communicated to such Person by a third party free of any obligation of confidence known to such Person.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"**Parent**" means W.J. Bradley Mortgage Capital, LLC, a Delaware limited liability company.

"**Partners**" has the meaning assigned to such term in the Preamble.

"**Partnership**" has the meaning assigned to such term in the Preamble.

"**Partnership Act**" has the meaning assigned to such term in the Preamble.

"**Partnership Expenses**" has the meaning assigned to such term in Section 4.05 of this Agreement.

"**Partnership Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"**Partner Nonrecourse Debt Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i).

"**Partner Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i).

"**Payment Default**" has the meaning assigned to such term in Section 6.02(d) of this Agreement.

"**Person**" means any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust or other entity, including any governmental entity.

"**Reimbursing Partner**" has the meaning assigned to such term in Section 5.03(a) of this Agreement.

"**Related Agreement**" has the meaning assigned to such term in the Investment Guidelines attached hereto as Schedule B.

"**Safe Harbor**" has the meaning assigned to such term in Section 10.04(a) of this Agreement.

"**Safe Harbor Election**" has the meaning assigned to such term in Section 10.04(a) of this Agreement.

"**Safe Harbor Partnership Interest**" has the meaning assigned to such term in Section 10.04(a) of this Agreement.

"**SEC**" means the Securities and Exchange Commission.

"**Securities**" has the meaning assigned to such term in Section 2(a)(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Series**" has the meaning assigned to such term in Section 1.07 of this Agreement.

"**Substitute General Partner**" has the meaning assigned to such term in Section 3.02 of this Agreement.

"**Tax Capital Account**" has the meaning assigned to such term in Section 10.01(a) of this Agreement.

"**Taxable Year**" means the Fiscal Year, unless otherwise required by the Code, including Section 706(b) of the Code.

"**Transfer**" has the meaning assigned to such term in Section 8.01(a) of this Agreement.

"**U.S. Partner**" means a Partner that is a "U.S. Person," as defined under Regulation S of the Securities Act.

"**Unpaid Preferred Return**" has the meaning assigned to such term in the Investment Guidelines attached hereto as <u>Schedule B</u>.

## ARTICLE III

## COMPOSITION, ADMISSIONS AND ALLOCATIONS

Section 3.01    <u>Contributions of the General Partner</u>.  The General Partner shall, together with its affiliates, partners, members and designees, provide initial capital to the Partnership of not less than $50,000 (the "<u>General Partner Commitment</u>") and, until the Partnership is completely wound up in accordance with Section 6.04, maintain capital in the Partnership such that at any point in time the tangible net worth of the Partnership, taking into account any Partnership liabilities, including any Partnership Expenses or other expenses and distributions payable to the Partners pursuant to Article IV, shall be not less than $40,000 (the "<u>GP Ongoing Commitment Threshold</u>").  The General Partner shall make additional Capital Contributions to the Partnership as necessary to meet the GP Ongoing Commitment Threshold and from time to time in respect of Maintenance Margin or to ensure that upon the winding up of the Partnership pursuant to Section 6.04 the Partnership has sufficient capital to make distributions to the

Limited Partner as required by Article V and Section 6.04(c).  In addition, the General Partner may make Capital Contributions from time to time of Investments.  Any Investments acquired by the Partnership pursuant to an Investment Acquisition Agreement may be treated as a Capital Contribution by the General Partner.  Each Capital Contribution of the General Partner represents a general partnership interest in the Partnership (each, a "GP Interest").  The GP Interest may have one or more Capital Accounts.

Section 3.02    Admission of Additional or Substitute General Partners.  The General Partner may admit one or more additional general partners or substitute general partners (a "Substitute General Partner") to the Partnership under such terms and conditions as the General Partner shall determine, but only, in each case, upon the Limited Partner's prior written consent.  In connection with the admission of a general partner to the Partnership, any general partner admitted shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement.

Section 3.03    Contributions of the Limited Partner.

(a)    So long as the Capital Contributions that have been made by the Limited Partner pursuant to this Section 3.03(a) and that have not been returned to the Limited Partner pursuant to Section 5.01(b)(i) do not exceed in an aggregate amount its Commitment (and subject to the Minimum Net Collateral Value Requirement as described in the Investment Guidelines attached hereto as Schedule B), the Limited Partner shall make Capital Contributions in installments as and when called by the General Partner as provided in an Investment Certificate.  Following the Minimum Investment Period, the Limited Partner may decrease its Commitment by providing the General Partner at least forty five (45) days prior written notice.  The General Partner may cause the Limited Partner to decrease its Commitment after the Minimum Investment Period by providing the Limited Partner at least forty five (45) days prior written notice.  The General Partner may cause the Limited Partner to increase its Commitment; provided, that with respect to any increase to the Limited Partner's Commitment such increase shall be subject to formal credit review, the reasonable consent of the Limited Partner and adjustment of the Minimum Net Collateral Value Requirement and other amendments to the Investment Guidelines as determined by the Limited Partner.  On and after any decrease to the Limited Partner's Commitment as set forth above, the Limited Partner will receive payments in return of its Capital Contributions as set forth in Section 5.01 and the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans will be reduced proportionately.  The General Partner shall deliver an Investment Certificate to the Limited Partner on each Business Day on and after the date the General Partner submits the first Investment Certificate for the initial Capital Contribution by the Limited Partner by no later than 4:00 p.m. (New York City time) on such Business Day.  Each submission of an Investment Certificate shall be deemed to constitute a representation and warranty by the General Partner on the date of such Investment Certificate that the information and materials submitted to the Limited Partner in connection with such Investment Certificate are true, correct and complete in all respects.  All Capital Contributions by the Limited Partner shall be made in cash via wire transfer of immediately available funds to an account designated by the General Partner.

(b)    In addition, if at any given point in time, the Partnership's obligations, including Maintenance Margin or any other margin obligation imposed by a third party, including without limitation any warehouse provider that has provided financing relating to any Investment, cannot be met with cash on hand, the Limited Partner may, in its sole discretion, make an additional Capital Contribution to preserve the value of the Partnership's existing Investments (any such Capital Contribution, a "Discretionary Contribution").  For the sake of clarity, the General Partner cannot require the Limited Partner to make a Discretionary Contribution.  Each Capital Contribution of the Limited Partner represents a limited partnership interest in the Partnership (each, an "LP Interest").  The LP Interest may have one or more Capital Accounts.

(c)    There is no limit to the amount or number of LP Interests that may be offered by the Partnership.

(d)    Capital Contributions made by the Limited Partner pursuant to Section 3.03(a) may be invested in Investments, distributed to the Partners under Article V, used to pay expenses pursuant to Section 4.05 or may be deposited in the Margin Account and treated as Maintenance Margin.  Discretionary Contributions shall be deposited in the Margin Account and treated as Maintenance Margin or distributed to the Limited Parted pursuant to Article V.   Any Capital Contributions that are returned to the Limited Partner shall be treated for purposes of this Agreement as not having been called and funded or deemed funded, as applicable (i.e., so that following the return, or deemed return, of such Capital Contributions such amounts shall be deemed to no longer represent Capital Contributions and may be called again by the General Partner in accordance with this Section 3.03).

(e)    Notwithstanding any other provision of this Agreement to the contrary, the Limited Partner shall not be required to make any Capital Contribution to the Partnership if immediately prior to or upon making such Capital Contribution the Minimum Net Collateral Value Requirement has not been met.

(f)    In the event of a Cause Event, the Limited Partner shall have the right to cease making any additional Capital Contributions to the Partnership.

(g)    It shall be a condition precedent to all obligations of the Limited Partner to make Capital Contributions to the Partnership that the Partnership has obtained the consent and approval of all applicable consents from third parties to any Related Agreement, in each case in form and substance acceptable to the Limited Partner (collectively, the "Related Agreement Consents").  The General Partner and Limited Partner shall each use commercially reasonable efforts and work together in good faith to obtain all Related Agreement Consents.  If all Related Agreement Consents have not been received by December 31, 2015, or such later date with the consent of the Limited Partner, this Agreement shall terminate and the General Partner shall dissolve the Partnership pursuant to Section 6.02

Section 3.04   Admission of the Limited Partner.  The Withdrawing Limited Partner hereby withdraws from the Partnership and the General Partner accepts such withdrawal.  The

Limited Partner shall be admitted to the Partnership as of the date of the Effective Date and thereafter, no additional Limited Partners may be admitted to the Partnership without the Limited Partner's prior written consent.  In connection with the admission of the Limited Partner to the Partnership, the Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement.

Section 3.05    Capital Accounts; Allocations.  The Partnership shall maintain a separate capital account for each Partner (each, a "Capital Account").  Items of Partnership income, gain, loss, expense or deduction for any fiscal period shall be allocated among the Partners in such manner that, as of the end of such fiscal period and to the greatest extent possible, the Capital Account of each Partner shall be equal to the respective net amount, positive or negative, that would be distributed to such Partner from the Partnership pursuant to Article VI or for which such Partner would be liable to the Partnership under this Agreement, determined as if, on the last day of such fiscal period, the Partnership were to liquidate the Partnership's assets and distribute the proceeds in liquidation in accordance with Article VI; provided that all items of Partnership loss, expense or deduction are known or have been adequately reserved for on the books and records of the Partnership.

Section 3.06    Valuation.

(a)    The General Partner hereby irrevocably appoints the Limited Partner to perform the valuations described herein in accordance with the principles of this Section 3.06.  The value of any Investment as of any date shall generally be determined as follows:

(i)    Cash on hand will be valued at face value with interest accrued where applicable; and

(ii)    All other Investments will be valued as of the valuation date determined using the criteria set forth below in the Investment Guidelines attached hereto as Schedule B.

(b)    The Limited Partner, in consultation with the General Partner, may follow some other prudent method of valuation other than pursuant to the principles set forth in Section 3.06(a) above if it considers that, under the circumstances, such other method of valuation should be adopted to reflect fairly the values of relevant Investments.

(c)    All matters concerning accounting procedures, not expressly provided for in this Agreement but necessary to accomplish the purposes of the Partnership, shall be determined by the General Partner in its commercially reasonable discretion made in good faith.

Section 3.07    Liabilities.  Liabilities shall be determined using GAAP as a guideline; provided that the General Partner may provide reserves for estimated accrued Partnership Expenses, liabilities or contingencies, including general reserves for unspecified contingencies (even if such reserves are not in accordance with GAAP), which could reduce the amount available for distribution pursuant to Article VI.

# ARTICLE IV

# MANAGEMENT OF PARTNERSHIP

Section 4.01    <u>Actions of the General Partner</u>.    The General Partner shall have the discretion to manage the business and affairs of the Partnership and to exercise the powers set forth in Section 4.02 below.  The General Partner may only appoint agents of the Partnership as it deems necessary to hold such offices, exercise such powers and perform such duties with the prior written consent of the Limited Partner.

Section 4.02    <u>Powers of the General Partner</u>.

(a)    The General Partner, in its sole discretion, subject to the restrictions contained herein, shall have the power to act on behalf of the Partnership as set forth below:

(i)    To acquire Investments in accordance with, and otherwise comply with all requires of, the Investment Guidelines set forth on <u>Schedule B</u> hereto; <u>provided</u>, that all Investments acquired by the Partnership must be acquired or contributed to the Partnership pursuant to an Investment Acquisition Agreement unless otherwise agreed to in writing by the General Partner and the Limited Partner;

(ii)    Subject to subsection (a)(i) above, to enter into, make and perform any other contracts, arrangements, agreements or other undertakings it may deem necessary and appropriate in connection with the acquisition and disposition of Investments, satisfying liabilities or indebtedness relating to the Investments;

(iii)    To retain one or more Persons to provide accounting services to the Partnership, including the General Partner or any affiliate thereof;

(iv)    To acquire or incur indebtedness on behalf of the Partnership, including, without limitation, indebtedness under warehouse credit facilities; <u>provided</u> that the Partnership shall not acquire any indebtedness other than such indebtedness, including margin requirements and other financing arrangements, that may be ancillary or relating to Investments or its obligations to the Limited Partner hereunder and as set forth in a Related Agreement.

(v)    To take any action necessary or appropriate in order to ensure that the Partnership is not required to register as an investment company under the 1940 Act, including without limitation, the right to restrict the number and/or nature of beneficial owners of Interests, to ensure that the Partnership is not subject to the plan assets regulations under ERISA and to ensure that the Partnership is not treated as a publicly traded partnership within the meaning of Code §7704 and U.S. Department of Treasury Reg. §1.7704-1;

(vi)    To make determinations on the allocations of profits and losses, tax and other allocations, valuations and accounting procedures and

determinations to be used by the Partnership, except as expressly provided for in this Agreement;

(vii)    To make distributions as set forth in Article V hereof; and

(viii)    To act for the Partnership in all other matters, with the consent of the Limited Partner.

(b)    The General Partner shall at all times comply with the Investment Guidelines set forth in Schedule B hereto and all other covenants and other obligations contained in this Agreement, any Investment Acquisition Agreement and any Related Agreement.

(c)    The General Partner shall not take any action not required by this Agreement that would otherwise cause the Partnership to be considered as a (A) partnership (within the meaning of Section 7701(a)(2) of the Code) engaged or deemed to be engaged in a trade or business within the United States or (B) United States real property interest as defined in Section 897 of the Code and the Treasury Regulations promulgated thereunder.

(d)    Notwithstanding anything set forth in subsections (a)-(c) above, the Limited Partner may immediately impose conditions upon the General Partner's authority to act on behalf of the Partnership or unilaterally amend the Investment Guidelines to impose additional terms in the event of a Cause Event.

Section 4.03    Activities of the General Partner and Affiliates.  The General Partner and its affiliates shall devote so much of their business time and efforts to the affairs of the Partnership as each may reasonably believe, in good faith, is necessary to accomplish the purposes of the Partnership, and none of the General Partner or its affiliates shall be obligated to do or perform any act or thing in connection with the business of the Partnership not expressly set forth herein.  Nothing herein contained shall prevent the General Partner, the Limited Partner or any member or affiliate of either of them from conducting any other existing or future business, including without limitation any business with respect to Securities or other Investments, and none of the Partnership, the General Partner or any other Partner shall have any rights in or to such other business or the income or the distributions therefrom.

Section 4.04    Restrictions on the Limited Partner.  The Limited Partner shall not participate in the control, management, direction or operation of the Partnership and shall have no power to bind the Partnership.  The exercise by the Limited Partner of any right conferred herein shall not be construed to constitute participation by the Limited Partner in the control of the business of the Partnership so as to make such Limited Partner liable as a general partner for the debts and obligations of the Partnership for purposes of the Partnership Act.  To the fullest extent permitted by applicable law, the Limited Partner shall not owe any fiduciary duty to the Partnership or any other Partner or be obligated to act in the interests of the Partnership or any other Partner.

Section 4.05    Expenses of the Partnership.  The General Partner shall bear all organizational expenses incurred by the Partnership and General Partner in the formation and

-12-

operation of the Partnership (including, but not limited to, legal, accounting and travel expenses, as well as ongoing legal, accounting and audit expenses).  It shall be understood that the Partnership's organizational expenses shall include the following expenses of the Limited Partner if the Effective Date is on or before December 9, 2015: (i) legal fees up to $65,000 and (ii) $5,000 of general expenses.  Fees and expenses paid by the Partnership shall be limited to transaction fees and commissions incurred in connection with the Partnership's acquisition and disposition of Investments, including custodial and bank service fees (the "Partnership Expenses").  All other expenses of the Partnership, including accounting, auditing and tax reporting expenses, shall be borne by the General Partner.  The General Partner shall maintain capital in the Partnership sufficient to pay for Partnership Expenses on an ongoing basis to the extent the Partnership does not otherwise have sufficient funds to pay such Partnership Expenses. Any expenses paid by the General Partner pursuant to this Section 4.05 shall increase the Capital Account of the General Partner.

Section 4.06    Management Fee.  The General Partner will not be paid a management fee in connection with its services to the Partnership.

Section 4.07    Representations and Warranties of the General Partner.  The General Partner hereby represents and warrants to the Limited Partner as follows:

(a)    Organization and Good Standing.  The General Partner is duly organized and existing in good standing under the laws of the state of its formation, is duly qualified to do business and is in good standing in all jurisdictions in which it is required to be qualified to do business, except where failure to so qualify would not be reasonably likely (individually or in the aggregate) to have a material adverse effect on the financial condition or business of the General Partner, and has the power and authority to own its properties and assets and to transact the business in which it is engaged.

(b)    Authorization and Power.  The General Partner has the requisite power and authority to, and has taken all action necessary to authorize it to, execute, deliver and perform this Agreement, any Related Agreements, any Investment Acquisition Agreements and all of the other documents herein or therein contemplated to be executed by the General Partner or otherwise to be executed by the General Partner from time to time in connection herewith; the General Partner will continue at all times during the term of this Agreement to have the requisite power and authority to do the foregoing; and the General Partner has received, has in its possession, and will maintain in full force and effect and in good standing, any and all federal, state and local licenses or approvals which may be necessary for the General Partner to undertake the actions required of it pursuant to this Agreement and to conduct its business.

(c)    No Conflicts or Consents.  Neither the execution and delivery by the General Partner of this Agreement, any Related Agreements, any Investment Acquisition Agreements or any other documents to be executed in connection herewith, nor the consummation by the General Partner of any of the transactions herein or therein contemplated, nor compliance by the General Partner with the terms and provisions hereof or with the terms and provisions thereof, will contravene or materially conflict with any legal requirement applicable to the General Partner, or any loan agreement,

lease, promissory note, indenture, mortgage, deed of trust, or other agreement or instrument to which the General Partner is a party or by which the General Partner or any of its property may be bound or be subject, or violate any provision of the documents creating or governing the General Partner.

(d)     Enforceable Obligations.  This Agreement, any Related Agreements, any Investment Acquisition Agreements and all other documents to be executed in connection herewith, to which the General Partner is or will become a party, are or upon execution will be the legal, valid and binding obligations of the General Partner, are enforceable against the General Partner in accordance with their respective terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

(e)     Financial Condition.  The General Partner has delivered to the Limited Partner copies of its most recent balance sheet, and the related statements of income, stockholders' equity and changes in financial position for the year ending on the date indicated therein, audited by independent certified public accountants; such financial statements are true and correct in all material respects, fairly present the financial condition of the General Partner for the period described therein and have been prepared in accordance with GAAP as of the date thereof; there are no obligations, liabilities or indebtedness (including contingent and indirect liabilities and obligations or unusual forward or long term commitments) of the General Partner which are not reflected in such financial statements; and no change having a material adverse effect has occurred in the financial condition or business of the General Partner since the date of such financial statements.

(f)     Material Agreements.  As of the date the Limited Partner makes the initial Capital Contribution pursuant to Section 3.03, the General Partner is not in default under any loan agreement, warehouse agreement, repurchase agreement, mortgage, security agreement or other material agreement or obligation to which it is a party or by which any of its properties is bound, and the execution by the General Partner of this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith, and the General Partner's performance of its duties and obligations hereunder and thereunder, will not cause a default under any loan agreement, warehouse agreement, repurchase agreement, mortgage, security agreement or other material agreement or obligation to which the General Partner is a party or by which any of its properties is bound.

(g)     No Litigation.  There are no actions, suits or legal, equitable, arbitration or administrative proceedings pending, or to the knowledge of the General Partner, threatened, against the General Partner which, if determined adversely to the General Partner, would be reasonably likely to have a material adverse effect on the General Partner or its financial condition.

(h)     Taxes.  All tax returns required to be filed by the General Partner in any jurisdiction have been filed and all taxes, assessments, fees and other governmental charges upon the General Partner or upon any of its properties, income or franchises

(which, if unpaid, would have a material adverse effect on the General Partner or its ability to conduct its business or perform its obligations under this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith) have been paid (if applicable, prior to the time that such taxes, assessments, fees or other governmental charges could give rise to a lien), unless protested in good faith by appropriate proceedings.

(i)    No Approvals Required.    Neither the execution and delivery by the General Partner of this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith, and all other documents to be executed by the General Partner in connection herewith, nor the consummation by the General Partner of any of the transactions contemplated hereby or thereby, requires the consent or approval of, the giving of notice to, or the registration, recording or filing of any document with, or the taking of any other action in respect of, any governmental authority or other Person other than those consents, approvals, notices, registrations, recordings, filings and other actions that have been obtained, given or taken, those that are not yet required to be obtained, given or taken and those that if not obtained, given or taken would not cause a material adverse effect on the financial condition of the General Partner or the Partnership or the ability of the General Partner to perform its obligations under this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith.

(j)    Representations as to Investments.    With respect to any Investment contributed to the Partnership by the General Partner, all of the representations and warranties made by the General Partner pursuant to the Related Agreements and the related Investment Acquisition Agreement are true and correct in all material respects.

(k)    Survival of Representations.    All representations and warranties by the General Partner herein shall survive the termination or expiration of this Agreement, and all documents to be executed in connection herewith.  Any and all investigations at any time made by or on behalf of the Limited Partner shall not limit, impair or diminish the Limited Partner's right to rely on any and all representations and warranties by the General Partner herein.

The General Partner shall notify the Limited Partner promptly and as soon as practicable after obtaining knowledge that any representation or warranty set forth in this Section was incorrect or untrue in any material respect when made by the General Partner.

Section 4.08    Affirmative Covenants of the General Partner.    At all times during the term of this Agreement, and thereafter until the General Partner shall have performed all of its obligations hereunder, the General Partner covenants and agrees that:

(a)    Financial Statements and Reports.    The General Partner shall furnish to the Limited Partner the following, all in form and detail satisfactory to the Limited Partner:

(i)    Promptly after becoming available, and in any event within ninety (90) days after the close of each fiscal year of the Parent, an audited

balance sheet of the Parent as of the end of such year, and an audited statement of income and retained earnings of the Parent for such year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, accompanied by the related report of independent certified public accountants reasonably acceptable to the Limited Partner, which report shall be to the effect that such statements have been prepared in accordance with GAAP;

(ii)    If requested by the Limited Partner, on or before the last day of any calendar month, a statement of income and expenses of the Parent for the prior calendar month;

(iii)    Promptly after becoming available, and in any event within forty five (45) days after the close of each fiscal quarter of the Parent, a balance sheet of the Parent as of the end of such fiscal quarter, a statement of income and retained earnings for such fiscal quarter and an operating statement of the Parent for such fiscal quarter setting forth in comparative form the corresponding figures for the corresponding fiscal quarter of the preceding fiscal year, prepared in accordance with GAAP and certified by the principal financial officer of the Parent;

(iv)    Promptly upon request from the Limited Partner, a copy of each other report submitted to the Parent by independent accountants in connection with any annual, interim or special audit of the books of the Parent;

(v)    Such information delivered to the Parent, the Partnership or General Partner by any third party pursuant to any Related Agreement or otherwise relating to any Investment;

(vi)    Such information delivered to the Partnership or General Partner pursuant to the Form of Contribution Agreement or Form of Purchase Agreement or Form of Participation Agreement (attached hereto as Exhibit A-1 and Exhibit A-2 and Exhibit A-3, respectively), once such agreements are utilized in a transaction; and

(vii)    Such other information concerning the business, properties or financial condition of the Parent, the General Partner or the Investments as the Limited Partner may reasonably request.

(b)    <u>Taxes and Other Liens</u>.  The Parent and the General Partner shall timely pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or upon any of its property as well as all claims of any kind (including claims for labor, materials, supplies and rent) which, if unpaid, might become a lien upon any or all of its property (and have a material adverse effect on the Parent, the General Partner or its ability to conduct its business or perform its obligations under this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith or therewith); <u>provided</u>, <u>however</u>, the Parent and the General Partner shall not be required to pay any such tax, assessment,

charge, levy or claim if the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings diligently conducted by or on behalf of the Parent or the General Partner and if the Parent or the General Partner, as the case may be, shall have set up reserves therefor adequate under GAAP.

(c)    <u>Maintenance</u>.  The Parent and the General Partner shall: (i) maintain its existence and all of its licenses, permits, franchises, qualifications and rights that are necessary in order for the Parent and the General Partner to conduct its business; and (ii) observe and comply in all material respects with all legal requirements applicable to the Parent and the General Partner.

(d)    <u>Further Assurances</u>.  The General Partner shall promptly cure any defects in the execution and delivery of this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith or therewith.  The General Partner shall, at its expense, promptly execute and deliver to the Limited Partner, upon the Limited Partner's reasonable request, all such other and further documents, agreements and instruments to comply with or satisfy or perform the covenants and agreements of the General Partner in this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents executed in connection herewith or therewith.  In addition, the Parent and the General Partner will provide the Limited Partner with any and all documentation required by the Limited Partner relating to the business and background of the Parent and the General Partner and their respective directors, officers, employees and representatives, and any certifications reasonably required by the Limited Partner to verify the Parent's and the General Partner's compliance with any applicable laws.

(e)    <u>Insurance</u>.  The Parent and the General Partner shall maintain with financially sound and reputable insurers, insurance with respect to their business and properties against such liabilities, casualties, risks and contingencies and in such types and amounts as is customary in the case of Persons engaged in the same or similar businesses and similarly situated and as otherwise required by the Limited Partner.  The insurance required herein shall include, at a minimum: (i) a fidelity bond of at least One Million Dollars ($1,000,000.00); and (ii) an errors and omissions policy with minimum coverage of at least One Million Dollars ($1,000,000.00); each with maximum deductibles of Two Hundred Fifty Thousand Dollars ($250,000.00) and each in such form, with endorsements and issued by insurers reasonably acceptable to the Limited Partner.

(f)    <u>Accounts and Records</u>.  The General Partner shall keep books of record and account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and activities, in accordance with GAAP.  The General Partner shall maintain its deposit accounts, certificates of deposit and other similar accounts only in accounts with depository institutions located in the United States of America having capital, surplus and undivided profits aggregating at least Twenty Million Dollars ($20,000,000.00).

(g) <u>Right of Inspection</u>.  The Parent and the General Partner shall permit any officer, employee, agent or representative of the Limited Partner during normal business hours: (i) with at least five (5) Business Days written notice (or, if a Cause Event has occurred and is continuing, without any notice), to examine the Parent's or the General Partner's, as the case may be, books of records and accounts and any and all files and records relating to Investments (including any in file credit reports), and make copies and extracts of any and all of the foregoing; and (ii) discuss the affairs, finances and accounts of the Parent and the General Partner with the Parent's and the General Partner's officers, accountants and auditors.

(h) <u>Notice of Certain Events</u>.  The General Partner shall promptly notify the Limited Partner after becoming aware of any event or notice thereof which reasonably would or could have a material adverse effect upon the Parent or the General Partner. Without limiting the generality of the foregoing, the Parent and the General Partner shall promptly deliver to the Limited Partner copies of all notices and other documents and correspondence from any governmental authority regarding any alleged material non-compliance or potential material non-compliance with the Dodd Frank Act or any other legal requirement applicable to the Parent or the General Partner.

(i) <u>Notice of Default</u>.  The General Partner shall furnish to the Limited Partner immediately upon becoming aware of the existence of any Cause Event, a written notice specifying the nature and period of existence thereof and the action which the General Partner is taking or proposes to take with respect thereto.

(j) <u>Compliance with Documents</u>.  The General Partner shall promptly and fully comply with any and all covenants, agreements and provisions of this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith or therewith.

(k) <u>Records</u>.  The General Partner shall maintain in its files all records relating to each Investment for the period of time required by applicable law, but in no event for less than twenty five (25) months from the date of such Investment by the Partnership. Within five (5) Business Days following any demand therefor (or, if a Cause Event has occurred and is continuing, immediately upon demand), the General Partner shall supply the Limited Partner with certified copies and/or originals of any such records.  Further, the Limited Partner shall have the right to inspect and make copies of the same at the General Partner's office in accordance with Section 4.08(g).

Section 4.09  <u>Negative Covenants of the General Partner</u>.  At all times during the term of this Agreement, and thereafter until the General Partner shall have performed all of its obligations hereunder, the General Partner covenants and agrees that:

(a) <u>No Merger, Etc</u>.  Without prior written notice to the Limited Partner, the General Partner shall not: (i) become a party to any merger or consolidation; (ii) purchase or otherwise acquire all or substantially all of the assets or shares or other evidence of beneficial ownership of any Person; (iii) sell or otherwise transfer all or substantially all of the assets or properties of the General Partner to any other Person; (iv) cease to

maintain key executive personnel and management at a level of experience and ability equivalent to the present executive personnel and management of the General Partner; and (v) wind up, dissolve or liquidate.  If the General Partner takes such action while no sums are outstanding hereunder, such action must be disclosed to the Limited Partner in writing and approved by the Limited Partner in writing prior to the Limited Partner making any further Capital Contributions hereunder.

(b)    Fiscal Year; Method of Accounting.  The General Partner shall not, without giving prior written notice to the Limited Partner, change its fiscal year or method of accounting.

(c)    Compliance with Material Agreements.  On and after the date the Limited Partner makes the initial Capital Contribution pursuant to Section 3.03, the General Partner shall not permit any default to occur with respect to any loan agreement, warehouse agreement, repurchase agreement, indenture, mortgage or other material agreement binding on it or affecting its property or business, if such default may have a material adverse effect on the financial condition or business of the General Partner.

Section 4.10    Indemnification by the General Partner.  The General Partner shall indemnify, defend, protect and hold harmless the Limited Partner and its successors and assigns, each affiliate of the Limited Partner, and each of its and their respective directors, officers, employees, representatives, agents, and attorneys (collectively, the "Indemnified Parties") from and against any and all losses, liabilities, damages, claims, penalties, judgments, disbursements, costs and expenses (including reasonable attorneys' fees and expenses but excluding expenses not required to be reimbursed by the General Partner under Section 4.05), actions, proceedings, or disputes incurred or suffered or to which any Indemnified Party may become subject (collectively, "Indemnifiable Costs") which directly or indirectly arise from or relate to this Agreement, any Related Agreements, any Investment Acquisition Agreements, any other documents to be executed in connection herewith or therewith, the Mortgage Loans Interests, or any of the transactions contemplated hereby or thereby, including due to the unmarketability of any Qualifying Mortgage Loan resulting from: (a) any negligent or fraudulent act or omission of the General Partner or its agents or employees; (b) any breach by the General Partner of any material warranty or representation contained herein; (c) any breach by the General Partner of any material covenant or condition of this Agreement; or (d) any failure by the General Partner to comply with any law in performing its obligations under this Agreement, except, in each case, to the extent such Indemnifiable Costs result from an Indemnified Party's bad faith, gross negligence or willful misconduct.  Without limiting any provision of this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith or therewith, it is the express intention of the parties hereto that each Person to be indemnified under this Section shall be indemnified from and held harmless against any and all Indemnifiable Costs arising out of or resulting from the sole contributory or ordinary negligence of such Person.  The Limited Partner may employ an attorney or attorneys firm to protect or enforce its rights, remedies and recourse under this Agreement, any Related Agreements, any Investment Acquisition Agreements and any other documents to be executed in connection herewith or therewith, and to advise and defend the Limited Partner with respect to any such actions and other matters.  The General Partner shall reimburse the Limited Partner for its reasonable attorneys' fees and expenses (including expenses and costs for experts but

excluding legal fees and expenses not required to be reimbursed by the General Partner under Section 4.05) as and when billed for the same, whether on a monthly or other time interval, and whether or not an action is actually commenced or concluded. All other amounts for Indemnified Costs shall become due and payable when actually incurred by the applicable Indemnified Party and upon presentment of reasonable backup documentation to the indemnifying party.  The provisions of this Section shall survive the termination of this Agreement.

Section 4.11   Collateral Oversight.  As soon as practicable following the Effective Date, the General Partner shall engage a third party consultant, acceptable to the Limited Partner, for the purpose of reviewing all Investments of the Partnership and creating such reports as may be reasonably requested by the Partners relating thereto and agree on behalf of the Partnership to pay such consultant no more than $10 per Investment for such review and oversight services. The General Partner shall not terminate or remove such consultant without the written consent of the Limited Partner.

## ARTICLE V

## DISTRIBUTIONS

Section 5.01   Distribution Policy.

(a)   No Partner shall be entitled to receive distributions from the Capital Account(s) that relate to its Interest except as provided in this Article V or as provided in Article VI.

(b)   So long as all covenants and obligations of the General Partner required by this Agreement have been complied with, both prior to and following any distribution made pursuant to this Section 5.01(b) and after taking into consideration any Capital Contributions made to the Partnership on the date of such distribution (including without limitation in respect of required Capital Contributions, maintenance of the GP Ongoing Commitment Threshold, the satisfaction of all requirements contained in the Investment Guidelines set forth on Schedule B hereto and required distributions pursuant to Section 5.01(c)) and no Cause Event has occurred and is continuing or will be caused by such distribution, the General Partner may elect at any time, to: (i) make distributions to any Partner, from uncommitted capital of the Partnership, at such times and in such amounts as it deems reasonable and appropriate; provided, however, that the General Partner shall not cause any distributions to be made to the Limited Partner during the Minimum Investment Period and any distribution made to the Limited Partner following the Minimum Investment Period shall be made on not less than forty five (45) days advance written notice to the Limited Partner, (ii) make distributions in kind to the General Partner, which may consist of Investments or other Assets of the Partnership, and (iii) reinvest Investment Proceeds in new or additional Investments.

(c)     The General Partner shall cause the Partnership to distribute monthly, within ten (10) days of each calendar month end (each, a "Distribution Date"), any Interest Income and Investment Proceeds that were not distributed in a prior calendar month in accordance with Section 5.01(b) as follows:

(i)     first, 100% to the Limited Partner, until the Limited Partner's Unpaid Preferred Return has been reduced to zero;

(ii)     second, 100% to the Limited Partner for any unreimbursed Partnership Expenses; and

(iii)     third, 100% to the Limited Partner in respect of return of the Limited Partner's Capital Contributions to the extent the Limited Partner's Commitment has been decreased pursuant to Section 3.03 until the Limited Partner's outstanding Capital Contributions equal its revised Commitment.

Section 5.02     Distributions in Cash.  All distributions to the Limited Partner shall be made in cash via wire transfer.  Distributions to the General Partner may be in cash via wire transfer or by distributions in kind consisting of Investments or other Assets of the Partnership.

Section 5.03     Withholding Taxes; Reimbursement for Payments on Behalf of a Partner.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or body or to any other person (or otherwise makes a payment) because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to non-U.S. Partners, state withholding taxes, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Reimbursing Partner") shall reimburse the Partnership in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payment), plus, at the option of the General Partner in its sole discretion, an additional amount computed on the amount so paid at a rate not to exceed the Base Rate plus two percentage points per annum (but not in excess of the highest rate per annum permitted by law).  The amount to be reimbursed shall be charged against the Capital Account of the Reimbursing Partner, and, at the option of the General Partner, but without duplication:  (i) promptly upon notification of an obligation to reimburse the Partnership, the Reimbursing Partner shall make a cash payment to the Partnership equal to the full amount to be reimbursed (and the amount paid shall be added to the Reimbursing Partner's Capital Account but shall not be deemed to be a Capital Contribution hereunder) or (ii) the Partnership shall make distributions to the Reimbursing Partner net of the payment to the governmental agency or other Person or reduce subsequent distributions that would otherwise be made to the Reimbursing Partner until the Partnership has recovered the amount to be reimbursed; provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Reimbursing Partner's Capital Account.

(b)   A Reimbursing Partner's obligation to make reimbursements to the Partnership under this Section 5.03 shall survive the dissolution, liquidation, winding up and termination of the Partnership, and for purposes of this Section 5.03, the Partnership shall be treated as continuing in existence.  The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 5.03, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Base Rate plus two percentage points per annum, adjusted monthly (but not in excess of the highest rate per annum permitted by law).

## ARTICLE VI

## TERM AND DISSOLUTION OF THE PARTNERSHIP

Section 6.01   <u>Term of Partnership</u>.  Only the General Partner shall have the right, on or after the Minimum Investment Period, to terminate and dissolve the Partnership by giving notice of such election to all Limited Partners at least forty-five (45) days prior to the proposed dissolution date.  Any dissolution of the Partnership for any reason shall be made in accordance with Section 6.04.

Section 6.02   <u>Early Dissolution of the Partnership</u>.

(a)   The Limited Partner may elect to dissolve the Partnership by delivering a written notice to the General Partner to such effect, which dissolution shall take effect not less than one (1) day from the date of such notice, after the occurrence of one or more of the following events: (i) the General Partner or one or more of its affiliates has been convicted of fraud, embezzlement or a similar felony involving the misappropriation of funds or has been suspended, or threatened in writing with suspension, by any government agency or regulator or self-regulatory organization or the General Partner has knowledge of facts that could lead to such a suspension; (ii) the Partnership files a voluntary petition of bankruptcy, is involuntarily dissolved and commences its winding up, or consents to or acquiesces to the appointment of a trustee, receiver or liquidator of the General Partner; (iii) the Parent or the General Partner has entered against it an order for relief in a federal bankruptcy proceeding which order is not stayed, vacated, or dismissed within 90 days; (iv) the General Partner fails to pay any of its obligations pursuant to this Agreement when due; or (v) any default or event of default relating to any Investment or any circumstance or set of circumstances arises with respect to the Partnership or any act taken or any failure to act by the General Partner or the Partnership or the Parent could cause a third party to put the Partnership into default pursuant to the Related Agreements, and the General Partner has not taken whatever action is necessary to prevent such default from occurring by the time that is no less one (1) Business Day prior to the time that such default will purportedly take effect pursuant to such party's notice.

(b)   The Limited Partner may also elect to dissolve the Partnership by delivering a written notice to the General Partner to such effect, which dissolution shall take effect not less than thirty (30) days from the date of such notice after the occurrence of one or more of the following events: (i) the General Partner has been

negligent or willfully malfeasant with respect to the Partnership and such negligence or willful malfeasance has a material and adverse effect on the conduct of the Partnership's business; (ii) the General Partner has failed to maintain capital in the Partnership at least equal to the GP Ongoing Commitment Threshold, and such breach is not cured within one (1) Business Day; (iii) the General Partner has materially breached any of its obligations under this Agreement (other than as set forth in clause (a) or clauses (b)(i) or (ii) of this Section 6.02), and such breach is not cured within five (5) Business Days; (v) the Limited Partner determines in its sole discretion that Parent or the General Partner has experienced a material adverse change (A) in the business of the Parent or in the ability of the General Partner to conduct the business of the Partnership, or (B) in the Parent's or the General Partner's financial condition that the Limited Partner reasonably believes could cause the General Partner to be unable to meet its obligations generally, including its obligations to the Partnership; or (vi) any breach of a representation, warranty or covenant or other default under any Investment Acquisition Agreement that the Limited Partner determines in its sole discretion to have a material adverse effect on the Partnership; provided that if any of the events described in this clause (b) is also an event described in clause (a) of this Section, then such event shall be handled in accordance with the terms of the applicable subsection of clause (a).

(c)    The General Partner shall be required to provide notice via email to the Limited Partner as soon as practicable (but in no event more than two (2) Business Days) after the General Partner has knowledge of any of the events described in clauses (a) or (b) above, and failure to provide such notice shall itself be treated as a material breach for purposes of clause (b)(iii) above.  The failure of the Limited Partner to dissolve the Partnership upon notice of any of the events described in clauses (a) or (b) shall not constitute a waiver or approval of, or consent to, such activity or release of any rights the Limited Partner might otherwise have hereunder.  The Limited Partner shall not be required to give advance notice of its intent to dissolve the Partnership in the event of a Cause Event described in (a)(ii) or (a)(iii) and may dissolve the Partnership immediately.

(d)    The General Partner may elect to dissolve the Partnership by delivering a written notice to the Limited Partner to such effect, which dissolution shall take effect not less than one (1) calendar day from the date of such notice, after the occurrence of one or more of the following events: (i) the Limited Partner has failed to make full payment when due of any portion of its Commitment (a "Payment Default") and such Payment Default is not cured within five (5) calendar days after written notice is given to the Limited Partner by the General Partner of such Payment Default, or (ii) any Transfer of LP Interest pursuant to Section 8.01 without the prior written consent of the General Partner.

(e)    The Partnership shall be dissolved at any time there are no limited partners of the Partnership, unless the business of the Partnership is continued in accordance with the Partnership Act.

(f)    The Partnership shall be dissolved at any time upon the entry of a decree of judicial dissolution of the Partnership under Section 17-802 of the Partnership Act.

(g)    The Partnership shall be dissolved if all Related Agreement Consents have not been obtained by the Partnership in conformance with Section 3.03(g).

(h)    The Partnership shall be dissolved upon any event that results in the sole remaining general partner ceasing to be a general partner of the Partnership under the Partnership Act, unless the business of the Partnership is continued in accordance with the Partnership Act.

(i)    Neither the admission of Partners, nor the bankruptcy, dissolution, death, disability or incapacity of the Limited Partner, shall dissolve the Partnership.

Section 6.03    Removal of the General Partner.    The Limited Partner may remove the General Partner as general partner of the Partnership by delivering notice of such removal to the General Partner (i) immediately following the occurrence of one or more Cause Events set forth in Section 6.02(a); or (ii) upon thirty (30) days' prior written notice following one or more Cause Events set forth in Section 6.02(b).    In the event of the General Partner's removal, (a) the General Partner shall continue to be liable for any obligation arising from an Investment entered into by the Partnership prior to removal of the General Partner that has not yet been settled, any expenses related to such Investment and any distributions required to be made to the Limited Partner pursuant to Article IV in connection with such Investment or Section 6.04(c) and the indemnification obligation in Section 4.10, and (b) the General Partner shall continue to have the right to any distributions under Section 7.01.

Section 6.04    Procedure on Winding Up.

(a)    In the event of a dissolution of the Partnership, the affairs of the Partnership shall be wound up promptly by the General Partner or the Person(s) previously designated by the General Partner or, if the General Partner has made no such designation, the Person(s) designated by the Limited Partner; provided that if the Limited Partner elects to dissolve the Partnership pursuant to Section 6.02(a) or (b), then the Limited Partner shall have the right to designate such Person(s).    Such designated Person(s) shall be herein referred to as the "Liquidator."

(b)    Notwithstanding anything in this Agreement, upon the dissolution, termination or winding up of the Partnership, all items of Partnership income, gain, loss, deduction or credit that are recognized for tax purposes, shall be allocated as provided in Article III, and any cash or other property shall thereafter be applied and distributed in the following order of priority:

(i)    to the payment of debts and liabilities of the Partnership then due (or required by any lender or creditor to be repaid on account of the dissolution and termination) including any fees and expenses;

(ii)    to fund reserves for contingent liabilities to the extent deemed necessary or appropriate by the General Partner (or Liquidator); provided that at the expiration of such period of time as the General Partner (or Liquidator) shall deem necessary or appropriate, the balance of such reserves remaining after

payment or other satisfaction of such contingencies shall be distributed in the manner hereinafter set forth in this Section 6.04(b); and

(iii)    all remaining amounts as follows:

(A)    first, 100% to the Limited Partner, until the Limited Partner's Unpaid Preferred Return reduced to zero; and

(B)    second, 100% to the Limited Partner until the Limited Partner has received cumulative distributions pursuant to this Section 6.04(b)(iii)(B) equal to the Limited Partner's aggregate Capital Contributions, to the extent not previously returned to the Limited Partner, and any unreimbursed Partnership Expenses;

(C)    thereafter, 100% to the General Partner.

(c)    After the final distribution of the Partnership's assets among the Partners as provided in this Section 6.04, in the event the Limited Partner does not receive aggregate distributions equal to its Capital Contribution(s) plus its Unpaid Preferred Return, the General Partner shall contribute to the Partnership an amount equal to the amount, if any, of such deficit, which amount shall be distributed to the Limited Partner pursuant to Section 6.04(b)(iii)(A) and (B).

(d)    Distributions to a Partner pursuant to Section 6.04(b) may be in installments and shall be made in cash.

(e)    Upon the winding up of the Partnership, the name of the Partnership and its goodwill shall not be appraised, sold or otherwise liquidated, but shall remain the exclusive property of the General Partner.

(f)    Within 90 days after the completion of the winding up of the Partnership, the General Partner (or the Liquidator) shall cause to be prepared and forwarded to each Partner a final statement and report of the Partnership.

(g)    If the Partnership is wound up by a Liquidator, the Liquidator shall be entitled to reasonable compensation for the Liquidator's services in winding up the Partnership.

Section 6.05    No Restoration of Deficit Capital Account Balances.    Subject to the General Partner's obligations in Article III and Article VI, if any Partner has a deficit balance in the Capital Account that relates to an Interest of such Partner (after taking into account all Capital Account adjustments for the Fiscal Year in which the liquidation occurs), such Partner will have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit will not be considered a debt owed to the Partnership or to any other Person for any purpose whatsoever.

## ARTICLE VII

## PAYMENTS TO AND BY A PERSON WHO HAS CEASED TO BE A PARTNER

Section 7.01    <u>Payments on Death, Bankruptcy or Incompetency of any Partner or Removal of the General Partner</u>.  Within thirty (30) days after the last day of the Fiscal Year during which a Partner died, was dissolved or became bankrupt or incompetent or the General Partner was removed pursuant to Section 6.03, there shall be paid or distributed to such Partner or to the designated representative of such Partner, an amount in cash equal in value to the amount of the Liquidating Share determined as of the date such Partner died, was dissolved, became bankrupt or incompetent or was removed.

## ARTICLE VIII

## TRANSFERABILITY OF INTERESTS OF LIMITED PARTNERS

Section 8.01    <u>Transfers of LP Interests.</u>

(a)    The Limited Partner may pledge, assign, hypothecate, sell, exchange, transfer or otherwise dispose of (each, a "<u>Transfer</u>") its interest in the Partnership, in whole or in part, and such pledgee, assignee, purchaser or transferee shall, upon the General Partner's receipt of written instructions from the Limited Partner and such pledgee, assignee, purchaser or transferee, be admitted as a substitute Limited Partner by the General Partner; <u>provided</u> that such pledgee, assignee, purchaser or transferee shall make the representations set forth in Section 11.03(b) hereto.

(b)    Any substitute Limited Partner admitted to the Partnership shall succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the beneficial interest to which the Limited Partner was substituted as of an effective date to be set by the General Partner.  The General Partner shall modify <u>Schedule A</u> to reflect such admittance of a substitute Limited Partner.

(c)    Except as otherwise agreed by the transferor and the transferee, the transferor and transferee of any portion of an LP Interest shall be severally, and not jointly, obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including reasonable attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

(d)    Except as otherwise agreed by the transferor and the transferee, the transferee of any portion of an LP Interest shall be treated as having made all of the Capital Contributions made by, and received all of the allocations and distributions received by, the transferor with respect to such LP Interest or portion of such LP Interest.

## ARTICLE IX

## BOOKS, RECORDS AND REPORTS

Section 9.01    <u>Maintaining Books of Account</u>.    Proper and complete books of account and records shall be kept at all times and shall be open to inspection and copying by any Partner or such Partner's designated representative at reasonable times during normal business hours. The General Partner shall maintain such books and records on behalf of the Partnership and shall allow the Partners and their designated representatives to inspect and copy such records at reasonable times during the General Partner's normal business hours and/or to provide electronic access to copies of such books and records.

Section 9.02    <u>Books</u>.    The books of account and records of the Partnership shall be kept in accordance with GAAP.

Section 9.03    <u>Custody of Partnership Assets</u>.    All cash shall be held in the Margin Account, in a general operating account in an amount up to $50,000 at an insured financial institution designated by the General Partner with the consent of the Limited Partner, or by a custodian or custodians appointed by the General Partner with the prior written consent of the Limited Partner, and may be registered in the name of the Partnership, such custodian or custodians or a nominee.    The terms of any agreement governing custody of cash, including any fees and subsequent amendments or modifications thereto, shall be determined by the General Partner and shall require the prior written approval of the Limited Partner.

Section 9.04    <u>Reports</u>.    The General Partner will provide, and shall cause the Parent to provide, to the Limited Partner reasonable access to monitor all trading activity, which requirement may be satisfied by providing the Limited Partner with reasonable access to the Partnership's books and records maintained by the General Partner or such other party approved in writing by the Limited Partner, and will instruct all counterparties/brokers to provide the Limited Partner with copies of trade confirmations.    In addition, the Limited Partner will receive the following from the General Partner:

(a)    within five (5) days of the end of each calendar month, a detailed report of all Investments and corresponding hedging and margining activity for the previous month in an electronic format acceptable to the Limited Partner;

(b)    within sixty (60) days of the end of each of the first three fiscal quarters of every fiscal year or as soon as reasonably practicable thereafter, (x) a copy of the Parent's quarterly unaudited financial statements and (y) a copy of the Partnership's quarterly unaudited financial statements;

(c)    within one hundred twenty (120) days after the end of each fiscal year, or as soon as reasonably practicable thereafter, all tax information relating to the Partnership which is necessary for the preparation of the Limited Partner's federal, state, and local income tax returns and a copy of the Parent's audited financial statements;

(d)    daily, the Parent's global hedge reporting;

(e)    prompt notification and a description of any material change in control of, or the departure from the Parent of William J. Bradley, Roy W. Browning, III or Dan Baruch, and such description shall include, as applicable, information regarding the identity of any new owner or replacement executive officer; and

(f)    other information and reports relating to the Partnership reasonably requested by the Limited Partner.

## ARTICLE X

## TAX MATTERS

Section 10.01  <u>Tax Capital Account Allocations; Tax Allocations</u>.

(a)    <u>Establishment and Determination of Tax Capital Accounts</u>.   A capital account shall be established for each Partner in accordance with Section 704(b) and the Treasury Regulations promulgated thereunder ("<u>Tax Capital Account</u>").  In accordance with such rules, the Tax Capital Account of each Partner shall equal, as of the date such Partner acquires an Interest, the Capital Account of such Partner with respect to such newly acquired Interest plus the amount of any existing Tax Capital Account with respect to any Interests already held by such Partner.  Such Tax Capital Account shall be (i) increased by such Partner's share of items of income and gain allocated to such Partner pursuant to Sections 10.01(b), (c) and (d) and (ii) decreased by such Partner's share of items of loss, deduction and expense allocated to such Partner pursuant to Sections 10.01(b), (c) and (d) and any distributions to such Partner of cash or the fair value of any other property (as determined by the General Partner with care and in good faith and net of liabilities assumed by such Partner and liabilities to which such property is subject) distributed to such Partner.  Any references in this Agreement to the Tax Capital Account of a Partner shall be deemed to refer to such Tax Capital Account as the same may be increased or decreased from time to time as set forth above.

(b)    <u>Allocations to Tax Capital Accounts</u>.   Except as otherwise provided in Section 10.01(e), items of Partnership income, gain, loss, expense or deduction for any Taxable Year as determined in accordance with Section 704(b) and the Treasury Regulations promulgated thereunder, shall be allocated among the Partners in such manner that, as of the end of such Taxable Year, the sum of (i) the Tax Capital Account of each Partner, (ii) such Partner's share of Partnership Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and (iii) such Partner's Partner Nonrecourse Debt Minimum Gain shall be equal to the respective net amounts, positive or negative, that would be distributed to them or for which they would be liable to the Partnership under this Agreement, determined as if the Partnership were to (A) liquidate all of the assets of the Partnership for an amount equal to their book value (determined according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)) and (B) distribute the proceeds of liquidation pursuant to Article VI.

(c)    <u>Adjustments to Reflect Fair Value</u>.  The Partnership shall, when permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(*f*), increase or decrease the Partners' Tax Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*) to reflect a revaluation of Partnership property.

(d)    <u>Special Allocations to Tax Capital Accounts</u>.  The following special allocations shall be made with respect to the Tax Capital Accounts in the following order and priority:

(i)    Items of Partnership loss, deduction or expense attributable to partner nonrecourse debt (as described in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i).  If there is a net decrease during a Taxable Year in Partner Nonrecourse Debt Minimum Gain, income and gain for such taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Partners in the amounts and of such character as determined according to, and subject to the exceptions contained in, Treasury Regulation Section 1.704-2(i)(4).  This Section 10.01(d)(i) is intended to be a "partner nonrecourse debt minimum gain chargeback" provision that complies with the requirements of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted in a manner consistent therewith.

(ii)    If there is a net decrease in Partnership Minimum Gain during any Taxable Year, each Partner shall be allocated income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to, and subject to the exceptions contained in, Treasury Regulation Section l.704-2(f).  This Section 10.01(d)(ii) is intended to be a "minimum gain chargeback" provision that complies with the requirements of Treasury Regulation Section 1.704-2(f) and shall be interpreted in a manner consistent therewith.

(iii)    Partner Nonrecourse Deductions for any Fiscal Year shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i). Nonrecourse Deductions for any Fiscal Year shall be allocated *pro rata* according to Capital Account balances.

(iv)    If any Partner who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(4), (5), and (6) has an adjusted capital account deficit (determined according to Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)) as of the end of any Taxable Year, then income and gain for such Taxable Year shall be allocated to such Partner in proportion to, and to the extent of, such adjusted capital account deficit. This Section 10.01(d)(iv) is intended to be a "qualified income offset" provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted in a manner consistent therewith.

(v)     Items of Partnership income, gain, loss, deduction or expense shall be allocated in a manner consistent with the manner that adjustments to the Tax Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*).

(e)     Tax Allocations.

(i)     The income, gains, losses, deductions and expenses of the Partnership shall be allocated, for federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, deductions and expenses among the Partners for computing their Tax Capital Accounts, except that if any such allocation is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, deductions and expenses shall be allocated among the Partners so as to reflect as nearly as possible the allocation set forth herein in computing their Tax Capital Accounts.

(ii)     In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, items of income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its fair value at the time of contribution.  The General Partner hereby elects, on behalf of the Partnership, the traditional method under Code Section 704(c) and the Treasury Regulations thereunder for taking into account any such variation.

(iii)     If the value of any Partnership asset is adjusted for Tax Capital Account maintenance purposes pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*e*) or (*f*), subsequent allocations of items of taxable income, gain, loss, deduction and expense with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and such adjusted value in the same manner as under Section 704(c) of the Code.

(iv)     Allocations pursuant to this Section 10.01(e) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account, the Capital Account with respect to any Interest, other items or distributions pursuant to any provisions of this Agreement.

(f)     Deficit Balance.  No Partner shall have any obligation to restore any deficit balance in its Tax Capital Account.

Section 10.02 Tax Matters Partner.  The General Partner is designated the "Tax Matters Partner" (as defined in Code §6231).

Section 10.03  Tax Elections.  The General Partner, with the Limited Partner's consent and subject to Section 4.02(c), may cause the Partnership to make various tax elections reasonably and in good faith deemed necessary or appropriate by the General Partner, including without limitation pursuant to Section 754 of the Code and Section 475 of the Code.

Section 10.04  Code §83 Safe Harbor Election.

(a)    By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice.  The Partnership and each Partner hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Partnership in a manner consistent with the requirements of the IRS Notice.  A Partner's obligations to comply with the requirements of this Section 10.04 shall survive such Partner's ceasing to be a Partner of the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership, and, for purposes of this Section 10.04, the Partnership shall be treated as continuing in existence.

(b)    Each Partner authorizes the General Partner to amend this Section 10.04 to the extent necessary to achieve similar tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in Section 4 of the IRS Notice (*e.g.*, to reflect changes from the rules set forth in the IRS Notice in subsequent U.S. Department of Treasury or Internal Revenue Service guidance).

Section 10.05  Tax Returns.  The General Partner shall, and shall cause the Partnership's accountants to, use commercially reasonable efforts to deliver copies of all income tax returns and related information returns (including that IRS Form commonly referred to as Schedule K-1) all similar state and local tax forms, and all required information for federal, state and local tax reporting to the Limited Partner within sixty (60) days following the end of each Fiscal Year.  If the Limited Partner provides any comments to any such returns, such comments shall be reflected in the final tax returns.  Upon receipt of comments from the Limited Partner or written notification from the Limited Partner that it has no comments with respect to any income or related information return, the General Partner shall, and shall cause the Partnership's accountants to, use commercially reasonable efforts to file any income tax returns in respect of a Fiscal Year by April 15 of the following year, and in all events the General Partner shall cause the Partnership's accountants to file any income tax returns in respect of a Fiscal Year by May 15 of the following year.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.01 <u>Amendment of Agreement</u>. This Agreement may be amended by the General Partner with the prior written consent of the Limited Partner.

Section 11.02 <u>Confidentiality</u>. The General Partner and the Limited Partner shall maintain the confidentiality of (a) Non-Public Information and (b) any information subject to a confidentiality agreement binding upon the Parent, the General Partner, the Partnership and made known to the Limited Partner; <u>provided</u> that each Partner may disclose Non-Public Information to (i) its affiliates, officers, employees, agents or consultants upon notification to such affiliate, officer, employee, agent or consultant that such disclosure is made in confidence and shall be kept in confidence; (ii) Persons having regulatory authority over such Person or its affiliates; <u>provided</u> that such Persons are advised that the Non-Public Information is confidential; or (iii) as otherwise required by law or required to enforce the rights and remedies under this Agreement. Each of the General Partner and the Limited Partner agree that in the event personal consumer information for any borrower is made available or disclosed to it, it will comply with all privacy and data protection laws, rules and regulations which are, or which may in the future, be applicable (including, without limitation, the names, addresses and social security numbers of the borrowers) ("<u>Borrower NPPI</u>") as otherwise specifically permitted under the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6801 et seq.) or its implementing regulations. The General Partner and the Limited Partner further agree that in safeguarding such Borrower NPPI from unauthorized use and unauthorized disclosure each shall use at least the same degree of care as it uses to protect its own confidential or proprietary information of like nature, but in no event less than reasonable care.

Section 11.03 <u>Partner Representations and Warranties</u>.

(a) The General Partner hereby represents and warrants that: (i) it is an "accredited investor" pursuant to Regulation D promulgated under the Securities Act and a "qualified purchaser" as such term is defined pursuant to the 1940 Act, and (ii) it is acquiring an Interest for investment purposes.

(b) The Limited Partner hereby represents and warrants that: (i) it is an "accredited investor" pursuant to Regulation D promulgated under the Securities Act and a "qualified purchaser" as such term is defined pursuant to the 1940 Act, (ii) it was not formed or reformed for the purposes of acquiring an Interest in the Partnership, (iii) the Limited Partner's Commitment is less than 40% of the Limited Partner's assets; and (iv) it is acquiring an Interest for investment purposes.

Section 11.04 <u>Notices and Consents</u>. All notices to Partners provided for under this Agreement shall be in writing and shall be sufficient if sent by first-class mail, a nationally recognized overnight courier service, facsimile transmission (with confirmed receipt) or electronic mail (with confirmed receipt) to each applicable Partner's address as set forth in <u>Schedule A</u> or in the files of the Partnership as of the date of such notice.

Section 11.05  <u>Power of Attorney</u>.  The General Partner shall provide the Limited Partner with an originally executed power of attorney appointing the Limited Partner as the General Partner's agent for purposes of the endorsement or execution of any documents for the transfer or assignment of any Investment and for assignments of any Firm Commitment relating to such Investment (including any related Qualifying Mortgage Loan); <u>provided</u>, <u>however</u>, that such power of attorney shall not be effective and the Limited Partner shall not use such power of attorney unless and until a Cause Event has occurred and is continuing.

Section 11.06  <u>Binding Effect of Agreement</u>.  This Agreement, including Section 11.04 hereof, shall be binding on the successors, assigns and the designated representatives of each of the Partners with respect to the matters herein described, but shall not affect any other agreement between or among the parties hereto with respect to matters not herein described.

Section 11.07  <u>Severability of Provisions</u>.  Each provision of this Agreement shall be considered severable and (i) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provision or provisions herein would cause any Partner who is not also specifically designated herein as a General Partner to be bound by the obligations of the Partnership as a General Partner under the laws of the State of Delaware as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

Section 11.08  <u>Effective Date</u>.  Notwithstanding the separate dates of execution hereof, all parties hereto agree that this Agreement shall become effective as of the date first written above.

Section 11.09  <u>Assignment by General Partner</u>.  The General Partner may not assign its interest in the Partnership to a Substitute General Partner without the consent of the Limited Partner.

Section 11.10  <u>Interpretation</u>.  The General Partner shall consult with the Limited Partner to resolve any ambiguity regarding the application of any provision of this Agreement, and the Partners shall resolve such ambiguity in the manner they deem equitable, practicable and consistent with this Agreement and applicable law.

Section 11.11  <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of laws.  Notwithstanding any other provision of this Agreement, no action may be taken under this Agreement unless such action is taken in compliance with the provisions of the Partnership Act.

Section 11.12  <u>Counterparts</u>.  This Agreement may be executed in several counterparts and all counterparts so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties have not signed the same counterpart.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned have signed this Amended and Restated Agreement of Limited Partnership of WJB LOAN LP as of the Effective Date.

GENERAL PARTNER:

**WJB GENERAL PARTNER, LLC**

By: **W.J. BRADLEY MORTGAGE CAPITAL, LLC**, its Managing Member

By:_____
Name: William J. Bradley
Title:   Chief Executive Officer and President

LIMITED PARTNER:

**MIMS MASTER FUND, L.P.**

By: **ILLUMINATION ASSET MANAGEMENT, LLC,**
      its General Partner

By:_____
Name: Greg Jacobson
Title:   CEO

IN WITNESS WHEREOF, the undersigned have signed this Amended and Restated Agreement of Limited Partnership of WJB LOAN LP as of the Effective Date.

GENERAL PARTNER:

**WJB GENERAL PARTNER, LLC**

By: **W.J. BRADLEY MORTGAGE CAPITAL, LLC**, its Managing Member

By:_____
Name: William J. Bradley
Title:   Chief Executive Officer and President

LIMITED PARTNER:

**MIMS MASTER FUND, L.P.**

By: **ILLUMINATION ASSET MANAGEMENT, LLC**, its General Partner

By:_____
Name: Greg Jacobson
Title:   CEO

**Schedule A**

**PARTNERS**

| Name | Address | Type of Interest | Commitment | Initial Capital Contribution | Date Admitted |
|---|---|---|---|---|---|
| WJB General Partner, LLC | 6465 Greenwood Plaza Blvd., 5th Floor, Centennial, CO 80111 | GP Interest | $50,000 | $50,000 plus the value of all Mortgage Loan Interests contributed on the Effective Date | December 9, 2015 |
| MIMS Master Fund, L.P. | 11755 Wilshire Blvd #1600, Los Angeles, CA 90025 | LP Interest | $10,000,000 | $7,000,000 | December 9, 2015 |

**Schedule B**

**INVESTMENT GUIDELINES**

<u>Definitions</u>:

"**Agency**" means Freddie Mac, Fannie Mae or GNMA, as applicable.

"**Aggregate Principal Balance**" means as of any date of determination, the aggregate Outstanding Principal Balances of all Qualifying Mortgage Loans relating to Mortgage Loan Interests that have been assigned, contributed or participated to the Partnership by the Parent or the General Partner as of such date of determination.

"**Approved Custodian**" means any custodian holding a complete mortgage file relating to any Qualifying Mortgage Loan on behalf of the General Partner, the Partnership or an Approved Counterparty pursuant to a Related Agreement and approved by the Limited Partner.

"**Firm Commitment**" means (a) a current, valid, binding and enforceable commitment issued by an Investor in favor of the Parent or the General Partner to purchase a specific Qualifying Mortgage Loan, which such commitment must be in form and substance satisfactory to the Limited Partner (including with respect to the purchase price percentage and amount to be paid for the purchase of such Qualifying Mortgage Loan and the Investor delivery expiration date) or (b) any Related Agreement for Qualifying Mortgage Loans which are to be securitized by an Issuer, including any forward sale of such resulting securities.

"**Indebtedness**" means with respect to any date of determination and any Mortgage Loan Interest owned by the Partnership as of such date of determination, the aggregate amount of all obligations relating to the Qualifying Mortgage Loan related to such Mortgage Loan Interest owed by the Partnership, the General Partner or the Parent to third parties pursuant to the Related Agreements (other than the obligation to deliver such Qualifying Mortgage Loan pursuant to such Related Agreements).

"**Interest Participation Accrual**" means with respect to each Mortgage Loan Interest, accrued interest for the related Interest Participation Accrual Period equal to the product of (i) a per annum rate equal to 1.246875% and (ii)  the Outstanding Principal Balance of the Qualifying Mortgage Loan relating to such Mortgage Loan Interest.  Interest Participation Accrual shall be calculated assuming a 360 day year and the actual number of days elapsed.

"**Interest Participation Accrual Period**" means the period beginning on the Investment Acquisition Date through the day prior to the date such Mortgage Loan Interest has been disposed of by the Partnership or distributed to a Partner.

"**Investment Acquisition Agreement**" means any contribution agreement, mortgage loan purchase agreement, asset purchase agreement, participation agreement or similar agreement pursuant to which the Partnership shall acquire Mortgage Loan Interests, in form and substance similar to one of the forms attached hereto as <u>Exhibit A-1</u> or <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, and as otherwise approved in writing by the Limited Partner.

"**Investment Acquisition Date**" means with respect to any Mortgage Loan Interest, the date on which the Partnership acquires such Mortgage Loan Interest, whether by purchase, Capital Contribution, participation or otherwise.

"**Investment Certificate**" means the notice delivered by the General Partner to the Limited Partner daily pursuant to Section 3.03(a), which shall be by electronic data file or other form of electronic submission required by the Limited Partner, and include such information and materials as the Limited Partner may require in accordance with its standard procedures then in effect, including information and materials derived from the following materials (and the Limited Partner expressly reserves the right to require delivery of a true and correct copy of such materials in certain situations and from time to time, it being understood that the delivery of such true and correct copies of such materials shall not be a prerequisite for funding any particular Capital Contribution) for each Mortgage Loan Interest (or Qualifying Mortgage Loan related to such Mortgage Loan Interest):

(a)     Requested Capital Contributions from the Limited Partner (to be at least forty five (45) days from the date of such Investment Certificate if not during the Minimum Investment Period);

(b)     Outstanding Principal Balance of the related Qualifying Mortgage Loan(s);

(c)     Total Indebtedness for such Qualifying Mortgage Loan(s);

(d)     Reference by number or other identifying mark as to the Firm Commitment for the related Qualifying Mortgage Loan and a separate schedule of all such Firm Commitments;

(e)     A custodial trust receipt from the related Approved Custodian for the complete mortgage file relating to such Qualifying Mortgage Loan (which may be delivered separately by the related Approved Custodian no later than noon (Eastern time) one (1) Business Day following such Investment Certificate); and

(f)     Such other information that the Limited Partner may reasonably request from time to time.

"**Investments**" means the approved investments of the Partnership as set forth below under the heading "Investment Policies."

"**Investor**" means any Person approved in advance by the Limited Partner, in its sole discretion, who agrees to purchase a Qualifying Mortgage Loan pursuant to a Firm Commitment.

"**Issuer**" means any Agency or any other issuer of a mortgaged-backed security, which Issuer (if other than an Agency) has been approved in advance by the Limited Partner to purchase Qualifying Mortgage Loans.

"**Margin Account**" means a deposit account established and maintained by the General Partner at an insured financial institution acceptable to the Limited Partner, in the name of the Partnership and for the benefit of the Limited Partner, and subject to an account control

agreement with such insured financial institution, into which amounts in respect of Margin Maintenance shall be deposited or withdrawn, which shall at all times contain a balance necessary to cause the Partnership to meet the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans and Minimum Net Collateral Value Requirement tests, as such amounts shall be determined by the Limited Partner from time to time in its sole discretion.

"**Minimum Aggregate Principal Balance of Qualifying Mortgage Loans**" means $80,000,000; provided, that following the Minimum Investment Period, the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans may be reduced by the General Partner in connection with a corresponding reduction to the Limited Partner's Commitment pursuant to Section 3.03(a) upon at least forty five (45) days notice to the Limited Partner.

"**Minimum Investment Shortfall**" means for any Minimum Investment Shortfall Period, accrued interest for such Minimum Investment Shortfall Period equal to the product of (i) a per annum rate equal to 1.246875% and (ii) the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans *less* the Aggregate Principal Balance of Qualifying Mortgage Loans during such Minimum Investment Shortfall Period.  Minimum Investment Shortfall shall be calculated assuming a 360 day year consisting of twelve 30 day months and the actual number of days elapsed.

"**Minimum Investment Shortfall Period**" means any period during which the Aggregate Principal Balance of Qualifying Mortgage Loans relating to Mortgage Loan Interests owned by the Partnership is not equal to at least the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans.

"**Minimum Net Collateral Value Requirement**" with respect to any date of determination shall be met if the Net Collateral Value as of such date of determination equals or exceeds the Participation Sale Price as of such date of determination.

"**Mortgage Loan**" means any closed residential mortgage loan evidenced by a promissory note and secured by a first lien mortgage on a one-to-four family residence, including all Mortgage Rights relating thereto.

"**Mortgage Loan Interest**" means all of the right, title and interest of the Partnership in and to the Qualifying Mortgage Loans (including participation and repurchase interests), including all of the Partnership's interest in any Related Agreements; provided, that such Qualifying Mortgage Loan shall not have Total Indebtedness related thereto except for debt and the liens securing such debt outstanding under the related Approved Counterparty's warehouse finance facilities, liens for taxes and government assessments not yet past due and the rights of any hedge counterparty in connection with any hedge on such Qualifying Mortgage Loan; provided, further, that any such Total Indebtedness shall not exceed ninety nine percent (99%) of the Outstanding Principal Balance of such Qualifying Mortgage Loan.

"**Mortgage Rights**" means, with respect to any Mortgage Loan, any and all of the following: (a) all rights to service such Mortgage Loan; (b) any payments or monies payable or received or receivable with respect to such Mortgage Loan; (c) any late fees, prepayment fees, assumption fees, penalties or similar payments with respect to such Mortgage Loan; (d) all

agreements or documents creating, defining or evidencing any rights with respect to such Mortgage Loan; (e) possession and use of any and all credit files pertaining to such Mortgage Loan or pertaining to the past, present or prospective servicing of such Mortgage Loan; (f) all accounts and other rights to payment related to any of the property described in this definition; and (g) all rights, powers and privileges incident to any of the foregoing.

"**Net Collateral Value**" means with respect to any date of determination, the sum of the following:

(a)     For all Mortgage Loan Interests owned by the Partnership as of such date of determination that are subject to Indebtedness, 85% of the difference between (i) the Total Hedged Value for the Qualifying Mortgage Loans related to such Mortgage Loan Interests, and (ii) the Total Indebtedness related to such Mortgage Loan Interests; plus

(b)     For all Mortgage Loan Interests owned by the Partnership as of such date of determination that are not subject to Indebtedness and that were originated not more than 15 days prior to such date of determination, 99% of the Total Hedged Value for the Qualifying Mortgage Loans related to such Mortgage Loan Interests; plus

(c)     For all Mortgage Loan Interests that do not fall under clauses (a) or (b) above, 85% of the Total Hedged Value for the Qualifying Mortgage Loans related to such Mortgage Loan Interests; plus

(d)     100% of all gains under Related Agreements (or portion of such Related Agreement allocated to the related Qualifying Mortgage Loan) assigned to the Partnership as of such date of determination; plus

(e)     Any Maintenance Margin as described under the heading "Investment Policies" below and remaining in the Partnership as of such date of determination; minus

(f)     100% of all losses under Related Agreements (or portion of such Related Agreement allocated to the related Qualifying Mortgage Loan) assigned to the Partnership as of such date of determination.

"**Outstanding Principal Balance**" means with respect to each Qualifying Mortgage Loan related to a Mortgage Loan Interest and any date of determination, the outstanding principal balance of such Qualifying Mortgage Loan.

"**Participation Purchase Price**" means an amount equal to 8.75% of the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans as of the related Investment Acquisition Date.

"**Participation Sale Price**" means, with respect to the aggregate Mortgage Loan Interests acquired, owned or held by the Partnership, an amount equal to the sum of (i) the Participation Purchase Price, (ii) all accrued and unpaid Interest Participation Accrual relating to such Mortgage Loan Interests from the date Interest Participation Accrual was last paid through the

day prior to the date the Mortgage Loan Interests are removed from the Partnership, and (iii) the amount of any Discretionary Contribution relating to such Mortgage Loan Interests.

"**Preferred Return**" means the Limited Partner's return on investment in the Partnership which shall be an amount equal to the sum of (a) all Interest Participation Accruals for Mortgage Loan Interests owned by the Partnership from time to time and (b) all accrued Minimum Investment Shortfalls.

"**Qualifying Mortgage Loan**" means a Mortgage Loan: (a)(i) to be sold (and is eligible for sale) to an Issuer, (ii) for which the Parent or the General Partner or an Approved Counterparty has received a Firm Commitment from an Investor, a copy of which Firm Commitment has been approved by Limited Partner and which is valid and enforceable in accordance with its terms, or (iii) such other Mortgage Loan specifically approved by the Limited Partner; (b) which is evidenced by a mortgage note, in form and substance acceptable to such Issuer or Investor, or the Limited Partner, payable to the order of the Approved Counterparty or the General Partner or the Parent; (c) which is secured by a security instrument, in form and substance acceptable to such Issuer or Investor, or the Limited Partner; (d) which conforms in all respects with all the requirements of the Firm Commitment to purchase the same or all requirements of the Issuer to purchase the same or is otherwise acceptable to the Limited Partner; (e) for which the related Investment Acquisition Date is more than two (2) Business Days following the origination date of such Mortgage Loan; and (f) for which the Approved Counterparty, the General Partner, the Partnership, the Parent or an Approved Custodian has received a complete mortgage file prior to the related Investment Acquisition Date.

"**Related Agreement**" means with respect to any Mortgage Loan Interest, any hedge agreement, swap agreement, master repurchase agreement, side letter, custodial agreement, warehouse loan agreement or other agreement entered into by the related Approved Counterparty and related to or otherwise affecting such Investment (or the portion of any such agreement that has been allocated to the related Mortgage Loan Interests), which Related Agreement shall be approved by the Limited Partner in its sole discretion.

"**Substitute Mortgage Loan Interest**" means any Mortgage Loan Interest assigned to or entered into by the Partnership in exchange for, or as a replacement of, a Mortgage Loan Interest owned or previously owned, by the Partnership as provided under the heading "Investment Policies" below, which such Substitute Mortgage Loan Interest shall have the following characteristics for the related Qualifying Mortgage Loan: (i) after removal of the replaced Mortgage Loan Interest and addition of such Substitute Mortgage Loan Interest, the Net Collateral Value is equal to or greater than the Net Collateral Value immediately prior to such exchange, and (ii) be, in the reasonable determination of Limited Partner, in material compliance with all other requirements for an Investment in the Partnership.

"**Total Hedged Value**" means an aggregate amount equal to the Outstanding Principal Amount of each Qualifying Mortgage Loan related to any Mortgage Loan Interest multiplied by the purchase price percentage for such Qualifying Mortgage Loan as set forth in the related Firm Commitment to purchase such Qualifying Mortgage Loan; provided, however, that such calculation of Total Hedged Value shall at all times be subject to clause (h)(i)(A) under the "Investment Policies" below.

"**Total Indebtedness**" means with respect to any date of determination and Mortgage Loan Interests owned by the Partnership as of such date of determination that are subject to Indebtedness, the aggregate Indebtedness for such Mortgage Loan Interests as of such date of determination.

"**Unpaid Preferred Return**" means as of any date of determination, all Preferred Return accrued to the Limited Partner hereunder remaining unpaid as of such date of determination.

<u>**Investment Policies**</u>:

The Investments of the Partnership shall consist only of Mortgage Loan Interests; <u>provided</u> that:

(a)      The General Partner shall cause Mortgage Loan Interests to be acquired by, or contributed to, the Partnership from time to time, in each case pursuant to an Investment Acquisition Agreement, such that (i) subject to the second proviso immediately below, the Aggregate Principal Balance of Qualifying Mortgage Loans relating to Mortgage Loan Interests owned by the Partnership is at all times equal to at least the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans, and (ii) the Minimum Net Collateral Value Requirement has been met; <u>provided</u>, that if the General Partner is unable to acquire or contribute Mortgage Loan Interests sufficient to meet the Minimum Net Collateral Value Requirement, the General Partner shall instead immediately post Maintenance Margin (pursuant to subparagraph (h) below) such that the Minimum Net Collateral Value Requirement will be met; <u>provided further</u>, that if the General Partner is unable to acquire or contribute Mortgage Loan Interests sufficient to meet the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans, the Partnership shall instead pay the Minimum Investment Shortfall during the Minimum Investment Shortfall Period.

(b)      The General Partner may sell any Mortgage Loan Interest, and the Parent may sell any Mortgage Loan related to a Mortgage Loan Interest, to an Issuer or an Approved Counterparty or make distributions to itself (including distributions in kind) at any time so long as all covenants and obligations of the General Partner required by this Agreement have been complied with both before and after such actions are taken (including without limitation as set forth in subparagraph (a) above, in respect of required Capital Contributions, maintenance of the GP Ongoing Commitment Threshold and the satisfaction of all requirements contained in these Investment Guidelines set forth on this <u>Schedule B</u> and after giving effect to any Capital Contributions to be made in connection with such sale) and no Cause Event has occurred and is continuing or will be caused by such actions being taken, and the General Partner shall cause Mortgage Loan Interests, or cause the Parent to cause the related Mortgage Loans, to be sold or transferred by the Partnership or the Parent from time to time in order to comply with the requirements of any Firm Commitment, Related Agreement or such sale or transfer is otherwise required in order to comply with any other third party agreement or requirements of law;

(c)      With respect to the sale, transfer or other disposition of any Mortgage Loan Interest from the Partnership or any Mortgage Loan related to any Mortgage Loan Interest from the Parent, the General Partner shall either (i) cause the related Approved Counterparty to pay a purchase price in an amount no less than the amount necessary after giving effect to such

payment and corresponding payment to the Partnership in respect of such Mortgage Loan Interest, that the Net Collateral Value is equal to or greater than the Net Collateral Value immediately prior to such sale, or (ii) contribute a Substitute Mortgage Loan Interest to the Partnership, or cause the Partnership to acquire a Substitute Mortgage Loan Interest in exchange for such Mortgage Loan Interest; provided, that if any Substitute Mortgage Loan Interest had been previously owned by the Partnership, the General Partner shall notify the Limited Partner upon transferring such Substitute Mortgage Loan Interest to the Partnership;

(d)      The General Partner or Partnership shall hedge, or cause WJB TBA LP to hedge, all Investments in accordance with the Parent's, the Partnership's, General Partner's or WJB TBA LP's hedging policies in effect from time to time, which shall be approved in advance by the Limited Partner;

(e)      The Partnership shall only transact with the Parent, Issuers or Approved Counterparties;

(f)      The Partnership shall not engage in speculative trading;

(g)      The Partnership shall not at any time have outstanding Investments representing more than $250 million in Aggregate Principal Amount; and

(h)      <u>Margin Account Maintenance</u>.

(i)      *Collateral Value.*  For purposes of determining (A) the "Total Hedged Value," the Limited Partner shall have the right to independently determine the market value of any or all Qualifying Mortgage Loans in its sole discretion at any time based on market conditions, credit quality of the related counterparty under a Firm Commitment, the lack of a Firm Commitment, deterioration of the value of such Qualifying Mortgage Loan since the date of the related Firm Commitment or otherwise, and (B) the "Minimum Net Collateral Value Requirement," the Limited Partner shall have the right to increase such requirement based upon any material adverse change in the financial condition of the Parent, the General Partner or changes in the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans.

(ii)      *Margin Deficit and Margin Call.*

(A)      If the General Partner or the Limited Partner shall determine at any time that (x) the Net Collateral Value is less than the Minimum Net Collateral Value Requirement, or (y) the Aggregate Principal Balance of Qualifying Mortgage Loans owned by the Partnership is less than the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans (in any such case, a "<u>Margin Deficit</u>"), then if the General Partner has determined any such shortfall, or if the Limited Partner has determined such shortfall and has delivered notice thereof to the General Partner (a "<u>Margin Call</u>"), the General Partner shall transfer cash to the Margin Account such that (x) the Net Collateral Value will meet the Minimum Net Collateral Value Requirement, or (y) the Aggregate Principal Balance of Qualifying Mortgage Loans owned by the Partnership plus such cash will meet the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans, as applicable.

(B)    In addition, in the event any Approved Counterparty has originated Mortgage Loans for which such Approved Counterparty, the General Partner, the Parent, or an Approved Custodian has not yet received a complete mortgage file (each such Mortgage Loan, a "Wet Loan"), and such Wet Loan has been financed by any warehouse provider or other lender that has also financed the Qualifying Mortgage Loans subject to this Agreement, then the Limited Partner may increase the Margin Deficit as follows:

1.    If the complete mortgage files for ten (10) or more Wet Loans have not been received by such Approved Counterparty, the General Partner, the Parent or an Approved Custodian within five (5) days of such Wet Loans origination date, the Margin Deficit shall be increased by an amount equal to twenty percent (20%) of the Outstanding Principal Balance of such Wet Loans;

2.    If the complete mortgage files for twenty (20) or more Wet Loans have not been received by such Approved Counterparty, the General Partner, the Parent or an Approved Custodian within five (5) days of such Wet Loans origination date, the Margin Deficit shall be increased by an amount equal to forty percent (40%) of the Outstanding Principal Balance of such Wet Loans;

3.    If the complete mortgage files for thirty (30) or more Wet Loans have not been received by such Approved Counterparty, the General Partner, the Parent or an Approved Custodian within five (5) days of such Wet Loans origination date, the Margin Deficit shall be increased by an amount equal to sixty percent (60%) of the Outstanding Principal Balance of such Wet Loans;

4.    If the complete mortgage files for forty (40) or more Wet Loans have not been received by such Approved Counterparty, the General Partner, the Parent or an Approved Custodian within five (5) days of such Wet Loans origination date, the Margin Deficit shall be increased by an amount equal to eighty percent (80%) of the Outstanding Principal Balance of such Wet Loans; and

5.    If the complete mortgage files for fifty (50) or more Wet Loans have not been received by such Approved Counterparty, the General Partner, the Parent or an Approved Custodian within five (5) days of such Wet Loans origination date, the Margin Deficit shall be increased by an amount equal to one hundred percent (100%) of the Outstanding Principal Balance of such Wet Loans.

(C)    If the General Partner determines any such Margin Deficit or receives a Margin Call from the Limited Partner on or prior to 12:00 p.m. (New York City time) on any Business Day, then the General Partner shall transfer cash to the Margin Account no later than 5:00 p.m. (New York City time) that same day.  If the General Partner determines any such Margin Deficit or receives a Margin Call from the Limited Partner after 12:00 p.m. (New York City time) on any Business Day, Seller shall be required to transfer cash to the Margin Account no later than 2:00 p.m. (New York City time) on the next subsequent Business Day.  Notice of a Margin Call may be provided by the Limited Partner to the General Partner electronically or in writing, including via email.

(iii)    <u>Limited Partner's Discretion</u>.  The Limited Partner's election not to make a Margin Call at any time that there is a Margin Deficit shall not in any way limit or impair its right to make a Margin Call at any time a Margin Deficit exists at any time thereafter.

**Exhibit A-1**

**FORM OF CONTRIBUTION AGREEMENT**

(See attached)

FORM OF

## CONTRIBUTION AGREEMENT

This CONTRIBUTION AGREEMENT is made and entered into as of _____ __, 201__ (the "Agreement"), by and among WJB General Partner, LLC, a Delaware limited liability company ("WJB"), WJB Loan LP, a Delaware limited partnership (the "Company''), and MIMS Master Fund, L.P., a Delaware limited partner, as the limited partner of the Company (together with its successors and assigns, the "Limited Partner").

## RECITALS

WJB acts as the general partner for the Company pursuant to that certain Second Amended and Restated Agreement of Limited Partnership, dated as of December 8, 2015, by and among WJB, as general partner, the Limited Partner, and the Company (the "Partnership Agreement").  In its capacity as general partner to the Company, WJB may elect from time to time to make capital contributions to the Company by contributing to the Company all of WJB's right, title and interest in and to certain Qualifying Mortgage Loans (as defined below), including assignment of all applicable warehouse credit facility obligations for which such mortgage loan packages serve as security and all of WJB's interest in any Related Agreements (as defined below) as identified in an Investment Certificate (as defined below) executed by WJB and the Limited Partner (each, a "Mortgage Loan Interest").  This Agreement is intended to set forth the terms and conditions by which WJB shall contribute such Mortgage Loan Interests to the Company.

## ARTICLE I

## DEFINITIONS

Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein.  Any capitalized term used or defined in an Investment Certificate that conflicts with the corresponding definition set forth herein shall supersede such term.  Any capitalized term not defined herein or in an Investment Certificate shall have the meaning given such term in the Partnership Agreement.

Accepted Practices:  The loan origination, administration and servicing practices to be observed by WJB in connection with Qualifying Mortgage Loans, which practices shall be conducted: (a) in a commercially reasonable manner and in good faith; (b) in accordance in all material respects with all Applicable Laws; (c) in accordance in all material respects with the policies, procedures, guidelines and other requirements of each Agency; and (d) in a manner consistent with customary and usual standards of practice of prudent originators, administrators and servicers of residential mortgage loans.

Agency:  Either Fannie Mae, Freddie Mac, FHA, VA or GNMA, as applicable.

Agreement:  This Contribution Agreement, including all exhibits and supplements hereto, and all amendments hereof.

Applicable Law:  All applicable (1) federal, state, and local legal requirements (including statutes, rules, regulations, and ordinances), including but not limited to usury, truth-in-lending, real estate settlement, consumer credit, equal credit opportunity, fair housing, disclosure, anti-predatory or abusive lending, or unfair and deceptive acts and practices laws; (2) requirements and guidelines of each governmental agency, board, commission, instrumentality, and other governmental body or office having

-1-

jurisdiction, including, without limitation, the CFPB; and (3) judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment of the Mortgage to the Company.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the States of California or New York are authorized or obligated by law or executive order to be closed.

Contribution:  The consummation of the contribution of each Mortgage Loan Package by WJB to the Company as set forth herein.

Contribution Date:  The date on which any Contribution occurs, as set forth in the related Investment Certificate.

Collateral Documents:  The collateral documents pertaining to each Qualifying Mortgage Loan as set forth in Exhibit A hereto.

Collateral File:  With respect to each Mortgage Loan, a file containing each of the Collateral Documents.

Company:  The Person identified as the "Company" in the preamble to this Agreement or its successor in interest or any successor or assign to the Company under this Agreement as herein provided. Any reference to the "Company" as used herein shall be deemed to include any designee of the Company.

Custodial Account:  The account or accounts created and maintained in connection with servicing Qualifying Mortgage Loans pursuant to this Agreement.

Custodial Agreement:  The agreement governing the temporary retention of the Collateral File by the Custodian with respect to a Mortgage Loan Package.

Custodian:  Deutsche Bank National Trust Company, or its successor in interest or assigns, or such other custodian as may be agreed to by the parties for the related Mortgage Loan Package.

Cut-off Date:  The first day of the month in which the related Contribution Date occurs or such other date as may be set forth in the related Investment Certificate.

Cut-off Date Balance:  The aggregate scheduled unpaid principal balance of the Mortgage Loans in a Mortgage Loan Package as of the Cut-off Date, after application of (i) scheduled payments of principal due on such Mortgage Loans on or before such Cut-off Date, whether or not collected, and (ii) any Principal Prepayments received from the Mortgagor prior to the date on which the Mortgage Loan Schedule is prepared.

Determination Date:  The Business Day immediately preceding the related Remittance Date.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period:  With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Event of Default:  Any one of the conditions or circumstances enumerated in Section 7.01(a).

FHA:  The Federal Housing Administration or any successor thereto.

Fannie Mae:  The Federal National Mortgage Association or any successor organization.

Firm Commitment:  A current, valid, binding and enforceable commitment issued by an Investor in favor of WJB or Parent to purchase a specific Qualifying Mortgage Loan, which such commitment must be in form and substance satisfactory to the Company (including with respect to the purchase price percentage and amount to be paid for the purchase of the Mortgage Loan and the Investor delivery expiration date) or any Related Agreement for Qualifying Mortgage Loans which are to be securitized by an Issuer, including any forward sale of such resulting securities.

Freddie Mac:  The Federal Home Loan Mortgage Corporation or any successor organization.

GNMA:  The Government National Mortgage Association or any successor organization.

HUD:  The Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof.

Investment Certificate:  A letter agreement, substantially in the form of Exhibit B hereto, executed by WJB and the Company in connection with the contribution of each Mortgage Loan Package by WJB to the Company, which sets forth the terms relating thereto including a description of the related Qualifying Mortgage Loans (including the Mortgage Loan Schedule) and the related Contribution Date.

Investor:  Any Person approved in advance by the Company, in its sole discretion, who agrees to purchase a Qualifying Mortgage Loan pursuant to a Firm Commitment.

Issuer:  Any Agency or any other issuer of a mortgaged-backed security, which Issuer (if other than an Agency) has been approved in advance by the Company to purchase Qualifying Mortgage Loans.

LPMI Fee:  The portion of the Mortgage Interest Rate relating to an LPMI Loan, which is set forth on the related Mortgage Loan Schedule, to be retained by WJB to pay the premium due on the PMI Policy with respect to such LPMI Loan.

LPMI Loan:  Any Mortgage Loan with respect to which WJB is responsible for paying the premium due on the related PMI Policy with the proceeds generated by the LPMI Fee relating to such Mortgage Loan, as set forth on the related Mortgage Loan Schedule.

MERS:  Mortgage Electronic Registration Systems, Inc. or any successor or assign thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The electronic system of recording transfers of mortgages maintained by MERS.

Monthly Payment:  The scheduled monthly payment on a Mortgage Loan as set forth in the related Mortgage Note.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a lien upon a leasehold estate of the Mortgagor or shares allocated to a cooperative unit, as the case may be.

Mortgage Interest Rate:  The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

Mortgage Loan:  Any closed residential mortgage loan evidenced by a promissory note and secured by a first lien mortgage on a one to four family residence, including all Mortgage Rights relating thereto.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting a Mortgage Loan Package.

Mortgage Loan Package:  The Qualifying Mortgage Loans sold or contributed to the Company pursuant to an Investment Certificate.

Mortgage Loan Remittance Rate:  With respect to each Qualifying Mortgage Loan, the interest rate payable to the Company on each Remittance Date which shall equal the Mortgage Interest Rate less the LPMI Fee, if applicable.

Mortgage Loan Schedule:  With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Investment Certificate, which schedule shall include, the following information with respect to each Mortgage Loan:  (i) information sufficient to uniquely identify such Mortgage Loan; (ii) the Mortgage Interest Rate as of the Cut-off Date; (iii) the loan-to-value at origination; (iv) the remaining term as of the Cut-off Date and the original term of such Mortgage Loan, and (vi) any other information pertaining to such Mortgage Loan as may be reasonably requested by the Company.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgage Rights:  With respect to any Mortgage Loan, any and all of the following: (a) all rights to service such Mortgage Loan; (b) any payments or monies payable or received or receivable with respect to such Mortgage Loan; (c) any late fees, prepayment fees, assumption fees, penalties or similar payments with respect to such Mortgage Loan; (d) all agreements or documents creating, defining or evidencing any rights with respect to such Mortgage Loan; (e) possession and use of any and all credit files pertaining to such Mortgage Loan or pertaining to the past, present or prospective servicing of such Mortgage Loan; (f) all accounts and other rights to payment related to any of the property described in this definition; and (g) all rights, powers and privileges incident to any of the foregoing.

Mortgaged Property:  The real property (or leasehold estate or cooperative shares, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

Mortgagee:  The mortgagee or beneficiary named in the Mortgage and the successors and assigns of such mortgagee or beneficiary.

Mortgagor:  The obligor on a Mortgage Note.

Parent:  W.J. Bradley Mortgage Capital, LLC, a Delaware limited liability company.

Person:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

PMI Policy:  A policy of private mortgage guaranty insurance relating to a Mortgage Loan and issued by a Qualified Insurer.

Principal Prepayment:  Any payment or other recovery of principal on a Qualifying Mortgage Loan which is received in advance of its scheduled Due Date, excluding any prepayment penalty or premium thereon (unless the Investment Certificate provides otherwise), which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Qualified Insurer:  An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, which insurer is acceptable in such capacity by the applicable Agency.

Qualifying Mortgage Loan:  A Mortgage Loan: (a)(i) to be sold (and is eligible for sale) to an Issuer, (ii) for which WJB or Parent has received a Firm Commitment from an Investor, a copy of which Firm Commitment has been approved by Limited Partner and which is valid and enforceable in accordance with its terms, or (iii) such other Mortgage Loan specifically approved by the Limited Partner; (b) which is evidenced by a mortgage note, in form and substance acceptable to such Issuer or Investor, or the Limited Partner, payable to the order of WJB or Parent; (c) which is secured by a security instrument, in form and substance acceptable to such Issuer or Investor, or the Limited Partner; (d) which conforms in all respects with all the requirements of the Firm Commitment to purchase the same or all requirements of the Issuer to purchase the same or is otherwise acceptable to the Limited Partner; (e) for which the related Investment Acquisition Date is more than two (2) Business Days following the origination date of such Mortgage Loan; and (f) for which WJB or Parent, the Company or an Approved Custodian has received a complete mortgage file prior to the related Investment Acquisition Date.

Related Agreement:  With respect to any Mortgage Loan Interest, any hedge agreement, swap agreement, master repurchase agreement, side letter, custodial agreement or other agreement entered into by WJB or Parent and related to or otherwise affecting such Mortgage Loan Interest, which Related Agreement shall be approved by the Company in its sole discretion.

Remittance Date:  The tenth (10th) day of any month, beginning with the month next following the month in which the related Cut-off Date occurs, or if such tenth (10th) day is not a Business Day, the first Business Day immediately following.

REO Property:  A Mortgaged Property acquired by WJB or Parent on behalf of the Company pursuant to Accepted Practices.

Stated Principal Balance:  With respect to each Mortgage Loan as of any date of determination: (i) the unpaid principal balance of the Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, *minus* (ii) all amounts previously remitted to the Company with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Substitute Mortgage Loan Interest:  Any Mortgage Loan Interest assigned or contributed to the Partnership in exchange for, or as a replacement of, a Defective Mortgage Loan Interest, which such Substitute Mortgage Loan Interest shall have the following characteristics for the related Qualifying Mortgage Loan: (i) an Outstanding Principal Balance at the time of substitution at least equal to the Outstanding Principal Balance of the Qualifying Mortgage Loan related to the Defective Mortgage Loan Interest, (ii) after removal of the Defective Mortgage Loan Interest and addition of such Substitute

Mortgage Loan Interest, the Net Collateral Value is equal to or greater than the Net Collateral Value immediately prior to such exchange, and (iii) be, in the reasonable determination of the Limited Partner, in material compliance with all other requirements for an investment in the Company.

> VA:  The Department of Veterans Affairs or any successor thereto.

## ARTICLE II

## CLOSING PROCEDURES

**Section 2.01    Collateral Files.**

(a)    All Collateral Files shall be held at the offices of the Custodian.  WJB shall, on or before one (1) Business Day prior to the related Contribution Date, cause the Custodian to deliver to the Company, a Trust Receipt and collateral exception report identifying any deficiencies contained in the Collateral File for each Qualifying Mortgage Loan in the Mortgage Loan Package.

(b)    In the event that any of the Collateral Documents in the related Collateral Files are identified by the Custodian as not having been delivered to the Custodian (each, a "Missing Collateral Document"), then WJB shall have six (6) months from the related Contribution Date to deliver to the Custodian such Missing Collateral Documents.  Notwithstanding the foregoing, WJB shall not be deemed to be in breach of this Agreement if its failure to deliver any Missing Collateral Document within the time specified above is due solely to (i) the failure of the applicable recorder's office to return a Missing Collateral Document that was sent for recording or (ii) the failure of the title insurer to issue and deliver the original mortgagee title policy, except where such refusal to issue the policy is based on a claim that the title insurer is under no obligation to issue such policy.

(c)    WJB shall forward to the Custodian or the Company in a timely manner any original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan Interest entered into in accordance with this Agreement upon execution and, if applicable, recordation thereof.

(d)    WJB hereby authorizes the Limited Partner, at WJB's expense, to perform all acts which the Limited Partner deems appropriate to protect, preserve and realize upon the Qualifying Mortgage Loans, including, but not limited to, the right to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note, complete blanks in documents, transfer servicing (including, but not limited, to sending "good bye letters" to any Mortgagor) and execute assignments on behalf of WJB as its attorney-in-fact. This power of attorney is coupled with an interest and is irrevocable without the Limited Partner's consent.  In connection with such power of attorney, upon the Limited Partner's request WJB shall execute a long form power of attorney, in form and substance similar to the form attached hereto as Exhibit C hereto.

**Section 2.02    Investment Certificate.**  Upon confirmation with the Limited Partner of a Mortgage Loan Package, WJB shall prepare and deliver to the Limited Partner for execution the related Investment Certificate, executed by an authorized signatory of WJB.

**Section 2.03    Contribution.**  The Contribution of each Mortgage Loan Package shall take place on the related Contribution Date and shall be subject to the satisfaction of each of the following conditions, unless otherwise waived by the prejudiced party(ies):

(a)    All of the representations and warranties of WJB under this Agreement shall be true and correct in all respects as of the related Cut-off Date; and

(b)    Both WJB and the Limited Partner shall have executed the related Investment Certificate.

**Section 2.04    Entitlement to Payments on the Mortgage Loans.**  With respect to any Qualifying Mortgage Loan transferred hereunder, the Company shall be entitled to (a) all scheduled principal due after the related Cut-off Date; (b) all other recoveries of principal collected after the related Cut-off Date, except for recoveries of principal collected after the related Cut-off Date (minus that portion of any such principal recovery which relates to the principal portion of Monthly Payments due on or prior to the Cut-off Date); and (c) all payments of interest on such Mortgage Loan net of interest at the LPMI Fee, if applicable (minus that portion of any such payment that is allocable to the period prior to the related Cut-off Date).

**Section 2.05    Payment of Costs and Expenses**.  Any costs and expenses incurred in connection with the contribution of any Mortgage Loan Interest to the Company, including without limitation recording the Assignment of Mortgage or any subsequent assignment thereof, shall be paid for by WJB.

**Section 2.07    MERS Mortgage Loans and the MERS System**.  Upon the Company's direction, WJB shall take such actions as may be necessary to reflect the Company's ownership interest in the Qualifying Mortgage Loans.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES; REMEDIES FOR BREACH

**Section 3.01    WJB's Representations and Warranties.**  WJB represents and warrants to the Company and the Limited Partner that, as of the related Contribution Date:

(a)    <u>Organization and Standing</u>.  WJB is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized and has all licenses necessary to carry on its business as now being conducted and either WJB, Parent or their subservicer is qualified, licensed and in good standing in each state where the Mortgaged Property is located if required to be so licensed or is exempt from such licensing requirement to ensure the subservicing of the Qualifying Mortgage Loan in accordance with the terms of this Agreement.

(b)    <u>Due Authority</u>.  WJB has the full power and authority to (i) to transfer each Qualifying Mortgage Loan, and (ii) service each Qualifying Mortgage Loan, either through itself or its subservicer, in compliance with the Agreement.

(c)    <u>No Conflict</u>.  Neither the acquisition or origination of the Qualifying Mortgage Loans by WJB, the contribution of the Qualifying Mortgage Loans to the Company, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of WJB's charter or by-laws or result in a material breach of any legal restriction or any material agreement or instrument to which WJB is now a party or by which it is bound, or constitute a material default or

result in an acceleration under any of the foregoing, or result in the violation of any material law, rule, regulation, order, judgment or decree to which WJB or its property is subject.

(d)      Approved Seller/Servicer.    WJB or Parent is an approved seller/servicer for FNMA and FHLMC in good standing and is a mortgagee approved by the Secretary of HUD.

(e)      No Pending Litigation.    There is no action, suit, proceeding, investigation or litigation pending or, to WJB's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to WJB would materially and adversely affect the contribution of the Qualifying Mortgage Loans to the Company, the ability of WJB or Parent to service the Qualifying Mortgage Loans hereunder, either through itself or its subservicer, in accordance with the terms hereof, or WJB's ability to perform its other obligations under this Agreement.

(f)      No Consent Required.    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by WJB, of or compliance by WJB with, this Agreement or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Contribution Date.

(g)      Good Title.    Immediately prior to the transfer and assignment of each Mortgage Loan Interest to the Company, WJB was the sole owner and holder of the related Qualifying Mortgage Loan, including all of WJB's interest in any Related Agreements, free and clear of any and all liens, pledges, charges or security interests of any nature except for liens securing debt outstanding under WJB's warehouse finance facilities (which liens shall not exceed ninety nine percent (99%) of the Stated Principal Balance of such Qualifying Mortgage Loan), liens for taxes and government assessments not yet past due and the rights of any hedge counterparty in connection with any hedge on such Qualifying Mortgage Loan.    WJB has good, indefeasible and marketable title and has full right and authority to contribute and assign its interest in such Qualifying Mortgage Loan to the Company.

**Section 3.02      Representation and Warranty Regarding Salability**.    With respect to each Qualifying Mortgage Loan identified in the related Investment Certificate as being salable to an Investor, WJB represents and warrants to the Company as of the related Contribution Date that such Qualifying Mortgage Loan is saleable to such Investor at the price specified in the related Firm Commitment, and in compliance with all applicable Agency guidelines and Applicable Laws.

**Section 3.03      Remedies for Breach of Representations and Warranties.**

(a) Notice of Breach.    The representations and warranties set forth in Sections 3.01 and 3.02 shall survive the Contribution of the Qualifying Mortgage Loans to the Company notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Collateral Documents.    Upon discovery by either WJB or the Limited Partner of a breach of any of the foregoing representations and warranties that materially and adversely affects the value of one or more of the related Qualifying Mortgage Loans (each, a "Defective Mortgage Loan Interest"), the party discovering such breach shall give prompt written notice to the other (a "Breach Notice").

(b) Cure.    Within thirty (30) days from any Breach Notice, WJB shall use its best efforts to cure such breach in all material respects.

(c) Substitution.    With respect to any Defective Mortgage Loan that cannot be cured by WJB, WJB shall have the option to substitute a Substitute Mortgage Loan Interest for such Defective

Mortgage Loan Interest.  On or before the date of substitution, the Company shall promptly cooperate with WJB to arrange for the reassignment of such Defective Mortgage Loan Interest and release of the related Collateral File to WJB and the delivery to WJB of any documents held by the Company or its designee relating to such Defective Mortgage Loan Interest.

(d)  Indemnification.  In addition to its cure and substitution obligations, WJB shall indemnify the Company and the Limited Partner and hold each of them harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other out-of-pocket costs and expenses resulting from a breach of WJB's representations and warranties contained in Sections 3.01 or 3.02 that materially and adversely affects the value of one or more of the Qualifying Mortgage Loans.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

**Section 4.01    WJB to Act as Subservicer**.  WJB or Parent, as elected by WJB, will have the responsibility for the administration and subservicing of each Qualifying Mortgage Loan Contributed to the Company pursuant to this Agreement until such Qualifying Mortgage Loan is distributed to WJB or otherwise sold to an Investor.  With respect to each Qualifying Mortgage Loan, WJB shall be responsible for the period from and after the Contribution of the related Mortgage Loan Interest for the execution of all appropriate notices and all other acts necessary to protect the Company's title in and to such Mortgage Loan Interest, as to the ownership of such Qualifying Mortgage Loan and for preserving all rights in and to said Qualifying Mortgage Loan and administering it in all respects consistent with Accepted Practices.

**Section 4.02    No Transfer of Servicing**.  Neither WJB nor Parent shall assign this Agreement or the servicing obligations hereunder to any other entity without the prior written consent of the Company and the Limited Partner.  Notwithstanding the foregoing, WJB and Parent have the right to delegate their respective duties under the Agreement to a subservicer or contractor as it deems necessary.

## ARTICLE V

## PROVISIONS OF PAYMENTS AND REPORTS TO THE COMPANY

**Section 5.01    Remittances**.  On each Remittance Date, WJB shall remit to the Company (a) all accrued Mortgage Loan Remittance Rate due to the Company on Qualifying Mortgage Loans owned by the Company as of the close of business on the preceding Determination Date (or such other date as may be agreed to by WJB and the Limited Partner).

**Section 5.02    Periodic Reports to the Company**.

(a)  Monthly Reports.  Not later than each Remittance Date, WJB shall furnish to the Company via any electronic medium a monthly report as specified in the related Investment Certificate.

(b)  Miscellaneous Reports.  Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Company pursuant to a deed-in-lieu of foreclosure, WJB shall submit to the Company a liquidation report with respect to such Mortgaged Property, which report may be included with any other reports prepared by WJB and delivered to the Company pursuant to the terms and conditions of this Agreement.  With respect to any REO Property, and upon the request of the Company, WJB shall furnish to the Company a statement describing WJB's or Parent's efforts during the previous month in connection with the sale of such REO Property, including any rental of such REO Property incidental to the sale thereof and an operating statement.  WJB shall also provide the Company with such

information concerning the Mortgage Loans as is necessary for the Company to prepare its federal income tax return and as the Company or the Limited Partner may reasonably request from time to time to the extent such information is not already in the reports distributed to the Company.  The Company agrees to pay for all reasonable out-of-pocket expenses incurred by WJB and Parent in connection with complying with any request made by the Company hereunder if such information is not customarily provided by WJB or Parent in the ordinary course of servicing mortgage loans similar to the Mortgage Loans.

## ARTICLE VI

## COVENANTS BY WJB

**Section 6.01     Indemnification by WJB**.  WJB shall indemnify the Company and the Limited Partner and hold each of them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary attorneys' fees and related costs, judgments, and any other costs, fees and expenses that the Company or the Limited Partner may sustain due to WJB's breach of any representation, warranty, covenant or other obligation under to this Agreement or relating to the Mortgage Loan Interests.

**Section 6.02     Third Party Claims**.   WJB, the Company and the Limited Partner shall immediately notify the other parties if a claim is made upon such party by a third party with respect to this Agreement or the Qualifying Mortgage Loans.  Upon the prior written consent of the Limited Partner, WJB shall assume the defense of any such claim and pay all expenses in connection therewith, including attorneys' fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it, the Limited Partner or the Company in respect of such claim.

## ARTICLE VII

## TERMINATION OF WJB AS SERVICER

**Section 7.01     Termination Due to an Event of Default.**

(a)     Each of the following shall be an Event of Default by WJB if it shall occur and be continuing:

(i)     any failure by WJB to remit to the Company any payment required to be made under the terms of this Agreement which such failure continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to WJB by the Limited Partner; or

(ii)     any failure on the part of WJB to duly observe or perform in any material respect any of the covenants or agreements on the part of WJB set forth in this Agreement (other than remittance of payments as described in clause (i) above), if any, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to WJB by the Limited Partner; or

(iii)     a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against WJB or Parent and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

-10-

(iv)    WJB or Parent shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to WJB or Parent or of or relating to all or substantially all of its property; or

(v)    WJB or Parent shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

(b)    In case one or more Events of Default by WJB shall occur and shall not have been remedied within the timeframe of any grace or cure period, the Company or the Limited Partner, by notice in writing to WJB may, in addition to whatever rights the Company or the Limited Partner, as applicable, may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of WJB under this Agreement and in and to the Qualifying Mortgage Loans and the proceeds thereof.  On or after the receipt by WJB of such written notice, all authority and power of WJB under this Agreement, whether with respect to the Qualifying Mortgage Loans or otherwise, shall pass to and be vested in the Company.  Upon written request from the Company or the Limited Partner, WJB shall prepare, execute and deliver, any and all documents and other instruments and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Qualifying Mortgage Loans and related documents, or otherwise, at WJB's sole expense.  WJB agrees to cooperate with the Company and the Limited Partner in effecting the termination of WJB's responsibilities and rights hereunder, including the transfer to the Company, for administration by it, of all cash amounts which shall at the time be credited by WJB to the Custodial Account or thereafter received with respect to the Qualifying Mortgage Loans.

(c)    Only the Limited Partner (and not the Company) may waive any default by WJB in the performance of WJB's obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Events of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereto except to the extent expressly so waived.

**Section 7.02    Termination by Other Means**.  The respective obligations and responsibilities of WJB shall terminate with respect to any Mortgage Loan Package upon the first to occur of:  (a) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Qualifying Mortgage Loan or the disposition of all REO Property in such Mortgage Loan Package and the remittance of all funds due hereunder; or (b) by mutual consent of WJB and the Limited Partner in writing.

# ARTICLE VIII

# MISCELLANEOUS

**Section 8.01    Notices**.  All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)      If to WJB:

                WJB General Partner, LLC
c/o  W.J. Bradley Mortgage Capital, LLC
6465 Greenwood Plaza Blvd., 5th Floor
Centennial, Colorado 80111

(ii)     If to the Company:

WJB Loan LP
c/o W.J. Bradley Mortgage Capital, LLC
6465 Greenwood Plaza Blvd., 5th Floor
Centennial, Colorado 80111

(iii)    If to the Limited Partner:

MIMS Master Fund, L.P.
c/o Illumination Asset Management, LLC
11755 Wilshire Boulevard #1600
Los Angeles, California 90025

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 8.03    Exhibits**.  The Exhibits to this Agreement and each Investment Certificate executed by WJB and the Company are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 8.04    General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)      accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)      references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)      reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration; and

(g)    reference to this Agreement or the Related Agreements or any other document referenced herein shall include all exhibits, schedules or other supplements thereto.

**Section 8.05    Reproduction of Documents**.    This Agreement and all documents relating thereto, including (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.    The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 8.06    Further Agreements**.    WJB shall execute and deliver to the Company and the Company shall be required to execute and deliver to WJB such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 8.07    Conflicts between Transaction Documents**.    In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and the related Investment Certificate, the terms of the related Investment Certificate shall control.

**Section 8.08    Governing Law**.    This Agreement shall be governed by and construed in accordance with the laws of the State of California.    This Agreement shall be construed in accordance with the laws of the State of California and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of California, without regard to principles of conflicts of law.    The parties consent to the exclusive jurisdiction of the following courts in connection with any dispute between the parties arising from or in connection with this Agreement (i) United States District Court for the Central District of California; and (ii) any Superior Court of California County of Los Angeles.    The parties hereby irrevocably waive any objection to venue of any action between the parties in the courts described herein, whether pursuant to the doctrine of *forum non conveniens* or otherwise.    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR RELATED INVESTMENT CERTIFICATE (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

**Section 8.10    Severability Clause**.    Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.    Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate

or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to an amendment to this Agreement which places each party in the same or as economic position as each party would have been in except for such invalidity.

**Section 8.11    Successors and Assigns**.  This Agreement shall bind and inure to the benefit of and be enforceable by WJB, the Limited Partner and the Company and the respective permitted successors and assigns of WJB, the Limited Partner and the Company.

**Section 8.12    Confidentiality**.  No party shall, without the prior written consent of the other parties, disclose to any third party any information regarding this Agreement or the transactions contemplated herein, except to the extent that such disclosure is (i) required to effect the transactions contemplated herein, (ii) required by law, court order or regulation, or (iii) necessary to permit the audit of the accounts of a party hereto.

**Section 8.13    Entire Agreement**.  This Agreement and the related Investment Certificate constitute the entire understanding between the parties hereto with respect to each Mortgage Loan Package and supersede all prior or contemporaneous oral or written communications regarding same. WJB, the Limited Partner and the Company understand and agree that no employee, agent or other representative of any party has any authority to bind any other party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement or the related Investment Certificate.  Neither this Agreement nor the related Investment Certificate shall be modified, amended or in any way altered except by an instrument in writing signed by all applicable parties.

**Section 8.14    Execution of Agreement**.  For the purpose of facilitating the execution of this Agreement, this Agreement may be executed simultaneously in any number of counterparts, each of which counterpart shall be deemed to be an original and all of which shall constitute one and the same instrument.  Electronic signatures shall be deemed valid and binding to the same extent as the original.

*(SIGNATURE PAGE TO FOLLOW)*

IN WITNESS WHEREOF, WJB, the Limited Partner and the Company have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**WJB GENERAL PARTNER, LLC**

By: _____
Name:
Title:

**WJB LOAN LP**

By:  W.J. BRADLEY MORTGAGE CAPITAL, LLC,
     its General Partner

    By: _____
    Name:
    Title:

**MIMS MASTER FUND, L.P.**

By:  ILLUMINATION ASSET MANAGEMENT, LLC,
     its General Partner

    By: _____
    Name:
    Title:

## EXHIBIT A

## COLLATERAL DOCUMENTS

1.      Mortgage Note:  The original Mortgage Note (or a lost note affidavit in a form acceptable to an Agency) bearing all intervening endorsements, endorsed "Pay to the order of_____, without recourse" and signed in the name of WJB or its nominee by an authorized officer.

2.      Assignment of Mortgage:  Except with respect to any MERS Mortgage Loan, the original Assignment of  Mortgage in blank.

3.      Guarantee:  If any, the original of any guarantee executed in connection with the Mortgage Note or a true and correct electronic copy thereof.

4.      Mortgage:  The original Mortgage with evidence of recording thereon or a true and correct electronic copy thereof, or, if such original Mortgage has not been returned to WJB or Parent on or prior to the related Contribution Date by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage certified by WJB or Parent, the originator, the escrow agent, the title insurer or the closing attorney to be a true and complete copy of the original Mortgage sent for recordation.

5.      Modifications:  The originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or a true and correct electronic copy thereof.

6.      Intervening Assignments:  The originals of all intervening assignments of Mortgage with evidence of recording thereon, provided that such originals have been returned to WJB or Parent by the public recording office where such intervening assignment of Mortgage has been delivered for recordation, or a true and correct electronic copy thereof.

7.      Title Policy:  Unless otherwise permitted by WJB's or Parent's underwriting guidelines, (i) the original mortgagee title insurance policy or a true and correct electronic copy thereof, or if the original mortgagee title insurance policy was provided electronically, proof of such mortgagee title insurance policy shall be provided by WJB or Parent upon receipt of written request for such mortgagee title insurance policy from the Company, or (ii) if the related Mortgaged Property is located in a jurisdiction where such title insurance is not customarily provided, WJB or Parent shall provide documentation customarily provided in lieu of such mortgagee title insurance policy, in each and every case, only if such title insurance policy has been issued by the related title company on or prior to the related Contribution Date.

8.      Loan Guaranty Certificate:  If applicable, the original Loan Guaranty Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

9.      Mortgage Insurance Certificate:   If applicable, the original Mortgage Insurance Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

**EXHIBIT B**

**FORM OF INVESTMENT CERTIFICATE**

[TBP BY THE COMPANY]

**EXHIBIT C**

**FORM OF POWER OF ATTORNEY**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

MIMS Master Fund, L.P. ("MIMS")
c/o Illumination Asset Management, LLC
11755 Wilshire Boulevard #1600
Los Angeles, California 90025
Attn: Greg Jacobson

LIMITED POWER OF ATTORNEY

      KNOW ALL MEN BY THESE PRESENTS, that WJB General Partner, LLC, a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business at 6465 Greenwood Plaza Blvd., 5th Floor, Centennial, Colorado 80111, as the originator/assignor (the "WJB") pursuant to that certain Contribution Agreement, between WJB Loan LP (the "Owner") and WJB, dated as of [DATE] (the "Agreement"), hereby constitutes and appoints MIMS, by and through MIMS' officers, WJB's true and lawful Attorney-in-Fact, in WJB's name, place and stead in connection with all Mortgage Loans and REO properties sold by WJB to Owner under the Agreement for the limited purpose of performing all acts and executing all documents in the name of WJB as may be customarily and reasonably necessary and appropriate to effectuate any transactions relating to the Mortgage Loans subject hereto, including but not limited to those enumerated below, in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust" respectively) and promissory notes secured thereby (the "Mortgage Notes") in the event WJB is named therein as mortgagee or beneficiary and the Owner has, notwithstanding its status as mortgagee by virtue of endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust, not yet become the mortgagee or beneficiary of record.

      This appointment shall include without limitation the following transactions:

      1.     The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re recording is for the purpose of correcting the Mortgage or Deed of Trust to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued.

      2.     The subordination of the lien of a Mortgage or Deed of Trust to an easement in favor of a public utility company of a United States governmental agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial reconveyances or the execution or requests to trustees to accomplish same.

      3.     The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

      4.     The completion of loan assumption agreements.

      5.     The full satisfaction/release of a Mortgage or Deed of Trust or full conveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

Exhibit C-1

6.      The assignment of any Mortgage or Deed of Trust and the related Mortgage Note, in connection with the assignment of the mortgage loan secured and evidenced thereby.

7.      The full assignment of a Mortgage or Deed of Trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the assignment of the related Mortgage Note.

8.      With respect to a Mortgage or Deed of Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

a.      the substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

b.      the preparation and issuance of statements of breach or non-performance;

c.      the preparation and filing of notices of default and/or notices of sale

d.      the cancellation/rescission of notices of default and/or notices of sale;

e.      the taking of a deed in lieu of foreclosure; and

f.      the preparation and execution of such other documents and performance such other actions as may be necessary under the terms of the Mortgage, Deed of Trust or state law to expeditiously complete said transactions in paragraphs 8(a) through 8(e), above.

9.      To take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Owner for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any Mortgage Note, Mortgage or Deed of Trust whenever payable.

10.     To take all other necessary and appropriate actions in connection with the foregoing.

The undersigned gives said MIMS as Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney, as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall lawfully do or cause to be done by authority hereof.  This Power of Attorney shall be effective as of _____ ___, 201__. This Power of Attorney is a power coupled with an interest and shall be irrevocable.

Exhibit C-2

IN WITNESS WHEREOF, W.J. Bradley Mortgage Capital, LLC pursuant to that certain Contribution Agreement, dated as of [DATE], between WJB and the Owner has caused its corporate seal to be hereto affixed and these presents to be signed and acknowledged in its name and behalf by _____, its duly elected and authorized _____ this ___ day of _____, 201_.

WJB GENERAL PARTNER, LLC


By:_____
Name:
Title:

Exhibit C-3

STATE OF _____

COUNTY OF _____

On _____ __, _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____ of WJB General Partner, LLC, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that [she/he] executed that same in [her/his] authorized capacity, and that by [her/his] signature on the instrument the entity upon behalf of which the person acted and executed the instrument.

WITNESS my hand and official seal.

(SEAL)


Notary Public

Exhibit C-4

**Exhibit A-2**

**FORM OF ASSET PURCHASE AGREEMENT**

(See attached)

FORM OF

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is made and entered into as of _____ __, 201__ (the "Agreement"), between [SELLER], a [STATE] [ENTITY TYPE] ("Seller") and WJB Loan LP, a Delaware limited partnership ("Purchaser'').

RECITALS

Purchaser has agreed to purchase from Seller and Seller has agreed to sell to Purchaser all of Seller's right, title and interest in and to the Qualifying Mortgage Loans (as defined below), including assignment of all applicable warehouse credit facility obligations for which such mortgage loan packages serve as security and all of Seller's interest in any Related Agreements (as defined below) as identified in a Purchase Confirmation (as defined below) executed by Seller and Purchaser (each, a "Mortgage Loan Interest"). This Agreement is intended to set forth the terms and conditions by which Seller shall transfer and Purchaser shall acquire such Mortgage Loan Interests.

In consideration of the promises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

ARTICLE I

DEFINITIONS

Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein. Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supersede such term. Any capitalized term not defined herein or in a Purchase Confirmation shall have the meaning given such term in Purchaser's Second Amended and Restated Limited Partnership Agreement, dated as of December 8, 2015, by and among WJB General Partner, LLC, as general partner, MIMS Master Fund, L.P., as limited partner, and Purchaser.

Accepted Practices: The loan origination, administration and servicing practices to be observed by Seller in connection with Qualifying Mortgage Loans, which practices shall be conducted: (a) in a commercially reasonable manner and in good faith; (b) in accordance in all material respects with all Applicable Laws; (c) in accordance in all material respects with the policies, procedures, guidelines and other requirements of each Agency; and (d) in a manner consistent with customary and usual standards of practice of prudent originators, administrators and servicers of residential mortgage loans.

Agency: Either Fannie Mae, Freddie Mac, FHA, VA or GNMA, as applicable.

Agreement: This Asset Purchase Agreement, including all exhibits and supplements hereto, and all amendments hereof.

Applicable Law: All applicable (1) federal, state, and local legal requirements (including statutes, rules, regulations, and ordinances), including but not limited to usury, truth-in-lending, real estate settlement, consumer credit, equal credit opportunity, fair housing, disclosure, anti-predatory or abusive lending, or unfair and deceptive acts and practices laws; (2) requirements and guidelines of each governmental agency, board, commission, instrumentality, and other governmental body or office having jurisdiction, including, without limitation, the CFPB; and (3) judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

Assignment of Mortgage:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to Purchaser.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the States of California or New York are authorized or obligated by law or executive order to be closed.

Closing:  The consummation of the sale and purchase of each Mortgage Loan Package to Purchaser.

Closing Date:  The date on which the purchase and sale of the Qualifying Mortgage Loans constituting a Mortgage Loan Package is consummated, as set forth in the Trade Confirmation and Purchase Confirmation.

Collateral Documents:  The collateral documents pertaining to each Qualifying Mortgage Loan as set forth in Exhibit A hereto.

Collateral File:  With respect to each Mortgage Loan, a file containing each of the Collateral Documents.

Custodial Account:  The account or accounts created and maintained in connection with servicing Qualifying Mortgage Loans pursuant to this Agreement.

Custodial Agreement:  The agreement governing the temporary retention of the Collateral File by the Custodian with respect to a Mortgage Loan Package.

Custodian:  Deutsche Bank National Trust Company, or its successor in interest or assigns, or such other custodian as may be agreed to by the parties for the related Mortgage Loan Package.

Cut-off Date:  The first day of the month in which the related Closing Date occurs or such other date as may be set forth in the related Trade Confirmation and/or Purchase Confirmation.

Cut-off Date Balance:  The aggregate scheduled unpaid principal balance of the Mortgage Loans in a Mortgage Loan Package as of the Cut-off Date, after application of (i) scheduled payments of principal due on such Mortgage Loans on or before such Cut-off Date, whether or not collected, and (ii) any Principal Prepayments received from the Mortgagor prior to the date on which the Mortgage Loan Schedule is prepared.

Determination Date:  The Business Day immediately preceding the related Remittance Date.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period:  With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Event of Default:  Any one of the conditions or circumstances enumerated in Section 7.01(a).

FHA:  The Federal Housing Administration or any successor thereto.

Fannie Mae:  The Federal National Mortgage Association or any successor organization.

Firm Commitment:  A current, valid, binding and enforceable commitment issued by an Investor in favor of Seller to purchase a specific Qualifying Mortgage Loan, which such commitment must be in form and substance satisfactory to Purchaser (including with respect to the purchase price percentage and amount to be paid for the purchase of the Mortgage Loan and the Investor delivery expiration date) or any Related Agreement for Qualifying Mortgage Loans which are to be securitized by an Issuer, including any forward sale of such resulting securities.

Freddie Mac:  The Federal Home Loan Mortgage Corporation or any successor organization.

GNMA:  The Government National Mortgage Association or any successor organization.

HUD:  The Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof.

Investor:  Any Person approved in advance by Purchaser, in its sole discretion, who agrees to purchase a Qualifying Mortgage Loan pursuant to a Firm Commitment.

Issuer:  Any Agency or any other issuer of a mortgaged-backed security, which Issuer (if other than an Agency) has been approved in advance by Purchaser to purchase Qualifying Mortgage Loans.

LPMI Fee:  The portion of the Mortgage Interest Rate relating to an LPMI Loan, which is set forth on the related Mortgage Loan Schedule, to be retained by Seller to pay the premium due on the PMI Policy with respect to such LPMI Loan.

LPMI Loan:  Any Mortgage Loan with respect to which Seller is responsible for paying the premium due on the related PMI Policy with the proceeds generated by the LPMI Fee relating to such Mortgage Loan, as set forth on the related Mortgage Loan Schedule.

MERS:  Mortgage Electronic Registration Systems, Inc. or any successor or assign thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The electronic system of recording transfers of mortgages maintained by MERS.

Monthly Payment:  The scheduled monthly payment on a Mortgage Loan as set forth in the related Mortgage Note.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a lien upon a leasehold estate of the Mortgagor or shares allocated to a cooperative unit, as the case may be.

Mortgage Interest Rate:  The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

Mortgage Loan:  Any closed residential mortgage loan evidenced by a promissory note and secured by a first lien mortgage on a one to four family residence, including all Mortgage Rights relating thereto.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting a Mortgage Loan Package.

Mortgage Loan Package:  The Qualifying Mortgage Loans sold to Purchaser pursuant to a Purchase Confirmation.

Mortgage Loan Remittance Rate:  With respect to each Qualifying Mortgage Loan, the interest rate payable to Purchaser on each Remittance Date which shall equal the Mortgage Interest Rate less the LPMI Fee, if applicable.

Mortgage Loan Schedule:  With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation, which schedule shall include, the following information with respect to each Mortgage Loan:  (i) information sufficient to uniquely identify such Mortgage Loan; (ii) the Mortgage Interest Rate as of the Cut-off Date; (iii) the loan-to-value at origination; (iv) the remaining term as of the Cut-off Date and the original term of such Mortgage Loan, and (vi) any other information pertaining to such Mortgage Loan as may be reasonably requested by Purchaser.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgage Rights:  With respect to any Mortgage Loan, any and all of the following: (a) all rights to service such Mortgage Loan; (b) any payments or monies payable or received or receivable with respect to such Mortgage Loan; (c) any late fees, prepayment fees, assumption fees, penalties or similar payments with respect to such Mortgage Loan; (d) all agreements or documents creating, defining or evidencing any rights with respect to such Mortgage Loan; (e) possession and use of any and all credit files pertaining to such Mortgage Loan or pertaining to the past, present or prospective servicing of such Mortgage Loan; (f) all accounts and other rights to payment related to any of the property described in this definition; and (g) all rights, powers and privileges incident to any of the foregoing.

Mortgaged Property:  The real property (or leasehold estate or cooperative shares, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

Mortgagee:  The mortgagee or beneficiary named in the Mortgage and the successors and assigns of such mortgagee or beneficiary.

Mortgagor:  The obligor on a Mortgage Note.

Person:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

PMI Policy:  A policy of private mortgage guaranty insurance relating to a Mortgage Loan and issued by a Qualified Insurer.

Principal Prepayment:  Any payment or other recovery of principal on a Qualifying Mortgage Loan which is received in advance of its scheduled Due Date, excluding any prepayment penalty or premium thereon (unless the Purchase Confirmation provides otherwise), which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Confirmation:  A letter agreement, substantially in the form of Exhibit B hereto, executed by Seller and Purchaser in connection with the purchase and sale of each Mortgage Loan Package, which sets forth the terms relating thereto including a description of the related Qualifying

Mortgage Loans (including the Mortgage Loan Schedule), the related purchase price for such Qualifying Mortgage Loans and the related Closing Date.

Purchase Price:  The amount paid on the related Closing Date by Purchaser to Seller in exchange for the Mortgage Loan Package purchased on such Closing Date as set forth in the applicable Purchase Confirmation.

Purchaser:  The Person identified as the "Purchaser" in the preamble to this Agreement or its successor in interest or any successor or assign to Purchaser under this Agreement as herein provided. Any reference to "Purchaser" as used herein shall be deemed to include any designee of Purchaser.

Qualified Insurer:  An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, which insurer is acceptable in such capacity by the applicable Agency.

Qualifying Mortgage Loan:  A Mortgage Loan: (a)(i) to be sold (and is eligible for sale) to an Issuer, (ii) for which Seller has received a Firm Commitment from an Investor, a copy of which Firm Commitment has been approved by Limited Partner and which is valid and enforceable in accordance with its terms, or (iii) such other Mortgage Loan specifically approved by the Limited Partner; (b) which is evidenced by a mortgage note, in form and substance acceptable to such Issuer or Investor, or the Limited Partner, payable to the order of Seller; (c) which is secured by a security instrument, in form and substance acceptable to such Issuer or Investor, or the Limited Partner; (d) which conforms in all respects with all the requirements of the Firm Commitment to purchase the same or all requirements of the Issuer to purchase the same or is otherwise acceptable to the Limited Partner; (e) for which the related Investment Acquisition Date is more than two (2) Business Days following the origination date of such Mortgage Loan; and (f) for which the Company or an Approved Custodian has received a complete mortgage file prior to the related Investment Acquisition Date.

Related Agreement:  With respect to any Mortgage Loan Interest, any hedge agreement, swap agreement, master repurchase agreement, side letter, custodial agreement or other agreement entered into by Seller and related to or otherwise affecting such Mortgage Loan Interest, which Related Agreement shall be approved by Purchaser in its sole discretion.

Remittance Date:  The tenth (10th) day of any month, beginning with the month next following the month in which the related Cut-off Date occurs, or if such tenth (10th) day is not a Business Day, the first Business Day immediately following.

REO Property:  A Mortgaged Property acquired by Seller on behalf of Purchaser pursuant to Accepted Practices.

Repurchase Price:  With respect to any Qualifying Mortgage Loan, a price equal to the sum of (a) the Purchase Price for such Qualifying Mortgage Loan, and (b) interest on such Stated Principal Balance of such Qualifying Mortgage Loan at the time of repurchase at the Mortgage Interest Rate from the last date through which interest has been paid and remitted to Purchaser to the date of repurchase.

Stated Principal Balance:  With respect to each Mortgage Loan as of any date of determination: (i) the unpaid principal balance of the Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, *minus* (ii) all amounts previously remitted to Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Trade Confirmation:  A letter agreement executed by Seller and Purchaser or a recorded verbal agreement together with a letter agreement sent by Seller to Purchaser by electronic mail or other medium prior to the applicable Closing Date confirming the terms of a prospective purchase and sale of a Mortgage Loan Package or a security issued by an Agency collateralized by the Qualifying Mortgage Loans.

VA:  The Department of Veterans Affairs or any successor thereto.

## ARTICLE II

## CLOSING PROCEDURES

**Section 2.01     Collateral Files.**

(a)     All Collateral Files shall be held at the offices of the Custodian.  Seller shall, on or before one (1) Business Day prior to the related Closing Date, cause the Custodian to deliver to Purchaser, a Trust Receipt and collateral exception report identifying any deficiencies contained in the Collateral File for each Qualifying Mortgage Loan in the Mortgage Loan Package.

(b)     In the event that any of the Collateral Documents in the related Collateral Files are identified by the Custodian as not having been delivered to the Custodian (each, a "Missing Collateral Document"), then Seller shall have six (6) months from the related Closing Date to deliver to the Custodian such Missing Collateral Documents.  Notwithstanding the foregoing, Seller shall not be deemed to be in breach of this Agreement if its failure to deliver any Missing Collateral Document within the time specified above is due solely to (i) the failure of the applicable recorder's office to return a Missing Collateral Document that was sent for recording or (ii) the failure of the title insurer to issue and deliver the original mortgagee title policy, except where such refusal to issue the policy is based on a claim that the title insurer is under no obligation to issue such policy.

(c)     Seller shall forward to the Custodian or Purchaser in a timely manner any original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan Interest entered into in accordance with this Agreement upon execution and, if applicable, recordation thereof.

(d)     Seller hereby authorizes Purchaser, at Seller's expense, to perform all acts which Purchaser deems appropriate to protect, preserve and realize upon the Qualifying Mortgage Loans, including, but not limited to, the right to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note, complete blanks in documents, transfer servicing (including, but not limited, to sending "good bye letters" to any Mortgagor) and execute assignments on behalf of Seller as its attorney in fact. This power of attorney is coupled with an interest and is irrevocable without Purchaser's consent.  In connection with such power of attorney, upon Purchaser's request Seller shall execute a long form power of attorney in form and substance similar to the form attached hereto as Exhibit C hereto.

**Section 2.02     Purchase Confirmation.**  Upon confirmation with Purchaser of a Mortgage Loan Package, Seller shall prepare and deliver to Purchaser for execution the related Purchase Confirmation, executed by an authorized signatory of Seller.

Section 2.03    **Closing.**  The Closing of each Mortgage Loan Package shall take place on the related Closing Date and shall be subject to the satisfaction of each of the following conditions, unless otherwise waived by the prejudiced party(ies):

(a)    All of the representations and warranties of Seller under this Agreement shall be true and correct in all respects as of the related Cut-off Date; and

(b)    Both parties shall have executed the related Purchase Confirmation.

Section 2.04    **Payment of the Purchase Price.**  Subject to the conditions set forth in Section 2.03, and in consideration for the Mortgage Loan Package to be purchased by Purchaser on the related Closing Date, Purchaser shall pay to Seller on such Closing Date the Purchase Price by wire transfer of immediately available funds to the account designated by Seller.

Section 2.05    **Entitlement to Payments on the Mortgage Loans.**  With respect to any Mortgage Loan purchased hereunder, Purchaser shall be entitled to (a) all scheduled principal due after the related Cut-off Date; (b) all other recoveries of principal collected after the related Cut-off Date, except for recoveries of principal collected after the related Cut-off Date (minus that portion of any such principal recovery which relates to the principal portion of Monthly Payments due on or prior to the Cut-off Date); and (c) all payments of interest on such Mortgage Loan net of interest at the LPMI Fee, if applicable (minus that portion of any such payment that is allocable to the period prior to the related Cut-off Date).

Section 2.06    **Payment of Costs and Expenses**.  Purchaser and Seller shall each bear its own costs and expenses in connection with the purchase and sale of the Mortgage Loan Interests including any commissions due its sales personnel, the legal fees and expenses of its attorneys and any due diligence expenses.  Without limiting the generality of the foregoing, any costs and expenses incurred in connection with recording the Assignment of Mortgage or any subsequent assignment thereof shall be paid for by Seller.

Section 2.07    **MERS Mortgage Loans and the MERS System**.  Upon Purchaser's direction, Seller shall take such actions as may be necessary to reflect Purchaser's ownership interest in the Qualifying Mortgage Loans.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES; REMEDIES FOR BREACH

Section 3.01    **Seller's Representations and Warranties.**  Seller represents and warrants to Purchaser that, as of the related Closing Date:

(a)    <u>Organization and Standing</u>.  Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized and has all licenses necessary to carry on its business as now being conducted and either Seller or its subservicer is qualified, licensed and in good standing in each state where the Mortgaged Property is located if required to be so licensed or is exempt from such licensing requirement to ensure the subservicing of the Qualifying Mortgage Loan in accordance with the terms of this Agreement.

(b)    <u>Due Authority</u>.  Seller has the full power and authority to (i) to sell each Qualifying Mortgage Loan, and (ii) service each Qualifying Mortgage Loan, either through itself or its subservicer, in compliance with the Agreement.

(c)    No Conflict.  Neither the acquisition or origination of the Qualifying Mortgage Loans by Seller, the sale of the Qualifying Mortgage Loans to Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of Seller's charter or by-laws or result in a material breach of any legal restriction or any material agreement or instrument to which Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any material law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

(d)    Approved Seller.  Seller is an approved seller/servicer for FNMA and FHLMC in good standing and is a mortgagee approved by the Secretary of HUD.

(e)    No Pending Litigation.  There is no action, suit, proceeding, investigation or litigation pending or, to Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to Seller would materially and adversely affect the sale of the Qualifying Mortgage Loans to Purchaser, the ability of Seller to service the Qualifying Mortgage Loans hereunder, either through itself or its subservicer, in accordance with the terms hereof, or Seller's ability to perform its other obligations under this Agreement.

(f)    No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Seller, of or compliance by Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date.

(g)    Good Title.  Immediately prior to the transfer and assignment of each Mortgage Loan Interest to Purchaser, Seller was the sole owner and holder of the related Qualifying Mortgage Loan, including all Seller's interest in any Related Agreements, free and clear of any and all liens, pledges, charges or security interests of any nature except for liens securing debt outstanding under the Seller's warehouse finance facilities (which liens shall not exceed ninety nine percent (99%) the Stated Principal Balance of such Qualifying Mortgage Loan), liens for taxes and government assessments not yet past due and the rights of any hedge counterparty in connection with any hedge on such Qualifying Mortgage Loan.  Seller has good, indefeasible and marketable title and has full right and authority to sell and assign its interest in such Qualifying Mortgage Loan.

**Section 3.02    Representation and Warranty Regarding Salability**.  With respect to each Qualifying Mortgage Loan identified in the related Trade Confirmation as being salable to an Investor, Seller represents and warrants to Purchaser as of the related Closing Date that such Qualifying Mortgage Loan is saleable to such Investor at the price specified in the related Firm Commitment, and in compliance with all applicable Agency guidelines and Applicable Laws.

**Section 3.03    Remedies for Breach of Representations and Warranties.**

(a) Notice of Breach.  The representations and warranties set forth in Sections 3.01 and 3.02 shall survive the sale of the Qualifying Mortgage Loans to Purchaser notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Collateral Documents.  Upon discovery by either Seller or Purchaser of a breach of any of the foregoing representations and warranties that materially and adversely affects the value of one or more of the related Qualifying Mortgage Loans (each, a "Defective Mortgage Loan"), the party discovering such breach shall give prompt written notice to the other (a "Breach Notice").

(b) <u>Cure</u>.  Within thirty (30) days from any Breach Notice, Seller shall use its best efforts to cure such breach in all material respects, and, if such breach cannot be cured within such thirty (30) day period, Seller shall, at Purchaser's option, repurchase such Defective Mortgage Loan at the Repurchase Price.

(c) <u>Repurchase</u>.  Any repurchase of a Defective Mortgage Loan(s) pursuant to the provisions of this Section 3.03 shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for remittance to Purchaser on the next scheduled Remittance Date, after deducting therefrom any amount received in respect of such repurchased Defective Mortgage Loan or Loans and being held in the Custodial Account for future remittance.  On or before the date of the repurchase, Purchaser shall promptly cooperate with Seller to arrange for the reassignment of such Defective Mortgage Loan and release of the related Collateral File to Seller and the delivery to Seller of any documents held by Purchaser or its designee relating to such Defective Mortgage Loan.

(d) <u>Indemnification</u>.  In addition to its repurchase and cure obligations, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other out-of-pocket costs and expenses resulting from a breach of Seller's representations and warranties contained in Sections 3.01 or 3.02 that materially and adversely affects the value of one or more of the Qualifying Mortgage Loans.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

**Section 4.01    Seller to Act as Subservicer**.  Seller will have the responsibility for the administration and subservicing of each Qualifying Mortgage Loan in which Purchaser has purchased a Mortgage Loan Interest until such Qualifying Mortgage Loan is sold to an Investor.  With respect to each Qualifying Mortgage Loan, Seller shall be responsible for the period from and after the purchase of the related Mortgage Loan Interest for the execution of all appropriate notices and all other acts necessary to protect Purchaser's title in and to such Mortgage Loan Interest, as to the ownership of such Qualifying Mortgage Loan and for preserving all rights in and to said Qualifying Mortgage Loan and administering it in all respects consistent with Accepted Practices.

**Section 4.02    No Transfer of Servicing**.  Seller shall not assign this Agreement or the servicing obligations hereunder to any other entity without the prior written consent of Purchaser.  Notwithstanding the foregoing, Seller has the right to delegate its duties under the Agreement to a subservicer or contractor as it deems necessary.

## ARTICLE V

## PROVISIONS OF PAYMENTS AND REPORTS TO PURCHASER

**Section 5.01    Distributions**.  On each Remittance Date, Seller shall remit to Purchaser (a) all accrued Mortgage Loan Remittance Rate due to Purchaser on Qualifying Mortgage Loans owned by Purchaser as of the close of business on the preceding Determination Date (or such other date as may be agreed to by Seller and the Limited Partner), net of charges against or withdrawals from the Custodial Account consistent with Accepted Practices; minus (b) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the preceding Determination Date.  It is understood that the remittance on the first Remittance Date is to include Mortgage Loan Remittance Rate collected after the Cut-off Date to such Determination Date exclusive of any portion thereof allocable to the period prior to the Cut-off Date.

**Section 5.02     Periodic Reports to Purchaser**.

(a) Monthly Reports.   Not later than each Remittance Date, Seller shall furnish to Purchaser via any electronic medium a monthly report as specified in the related Purchase Confirmation or Trade Confirmation.

(b) Miscellaneous Reports.   Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by Purchaser pursuant to a deed-in-lieu of foreclosure, Seller shall submit to Purchaser a liquidation report with respect to such Mortgaged Property, which report may be included with any other reports prepared by Seller and delivered to Purchaser pursuant to the terms and conditions of this Agreement.  With respect to any REO Property, and upon the request of Purchaser, Seller shall furnish to Purchaser a statement describing Seller's efforts during the previous month in connection with the sale of such REO Property, including any rental of such REO Property incidental to the sale thereof and an operating statement.  Seller shall also provide Purchaser with such information concerning the Mortgage Loans as is necessary for Purchaser to prepare its federal income tax return and as Purchaser may reasonably request from time to time to the extent such information is not already in the reports distributed to Purchaser.  Purchaser agrees to pay for all reasonable out-of-pocket expenses incurred by Seller in connection with complying with any request made by Purchaser hereunder if such information is not customarily provided by Seller in the ordinary course of servicing mortgage loans similar to the Mortgage Loans.

# ARTICLE VI

## COVENANTS BY THE SELLER

**Section 6.01     Indemnification by Seller**.   Seller shall indemnify Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary attorneys' fees and related costs, judgments, and any other costs, fees and expenses that Purchaser may sustain due to Seller's breach of any representation, warranty, covenant or other obligation under to this Agreement.

**Section 6.02     Third Party Claims**.   Seller and Purchaser shall immediately notify the other if a claim is made upon such party by a third party with respect to this Agreement or the Qualifying Mortgage Loans.  Upon the prior written consent of Purchaser, Seller shall assume the defense of any such claim and pay all expenses in connection therewith, including attorneys' fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or Purchaser in respect of such claim.

# ARTICLE VII

## TERMINATION OF SELLER AS SERVICER

**Section 7.01     Termination Due to an Event of Default**.

(a)     Each of the following shall be an Event of Default by Seller if it shall occur and be continuing:

(i)     any failure by Seller to remit to Purchaser any payment required to be made under the terms of this Agreement which such failure continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Purchaser; or

(ii)    any failure on the part of Seller to duly observe or perform in any material respect any of the covenants or agreements on the part of Seller set forth in this Agreement (other than remittance of payments as described in clause (i) above), if any, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Purchaser; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv)    Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to Seller or of or relating to all or substantially all of its property; or

(v)    Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

(b)    In case one or more Events of Default by Seller shall occur and shall not have been remedied within the timeframe of any grace or cure period, Purchaser, by notice in writing to Seller may, in addition to whatever rights Purchaser may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of Seller under this Agreement and in and to the Qualifying Mortgage Loans and the proceeds thereof.  On or after the receipt by Seller of such written notice, all authority and power of Seller under this Agreement, whether with respect to the Qualifying Mortgage Loans or otherwise, shall pass to and be vested in Purchaser.  Upon written request from Purchaser, Seller shall prepare, execute and deliver, any and all documents and other instruments and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Qualifying Mortgage Loans and related documents, or otherwise, at Seller's sole expense.  Seller agrees to cooperate with Purchaser in effecting the termination of Seller's responsibilities and rights hereunder, including the transfer to Purchaser, for administration by it, of all cash amounts which shall at the time be credited by Seller to the Custodial Account or thereafter received with respect to the Mortgage Loans.

(c)    Purchaser may waive any default by Seller in the performance of Seller's obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Events of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereto except to the extent expressly so waived.

**Section 7.02    Termination by Other Means**.  The respective obligations and responsibilities of Seller shall terminate with respect to any Mortgage Loan Package upon the first to occur of:  (a) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Qualifying Mortgage Loan or the disposition of all REO Property in such Mortgage Loan Package and the remittance of all funds due hereunder; (b) by mutual consent of Seller and Purchaser in writing; or (c) the repurchase by Seller of all outstanding Qualifying Mortgage Loans and REO Property in a Mortgage Loan Package at a price equal to the related Repurchase Price.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.01    Notices**.  All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

    (i)     If to Seller:

         [_____]

    (ii)    If to Purchaser:

         WJB Loan LP
         c/o W.J. Bradley Mortgage Capital, LLC
         6465 Greenwood Plaza Blvd., 5th Floor
         Centennial, Colorado 80111

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 8.02    Sale Treatment**.

    (a)    It is the express intention of the parties that the transactions contemplated by this Agreement be, and be construed as, a sale of the Mortgage Loans by Seller and not a pledge of the Mortgage Loans by Seller to Purchaser to secure a debt or other obligation of Seller.  Consequently, the sale of each Mortgage Loan shall be reflected as a sale on Seller's business records, tax returns and financial statements.  Accordingly, Seller and Purchaser shall each treat the transaction for federal income tax purposes as a sale by Seller, and a purchase by Purchaser, of the Mortgage Loans.

    (b)    Should any court of competent jurisdiction deem any transaction governed by this Agreement to be a loan or extension of credit, as collateral security for Seller's obligations to Purchaser under this Agreement, Purchaser shall have a first priority security interest in the following with respect to each Qualifying Mortgage Loan in which Purchaser purchased the Mortgage Loan Interest from Seller, wherever the following is located and whether the following is now owned or existing or is owned, acquired, or arises hereafter, including acquisition by contract or by operation of Law (all terms used in this Section which are defined in the UCC shall have the meanings given to such terms in the UCC): (i) all right, title and interest of Seller in and to each Mortgage Note and Security Instrument; (ii) all right, title and interest of Seller in and to each Qualifying Mortgage Loan, guaranty, loan document, title policy, insurance policy, Firm Commitment, and any other right ancillary to or securing or relating to any Mortgage Note; (iii) all accounts and receivables of Seller arising out of or relating to any and all Qualifying Mortgage Loans; (iv) all general intangibles of Seller relating to or arising out of any and all Qualifying Mortgage Loans; (v) all of the rights of Seller to the payment of money, including tax refund and insurance proceeds, relating to any and all Qualifying Mortgage Loans or the real properties securing the same; (vi) all files, records, books, ledger cards (including computer programs, tapes and related electronic data processing software) and writings of Seller or in which it has an interest in any way

relating to any and all Qualifying Mortgage Loans; (vii) all other personal property of Seller of any kind or type whatsoever relating to any and all Qualifying Mortgage Loans; and (vii) all additions, substitutions, replacements, proceeds, interest, and products of each of the foregoing described in this Section.  For this purpose, this Agreement shall constitute a security agreement in accordance with the UCC, and Purchaser shall have all the rights of a secured creditor with respect to such security.

**Section 8.03    Exhibits**.  The Exhibits to this Agreement and each Trade Confirmation and Purchase Confirmation executed by Seller and Purchaser are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 8.04    General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration; and

(g)    reference to this Agreement or the Related Agreements or any other document referenced herein shall include all exhibits, schedules or other supplements thereto.

**Section 8.05    Reproduction of Documents**.  This Agreement and all documents relating thereto, including (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 8.06    Further Agreements**.  Seller shall execute and deliver to Purchaser and Purchaser shall be required to execute and deliver to Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 8.07    Conflicts between Transaction Documents**.  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and either the related Trade Confirmation or related Purchase Confirmation, the terms of the related Trade Confirmation or related Purchase Confirmation, as the case may be, shall control.  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of the related Trade Confirmation and the related Purchase Confirmation, the terms of the related Purchase Confirmation shall control.

**Section 8.08    Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  This Agreement shall be construed in accordance with the laws of the State of California and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of California, without regard to principles of conflicts of law.  The parties consent to the exclusive jurisdiction of the following courts in connection with any dispute between the parties arising from or in connection with this Agreement (i) United States District Court for the Central District of California; and (ii) any Superior Court of California County of Los Angeles.  The parties hereby irrevocably waive any objection to venue of any action between the parties in the courts described herein, whether pursuant to the doctrine of *forum non conveniens* or otherwise.   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT, RELATED TRADE CONFIRMATION OR RELATED PURCHASE CONFIRMATION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

**Section 8.10    Severability Clause**.  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to an amendment to this Agreement which places each party in the same or as economic position as each party would have been in except for such invalidity.

**Section 8.11    Successors and Assigns**.  This Agreement shall bind and inure to the benefit of and be enforceable by Seller and Purchaser and the respective permitted successors and assigns of Seller and Purchaser.

**Section 8.12    Confidentiality**.  Neither Purchaser nor Seller shall, without the prior written consent of the other, disclose to any third party any information regarding this Agreement or the transactions contemplated herein, except to the extent that such disclosure is (i) required to effect the transactions contemplated herein, (ii) required by law, court order or regulation, or (iii) necessary to permit the audit of the accounts of a party hereto.

**Section 8.13    Entire Agreement**.  This Agreement and the related Trade Confirmation and related Purchase Confirmation constitute the entire understanding between the parties hereto with respect to each Mortgage Loan Package and supersede all prior or contemporaneous oral or written communications regarding same.  Seller and Purchaser understand and agree that no employee, agent or

other representative of Seller or Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement or the related Trade Confirmation or related Purchase Confirmation.    Neither this Agreement nor the related Trade Confirmation nor the related Purchase Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both parties.

       **Section 8.14**    **Execution of Agreement**.  For the purpose of facilitating the execution of this Agreement, this Agreement may be executed simultaneously in any number of counterparts, each of which counterpart shall be deemed to be an original and all of which shall constitute one and the same instrument.  Telecopy signatures shall be deemed valid and binding to the same extent as the original.

*(SIGNATURE PAGE TO FOLLOW)*

IN WITNESS WHEREOF, Seller and Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

SELLER:

[_____]


By:_____
Name:
Title:


PURCHASER:

**WJB LOAN LP**

By: W.J. BRADLEY MORTGAGE CAPITAL, LLC,
      its General Partner


      By:_____
      Name:
      Title:

## EXHIBIT A

## COLLATERAL DOCUMENTS

1.      Mortgage Note:  The original Mortgage Note (or a lost note affidavit in a form acceptable to an Agency) bearing all intervening endorsements, endorsed "Pay to the order of_____, without recourse" and signed in the name of Seller or its nominee by an authorized officer.

2.      Assignment of Mortgage:  Except with respect to any MERS Mortgage Loan, the original Assignment of  Mortgage in blank.

3.      Guarantee:  If any, the original of any guarantee executed in connection with the Mortgage Note or a true and correct electronic copy thereof.

4.      Mortgage:  The original Mortgage with evidence of recording thereon or a true and correct electronic copy thereof, or, if such original Mortgage has not been returned to Seller on or prior to the related Closing Date by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage certified by Seller, the originator, the escrow agent, the title insurer or the closing attorney to be a true and complete copy of the original Mortgage sent for recordation.

5.      Modifications:  The originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or a true and correct electronic copy thereof.

6.      Intervening Assignments:  The originals of all intervening assignments of Mortgage with evidence of recording thereon, provided that such originals have been returned to Seller by the public recording office where such intervening assignment of Mortgage has been delivered for recordation, or a true and correct electronic copy thereof.

7.      Title Policy:  Unless otherwise permitted by Seller's underwriting guidelines, (i) the original mortgagee title insurance policy or a true and correct electronic copy thereof, or if the original mortgagee title insurance policy was provided electronically, proof of such mortgagee title insurance policy shall be provided by Seller upon receipt of written request for such mortgagee title insurance policy from Purchaser, or (ii) if the related Mortgaged Property is located in a jurisdiction where such title insurance is not customarily provided, Seller shall provide documentation customarily provided in lieu of such mortgagee title insurance policy, in each and every case, only if such title insurance policy has been issued by the related title company on or prior to the related Closing Date.

8.      Loan Guaranty Certificate:  If applicable, the original Loan Guaranty Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

9.      Mortgage Insurance Certificate:  If applicable, the original Mortgage Insurance Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

**EXHIBIT B**

**FORM OF PURCHASE CONFIRMATION**

[DATE]

**WJB Loan LP**
**c/o W.J. Bradley Mortgage Capital, LLC**
**6465 Greenwood Plaza Blvd., 5th Floor**
**Centennial, Colorado 80111**

       Re:  Purchase Confirmation

Ladies and Gentlemen:

       This purchase confirmation (the "Purchase Confirmation") between [SELLER] (the "Seller") and WJB Loan LP (the "Purchaser") sets forth our agreement pursuant to which Purchaser is purchasing, and Seller is selling, those certain mortgage loans identified in Schedule A hereto and more particularly described herein (the "Qualifying Mortgage Loans").

       The purchase, sale and servicing of the Qualifying Mortgage Loans as contemplated herein shall be governed by that certain Asset Purchase Agreement, dated as of [ ], 2015, between Seller and Purchaser (as amended herein and otherwise, the "Agreement").   By executing this Purchase Confirmation, each of Seller and Purchaser again makes, with respect to itself and each Mortgage Loan, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

       All exhibits hereto are incorporated herein in their entirety.   In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, this Purchase Confirmation shall be controlling notwithstanding anything contained in the Agreement to the contrary.   All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

       1.  Defined Terms.  As used in the Agreement, the following defined terms shall have meanings set forth below.

       a.      Closing Date:  [DATE].

       b.      Custodian:  [Custodian].

       c.      Index:  [      ]

       d.      Missing Credit Documents:  [      ]

       e.      Purchase Price:  See attached Schedule B.

       f.      Loan Type:     Each Mortgage Loan is a [Conventional] [Government] Mortgage Loan and a [Adjustable Rate] [Convertible] [Fixed Rate] Mortgage Loan.

       g.      Lien Position:  Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

       h.      Servicer Reporting Type: [Proprietary System].

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned.

Confirmed and agreed:

**[SELLER]**

By:_____
Name:
Title:

Agreed and Accepted:

**WJB LOAN LP**

By: W.J. BRADLEY MORTGAGE CAPITAL, LLC,
       its General Partner

By:_____
Name:
Title:

**Schedule A**

**to**

**Purchase Confirmation**

Mortgage Loan Schedule

(attached)

**Schedule B**

**to**

**Purchase Confirmation**

Calculation of Purchase Price

(attached)

**EXHIBIT C**

**FORM OF POWER OF ATTORNEY**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:
WJB LOAN LP
c/o W.J. Bradley Mortgage Capital, LLC
6465 Greenwood Plaza Blvd., 5th floor
Centennial, Colorado 80111
Attn:  [PURCHASER CONTACT]

LIMITED POWER OF ATTORNEY

       KNOW ALL MEN BY THESE PRESENTS, that [SELLER], a [ENTITY TYPE] organized and existing under the laws of the State of [STATE] and having its principal place of business at [SELLER ADDRESS], as the originator/seller (the "Seller") pursuant to that certain Asset Purchase Agreement, between WJB LOAN LP (the "Owner") and Seller, dated as of [DATE] (the "Agreement"), hereby constitutes and appoints the Owner, by and through the Owner's officers, Seller's true and lawful Attorney-in-Fact, in Seller's name, place and stead in connection with all Mortgage Loans and REO properties sold by Seller to Owner under the Agreement for the limited purpose of performing all acts and executing all documents in the name of Seller as may be customarily and reasonably necessary and appropriate to effectuate any transactions relating to the Mortgage Loans subject hereto, including but not limited to those enumerated below, in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust" respectively) and promissory notes secured thereby (the "Mortgage Notes") in the event Seller is named therein as mortgagee or beneficiary and the Owner has, notwithstanding its status as mortgagee by virtue of endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust, not yet become the mortgagee or beneficiary of record.

       This appointment shall include without limitation the following transactions:

       1.      The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re recording is for the purpose of correcting the Mortgage or Deed of Trust to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued

       2.      The subordination of the lien of a Mortgage or Deed of Trust to an easement in favor of a public utility company of a United States governmental agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial reconveyances or the execution or requests to trustees to accomplish same.

       3.      The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

       4.      The completion of loan assumption agreements.

       5.      The full satisfaction/release of a Mortgage or Deed of Trust or full conveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

Exhibit C-1

6.　　　The assignment of any Mortgage or Deed of Trust and the related Mortgage Note, in connection with the purchase of the mortgage loan secured and evidenced thereby.

7.　　　The full assignment of a Mortgage or Deed of Trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the assignment of the related Mortgage Note.

8.　　　With respect to a Mortgage or Deed of Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

　　　　　a.　　　the substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

　　　　　b.　　　the preparation and issuance of statements of breach or non-performance;

　　　　　c.　　　the preparation and filing of notices of default and/or notices of sale

　　　　　d.　　　the cancellation/rescission of notices of default and/or notices of sale;

　　　　　e.　　　the taking of a deed in lieu of foreclosure; and

　　　　　f.　　　the preparation and execution of such other documents and performance such other actions as may be necessary under the terms of the Mortgage, Deed of Trust or state law to expeditiously complete said transactions in paragraphs 8(a) through 8(e), above.

9.　　　To take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Owner for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any Mortgage Note, Mortgage or Deed of Trust whenever payable.

10.　　　To take all other necessary and appropriate actions in connection with the foregoing.

The undersigned gives said Owner as Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney, as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall lawfully do or cause to be done by authority hereof.  This Power of Attorney shall be effective as of _____ ___, 201__. This Power of Attorney is a power coupled with an interest and shall be irrevocable.

Exhibit C-2

IN WITNESS WHEREOF, [SELLER], as Seller pursuant to that certain Asset Purchase Agreement, dated as of [DATE], between Seller and the Owner has caused its corporate seal to be hereto affixed and these presents to be signed and acknowledged in its name and behalf by _____, its duly elected and authorized _____ this ___ day of _____, 201_.

[SELLER]


By:_____
Name:
Title:

Exhibit C-3

STATE OF _____

COUNTY OF _____

On _____ __, _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____ of _____, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that [she/he] executed that same in [her/his] authorized capacity, and that by [her/his] signature on the instrument the entity upon behalf of which the person acted and executed the instrument.

WITNESS my hand and official seal.

(SEAL)


Notary Public

Exhibit C-4

**Exhibit A-3**

**FORM OF PARTICIPATION AGREEMENT**

(See attached)

**FORM OF**

**PARTICIPATION AGREEMENT**

This PARTICIPATION AGREEMENT is made and entered into as of _____ __, 201__ (the "Agreement"), between [SELLER], a [STATE] [ENTITY TYPE] ("Seller") and WJB Loan LP, a Delaware limited partnership ("Purchaser'').

**RECITALS**

In connection with that certain Second Amended and Restated Limited Partnership Agreement of WJB LOAN LP, dated as of December 8, 2015, by and among WJB General Partner, LLC, as general partner, MIMS Master Fund, L.P., as limited partner, and W.J. Bradley Company Merchant Partners, LLC (the "WJB LOAN LPA"), Seller has agreed to sell or assign to Purchaser, and Purchaser has agreed to purchase or accept from Seller, participations in all of Seller's right, title and interest in and to the related Qualifying Mortgage Loans (as defined below), in each case equal to the Participation Percentage and including all applicable warehouse credit facility obligations for which such mortgage loan packages serve as security and all of Seller's interest in any Related Agreements (as defined below) as identified in a Purchase Confirmation (as defined below) executed by Seller and Purchaser (each, a "Participation"). This Agreement is intended to set forth the terms and conditions by which Seller shall transfer and Purchaser shall acquire such Participations.

In consideration of the promises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

**ARTICLE I**

**DEFINITIONS**

Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein. Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supersede such term. Any capitalized term not defined herein or in a Purchase Confirmation shall have the meaning given such term in the WJB LOAN LPA.

Accepted Practices:  The loan origination, administration and servicing practices to be observed by Seller in connection with Qualifying Mortgage Loans, which practices shall be conducted: (a) in a commercially reasonable manner and in good faith; (b) in accordance in all material respects with all Applicable Laws; (c) in accordance in all material respects with the policies, procedures, guidelines and other requirements of each Agency; and (d) in a manner consistent with customary and usual standards of practice of prudent originators, administrators and servicers of residential mortgage loans.

Agency:  Either Fannie Mae, Freddie Mac, FHA, VA or GNMA, as applicable.

Agreement:  This Participation Agreement, including all exhibits and supplements hereto, and all amendments hereof.

Applicable Law:  All applicable (1) federal, state, and local legal requirements (including statutes, rules, regulations, and ordinances), including but not limited to usury, truth-in-lending, real estate settlement, consumer credit, equal credit opportunity, fair housing, disclosure, anti-predatory or abusive lending, or unfair and deceptive acts and practices laws; (2) requirements and guidelines of each governmental agency, board, commission, instrumentality, and other governmental body or office having jurisdiction, including, without limitation, the CFPB; and (3) judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the States of California or New York are authorized or obligated by law or executive order to be closed.

Closing:  The consummation of the transfer of each Mortgage Loan Package to Purchaser.

Closing Date:  The date on which the transfer to Purchaser of the Participations constituting a Mortgage Loan Package is consummated, as set forth in the Trade Confirmation and Purchase Confirmation.

Collateral Documents:  The collateral documents pertaining to each Qualifying Mortgage Loan as set forth in Exhibit A hereto.

Collateral File:  With respect to each Mortgage Loan, a file containing each of the Collateral Documents.

Custodial Account:  The account or accounts created and maintained in connection with servicing Qualifying Mortgage Loans pursuant to this Agreement.

Custodial Agreement:  The agreement governing the temporary retention of the Collateral File by the Custodian with respect to a Mortgage Loan Package.

Custodian:  Deutsche Bank National Trust Company, or its successor in interest or assigns, or such other custodian as may be agreed to by the parties for the related Mortgage Loan Package.

Cut-off Date:  The first day of the month in which the related Closing Date occurs or such other date as may be set forth in the related Trade Confirmation and/or Purchase Confirmation.

Cut-off Date Balance:  The aggregate scheduled unpaid principal balance of the Mortgage Loans in a Mortgage Loan Package as of the Cut-off Date, after application of (i) scheduled payments of principal due on such Mortgage Loans on or before such Cut-off Date,

-2-

whether or not collected, and (ii) any Principal Prepayments received from the Mortgagor prior to the date on which the Mortgage Loan Schedule is prepared.

Determination Date:  The Business Day immediately preceding the related Remittance Date.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period:  With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

Event of Default:   Any one of the conditions or circumstances enumerated in Section 7.01(a).

FHA:  The Federal Housing Administration or any successor thereto.

Fannie Mae:  The Federal National Mortgage Association or any successor organization.

Firm Commitment:  A current, valid, binding and enforceable commitment issued by an Investor in favor of Seller to purchase a specific Qualifying Mortgage Loan, which such commitment must be in form and substance satisfactory to Purchaser (including with respect to the purchase price percentage and amount to be paid for the purchase of the Mortgage Loan and the Investor delivery expiration date) or any Related Agreement for Qualifying Mortgage Loans which are to be securitized by an Issuer, including any forward sale of such resulting securities.

Freddie Mac:   The Federal Home Loan Mortgage Corporation or any successor organization.

GNMA:  The Government National Mortgage Association or any successor organization.

HUD:  The Department of Housing and Urban Development or any federal agency or official thereof which may from time to time succeed to the functions thereof.

Investor:  Any Person approved in advance by Purchaser, in its sole discretion, who agrees to purchase a Qualifying Mortgage Loan pursuant to a Firm Commitment.

Issuer:  Any Agency or any other issuer of a mortgaged-backed security, which Issuer (if other than an Agency) has been approved in advance by Purchaser to purchase Qualifying Mortgage Loans.

LPMI Fee:  The portion of the Mortgage Interest Rate relating to an LPMI Loan, which is set forth on the related Mortgage Loan Schedule, to be retained by Seller to pay the premium due on the PMI Policy with respect to such LPMI Loan.

LPMI Loan:  Any Mortgage Loan with respect to which Seller is responsible for paying the premium due on the related PMI Policy with the proceeds generated by the LPMI Fee relating to such Mortgage Loan, as set forth on the related Mortgage Loan Schedule.

MERS:  Mortgage Electronic Registration Systems, Inc. or any successor or assign thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The electronic system of recording transfers of mortgages maintained by MERS.

Monthly Payment:  The scheduled monthly payment on a Mortgage Loan as set forth in the related Mortgage Note.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a lien upon a leasehold estate of the Mortgagor or shares allocated to a cooperative unit, as the case may be.

Mortgage Interest Rate:  The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

Mortgage Loan:  Any closed residential mortgage loan evidenced by a promissory note and secured by a first lien mortgage on a one to four family residence, including all Mortgage Rights relating thereto.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting a Mortgage Loan Package.

Mortgage Loan Package:  The pool of Participations sold to Purchaser pursuant to a Purchase Confirmation.

Mortgage Loan Remittance Rate:  With respect to each Participation, the interest rate payable to Purchaser on each Remittance Date which shall equal the Mortgage Interest Rate on the related Qualifying Mortgage Loan less the LPMI Fee, if applicable, in each case subject to the Participation.

Mortgage Loan Schedule:  With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation, which schedule shall include, the following information with respect to each Mortgage Loan: (i) information sufficient to uniquely identify such Mortgage Loan; (ii) the Mortgage Interest Rate as of the Cut-off Date; (iii) the loan-to-value at origination; (iv) the remaining term as of the Cut-off Date and the original term of such Mortgage Loan, and (vi) any other information pertaining to such Mortgage Loan as may be reasonably requested by Purchaser.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgage Rights:  With respect to any Mortgage Loan, any and all of the following: (a) all rights to service such Mortgage Loan; (b) any payments or monies payable or received or receivable with respect to such Mortgage Loan; (c) any late fees, prepayment fees, assumption fees, penalties or similar payments with respect to such Mortgage Loan; (d) all agreements or documents creating, defining or evidencing any rights with respect to such Mortgage Loan; (e) possession and use of any and all credit files pertaining to such Mortgage Loan or pertaining to the past, present or prospective servicing of such Mortgage Loan; (f) all accounts and other rights to payment related to any of the property described in this definition; and (g) all rights, powers and privileges incident to any of the foregoing.

Mortgaged Property:  The real property (or leasehold estate or cooperative shares, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

Mortgagee:  The mortgagee or beneficiary named in the Mortgage and the successors and assigns of such mortgagee or beneficiary.

Mortgagor:  The obligor on a Mortgage Note.

Participation:  As defined in the Recitals hereto.

Participation Percentage:  As set forth in the Purchase Confirmation.

Person:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

PMI Policy:  A policy of private mortgage guaranty insurance relating to a Mortgage Loan and issued by a Qualified Insurer.

Principal Prepayment:  Any payment or other recovery of principal on a Qualifying Mortgage Loan which is received in advance of its scheduled Due Date, excluding any prepayment penalty or premium thereon (unless the Purchase Confirmation provides otherwise), which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Confirmation:  A letter agreement, substantially in the form of Exhibit B hereto, executed by Seller and Purchaser in connection with the transfer of each Mortgage Loan Package to Purchaser, which sets forth the terms relating thereto including a description of the related Qualifying Mortgage Loans (including the Mortgage Loan Schedule), the purchase price for the related Qualifying Mortgage Loans, if applicable, and the related Closing Date.

Purchase Price:  The amount, if any, paid on the related Closing Date by Purchaser to Seller in exchange for the Mortgage Loan Package transferred on such Closing Date as set forth in the applicable Purchase Confirmation.

Purchaser:  The Person identified as the "Purchaser" in the preamble to this Agreement or its successor in interest or any successor or assign to Purchaser under this Agreement as herein provided.  Any reference to "Purchaser" as used herein shall be deemed to include any designee of Purchaser.

Qualified Insurer:  An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, which insurer is acceptable in such capacity by the applicable Agency.

Qualifying Mortgage Loan:  A Mortgage Loan: (a)(i) to be sold (and is eligible for sale) to an Issuer, (ii) for which Seller has received a Firm Commitment from an Investor, a copy of which Firm Commitment has been approved by Limited Partner and which is valid and enforceable in accordance with its terms, or (iii) such other Mortgage Loan specifically approved by the Limited Partner; (b) which is evidenced by a mortgage note, in form and substance acceptable to such Issuer or Investor, or the Limited Partner, payable to the order of Seller; (c) which is secured by a security instrument, in form and substance acceptable to such Issuer or Investor, or the Limited Partner; (d) which conforms in all respects with all the requirements of the Firm Commitment to purchase the same or all requirements of the Issuer to purchase the same or is otherwise acceptable to the Limited Partner; (e) for which the related Investment Acquisition Date is more than two (2) Business Days following the origination date of such Mortgage Loan; and (f) for which the Company or an Approved Custodian has received a complete mortgage file prior to the related Investment Acquisition Date.

Related Agreement:  With respect to any Participation, any hedge agreement, swap agreement, master repurchase agreement, side letter, custodial agreement or other agreement entered into by Seller and related to or otherwise affecting the related Qualifying Mortgage Loan (or the portion of any such agreement allocated to such Qualifying Mortgage Loan), which Related Agreement shall be approved by Purchaser in its sole discretion.

Remittance Date:  The tenth (10th) day of any month, beginning with the month next following the month in which the related Cut-off Date occurs, or if such tenth (10th) day is not a Business Day, the first Business Day immediately following.

REO Property:  A Mortgaged Property acquired by Seller on behalf of Purchaser pursuant to Accepted Practices.

Repurchase Price:  With respect to any Participation, a price equal to the sum of (a) the Purchase Price for Participation, and (b) the Participation's portion of interest on the Stated Principal Balance of the related Qualifying Mortgage Loan at the time of repurchase at the Mortgage Interest Rate from the last date through which interest has been paid and remitted to Purchaser to the date of repurchase.

Stated Principal Balance:  With respect to each Mortgage Loan as of any date of determination:  (i) the unpaid principal balance of the Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, *minus*

(ii) all amounts previously remitted to Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

<u>Trade Confirmation</u>:  A letter agreement executed by Seller and Purchaser or a recorded verbal agreement together with a letter agreement sent by Seller to Purchaser by electronic mail or other medium prior to the applicable Closing Date confirming the terms of a prospective Mortgage Loan Package or a security issued by an Agency collateralized by the Qualifying Mortgage Loans.

<u>VA</u>:  The Department of Veterans Affairs or any successor thereto.

## ARTICLE II

## CLOSING PROCEDURES

### Section 2.01   Collateral Files.

(a)      All Collateral Files shall be held at the offices of the Custodian.  Seller shall, on or before one (1) Business Day prior to the related Closing Date, cause the Custodian to deliver to Purchaser, a Trust Receipt and collateral exception report identifying any deficiencies contained in the Collateral File for each Qualifying Mortgage Loan in the Mortgage Loan Package.

(b)      In the event that any of the Collateral Documents in the related Collateral Files are identified by the Custodian as not having been delivered to the Custodian (each, a "<u>Missing Collateral Document</u>"), then Seller shall have six (6) months from the related Closing Date to deliver to the Custodian such Missing Collateral Documents.  Notwithstanding the foregoing, Seller shall not be deemed to be in breach of this Agreement if its failure to deliver any Missing Collateral Document within the time specified above is due solely to (i) the failure of the applicable recorder's office to return a Missing Collateral Document that was sent for recording or (ii) the failure of the title insurer to issue and deliver the original mortgagee title policy, except where such refusal to issue the policy is based on a claim that the title insurer is under no obligation to issue such policy.

(c)      Seller shall forward to the Custodian in a timely manner any original documents evidencing an assumption, modification, consolidation or extension of any Qualifying Mortgage Loan entered into in accordance with this Agreement upon execution and, if applicable, recordation thereof.

(d)      Seller hereby authorizes Purchaser, at Seller's expense, to perform all acts which Purchaser deems appropriate to protect, preserve and realize upon the Qualifying Mortgage Loans, including, but not limited to, the right to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note, complete blanks in documents, transfer servicing (including, but not limited, to sending "good bye letters" to any Mortgagor) and execute assignments on behalf of Seller as its attorney in fact. This power of attorney is coupled with an interest and is irrevocable without Purchaser's consent.  In connection with such

power of attorney, upon Purchaser's request Seller shall execute a long form power of attorney in form and substance similar to the form attached hereto as <u>Exhibit C</u> hereto.

**Section 2.02    Purchase Confirmation.**    Upon confirmation with Purchaser of a Mortgage Loan Package to be transferred to Purchaser, Seller shall prepare and deliver to Purchaser for execution the related Purchase Confirmation, executed by an authorized signatory of Seller.

**Section 2.03    Closing.**    The Closing of each Mortgage Loan Package shall take place on the related Closing Date and shall be subject to the satisfaction of each of the following conditions, unless otherwise waived by the prejudiced party(ies):

(a)    All of the representations and warranties of Seller under this Agreement shall be true and correct in all respects as of the related Cut-off Date; and

(b)    Both parties shall have executed the related Purchase Confirmation.

**Section 2.04    Payment of the Purchase Price.**    Subject to the conditions set forth in Section 2.03, and in consideration for the Mortgage Loan Package to be purchased by Purchaser on the related Closing Date, to the extent set forth in the related Purchase Confirmation Purchaser shall pay to Seller on the related Closing Date the Purchase Price by wire transfer of immediately available funds to the account designated by Seller.

**Section 2.05    Entitlement to Payments on the Mortgage Loans.**    With respect to any Participation transferred to Purchaser hereunder, Purchaser shall be entitled to (a) all scheduled principal due after the related Cut-off Date (minus that portion of any such principal recovery which relates to the principal portion of Monthly Payments due on or prior to the Cut-off Date); and (b) all payments of interest on such Mortgage Loan net of interest at the LPMI Fee, if applicable (minus that portion of any such payment that is allocable to the period prior to the related Cut-off Date).

**Section 2.06    Payment of Costs and Expenses.**    Purchaser and Seller shall each bear its own costs and expenses in connection with the transfer of the Participations including any commissions due its sales personnel, the legal fees and expenses of its attorneys and any due diligence expenses.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES; REMEDIES FOR BREACH

**Section 3.01    Seller's Representations and Warranties.**    Seller represents and warrants to Purchaser that, as of the related Closing Date:

(a)    <u>Organization and Standing</u>.  Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized and has all licenses necessary to carry on its business as now being conducted and either Seller or its subservicer is qualified, licensed and in good standing in each state where the Mortgaged Property is located if required

to be so licensed or is exempt from such licensing requirement to ensure the subservicing of the Qualifying Mortgage Loan in accordance with the terms of this Agreement.

(b)     Due Authority.   Seller has the full power and authority to (i) to sell each Qualifying Mortgage Loan, (ii) sell, assign or transfer Participations in each Qualifying Mortgage Loan and (iii) service each Qualifying Mortgage Loan, either through itself or its subservicer, in compliance with the Agreement.

(c)     No Conflict.   Neither the acquisition or origination of the Qualifying Mortgage Loans by Seller, the transfer of the Participations to Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of Seller's charter or by-laws or result in a material breach of any legal restriction or any material agreement or instrument to which Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any material law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

(d)     Approved Seller.   Seller is an approved seller/servicer for FNMA and FHLMC in good standing and is a mortgagee approved by the Secretary of HUD.

(e)     No Pending Litigation.   There is no action, suit, proceeding, investigation or litigation pending or, to Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to Seller would materially and adversely affect the transfer of the Participations to Purchaser, the ability of Seller to service the Qualifying Mortgage Loans hereunder, either through itself or its subservicer, in accordance with the terms hereof, or Seller's ability to perform its other obligations under this Agreement.

(f)     No Consent Required.   No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Seller, of or compliance by Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date.

(g)     Good Title.   Immediately prior to the transfer and assignment of each Participation to Purchaser, Seller was the sole owner and holder of the related Qualifying Mortgage Loan, including all of Seller's interest in any Related Agreements, free and clear of any and all liens, pledges, charges or security interests of any nature except for liens securing debt outstanding under the Seller's warehouse finance facilities (which liens shall not exceed ninety nine percent (99%) the Stated Principal Balance of such Qualifying Mortgage Loan), liens for taxes and government assessments not yet past due and the rights of any hedge counterparty in connection with any hedge on such Qualifying Mortgage Loan.   Seller has good, indefeasible and marketable title and has full right and authority to sell and assign the Participation in such Qualifying Mortgage Loan.

**Section 3.02   Representation and Warranty Regarding Salability.**  With respect to each Qualifying Mortgage Loan identified in the related Trade Confirmation as being salable to an Investor, Seller represents and warrants to Purchaser as of the related Closing Date that such Qualifying Mortgage Loan is saleable to such Investor at the price specified in the related Firm Commitment, and in compliance with all applicable Agency guidelines and Applicable Laws.

**Section 3.03   Remedies for Breach of Representations and Warranties.**

(a)   <u>Notice of Breach</u>.  The representations and warranties set forth in Sections 3.01 and 3.02 shall survive the transfer of the Participations to Purchaser notwithstanding any restrictive or qualified endorsement on any Mortgage Note or assignment of mortgage or the examination or failure to examine any Collateral Documents.  Upon discovery by either Seller or Purchaser of a breach of any of the foregoing representations and warranties that materially and adversely affects the value of one or more of the related Qualifying Mortgage Loans or the Participations therein (each, a "<u>Defective Mortgage Loan</u>"), the party discovering such breach shall give prompt written notice to the other (a "<u>Breach Notice</u>").

(b)   <u>Cure</u>.  Within thirty (30) days from any Breach Notice, Seller shall use its best efforts to cure such breach in all material respects, and, if such breach cannot be cured within such thirty (30) day period, Seller shall, at Purchaser's option, repurchase the Participation in such Defective Mortgage Loan at the Repurchase Price.

(c)   <u>Repurchase</u>.  Any repurchase of a Participation in a Defective Mortgage Loan(s) pursuant to the provisions of this Section 3.03 shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for remittance to Purchaser on the next scheduled Remittance Date, after deducting therefrom any amount received in respect of such repurchased Defective Mortgage Loan or Loans and being held in the Custodial Account for future remittance.  On or before the date of the repurchase, Purchaser shall promptly cooperate with Seller to arrange for the reassignment of the Participation in such Defective Mortgage Loan and the delivery to Seller of any documents held by Purchaser or its designee relating to such Defective Mortgage Loan or the Participation therein.

(d)   <u>Indemnification</u>.  In addition to its repurchase and cure obligations, Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other out-of-pocket costs and expenses resulting from a breach of Seller's representations and warranties contained in Sections 3.01 or 3.02 that materially and adversely affects the value of one or more of the Qualifying Mortgage Loans.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

**Section 4.01   Seller to Act as Subservicer.**  Seller will have the responsibility for the administration and subservicing of each Qualifying Mortgage Loan in which Purchaser has obtained a Participation until such Qualifying Mortgage Loan is sold to an Investor.  With respect to each Qualifying Mortgage Loan, Seller shall be responsible for the period from and after the transfer of the related Participation for the execution of all appropriate notices and all other acts necessary to protect Purchaser's interest in and to such Participation, as to the Participation in such Qualifying Mortgage Loan and for preserving all rights in and to said Qualifying Mortgage Loan and administering it in all respects consistent with Accepted Practices.

**Section 4.02   No Transfer of Servicing**.  Seller shall not assign this Agreement or the servicing obligations hereunder to any other entity without the prior written consent of Purchaser.  Notwithstanding the foregoing, Seller has the right to delegate its duties under the Agreement to a subservicer or contractor as it deems necessary.

## ARTICLE V

## PROVISIONS OF PAYMENTS AND REPORTS TO PURCHASER

**Section 5.01   Distributions.**  On each Remittance Date, Seller shall remit to Purchaser (a) all accrued Mortgage Loan Remittance Rate due to Purchaser on Qualifying Mortgage Loans subject to Participations owned by Purchaser as of the close of business on the preceding Determination Date (or such other date as may be agreed to by Seller and the Limited Partner), net of charges against or withdrawals from the Custodial Account consistent with Accepted Practices; minus (b) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the preceding Determination Date.  It is understood that the remittance on the first Remittance Date is to include Mortgage Loan Remittance Rate collected after the Cut-off Date to such Determination Date exclusive of any portion thereof allocable to the period prior to the Cut-off Date.

**Section 5.02   Periodic Reports to Purchaser.**

(a)      <u>Monthly Reports</u>.  Not later than each Remittance Date, Seller shall furnish to Purchaser via any electronic medium a monthly report as specified in the related Purchase Confirmation or Trade Confirmation.

(b)      <u>Miscellaneous Reports</u>.  Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by Seller pursuant to a deed-in-lieu of foreclosure, Seller shall submit to Purchaser a liquidation report with respect to such Mortgaged Property, which report may be included with any other reports prepared by Seller and delivered to Purchaser pursuant to the terms and conditions of this Agreement.  With respect to any REO Property, and upon the request of Purchaser, Seller shall furnish to Purchaser a statement describing Seller's efforts during the previous month in connection with the sale of such REO Property, including any

rental of such REO Property incidental to the sale thereof and an operating statement.  Seller shall also provide Purchaser with such information concerning the Mortgage Loans as is necessary for Purchaser to prepare its federal income tax return and as Purchaser may reasonably request from time to time to the extent such information is not already in the reports distributed to Purchaser.  Purchaser agrees to pay for all reasonable out-of-pocket expenses incurred by Seller in connection with complying with any request made by Purchaser hereunder if such information is not customarily provided by Seller in the ordinary course of servicing mortgage loans similar to the Mortgage Loans.

**Section 5.03   Repurchase of Participation Interests**.  If Seller sells or transfers any Qualifying Mortgage Loans subject to a Participation hereunder, Seller shall repurchase such Participation from Purchase at the Repurchase Price.  Any such repurchase pursuant to the provisions of this Section 5.03 shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for remittance to Purchaser on the next scheduled Remittance Date.  On or before the date of the repurchase, Purchaser shall promptly cooperate with Seller to arrange for the reassignment of such Participation and the delivery to Seller of any documents held by Purchaser or its designee relating to such Participation.  Notwithstanding the foregoing, in lieu of remitting the Repurchase Price to the Purchaser, the Seller may reinvest such Repurchase Price in other Qualifying Mortgage Loans ("Substitute Loans").  To reinvest such Repurchase Price, the Seller must notify the Purchase and deliver a new Purchase Confirmation or Trade Confirmation relating to the Substitute Loans.  Upon such reinvestment, this Agreement shall continue and be effective with respect to the Participation in the Substitute Loans.  Any Repurchase Price not so reinvested shall be remitted to Purchaser.

## ARTICLE VI

## COVENANTS BY THE SELLER

**Section 6.01   Indemnification by Seller.**  Seller shall indemnify Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary attorneys' fees and related costs, judgments, and any other costs, fees and expenses that Purchaser may sustain due to Seller's breach of any representation, warranty, covenant or other obligation under to this Agreement.

**Section 6.02   Third Party Claims.**  Seller and Purchaser shall immediately notify the other if a claim is made upon such party by a third party with respect to this Agreement or the Qualifying Mortgage Loans or any Participation interest therein.  Upon the prior written consent of Purchaser, Seller shall assume the defense of any such claim and pay all expenses in connection therewith, including attorneys' fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or Purchaser in respect of such claim.

**Section 6.03   Good Title.**  Until all Participations transferred to Purchaser hereunder are repurchased by Seller, Seller shall (a) be the sole owner and holder of the related Qualifying Mortgage Loan, including all Seller's interest in any Related Agreements, free and clear of any and all liens, pledges, charges or security interests of any nature except for liens securing debt outstanding under the Seller's warehouse finance facilities (which liens shall not exceed ninety nine percent (99%) the Stated Principal Balance of such Qualifying Mortgage Loan), liens for

taxes and government assessments not yet past due and the rights of any hedge counterparty in connection with any hedge on such Qualifying Mortgage Loan and (b) have good, indefeasible and marketable title and have full right and authority to sell and assign its interest in such Qualifying Mortgage Loan.

**ARTICLE VII**

**TERMINATION OF SELLER AS SERVICER**

**Section 7.01    Termination Due to an Event of Default.**

(a)    Each of the following shall be an Event of Default by Seller if it shall occur and be continuing:

(i)    any failure by Seller to remit to Purchaser any payment required to be made under the terms of this Agreement which such failure continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Purchaser; or

(ii)    any failure on the part of Seller to duly observe or perform in any material respect any of the covenants or agreements on the part of Seller set forth in this Agreement (other than remittance of payments as described in clause (i) above), if any, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Purchaser; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv)    Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to Seller or of or relating to all or substantially all of its property; or

(v)    Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

(b)    In case one or more Events of Default by Seller shall occur and shall not have been remedied within the timeframe of any grace or cure period, Purchaser, by notice in writing to Seller may, in addition to whatever rights Purchaser may have at law or equity to damages, including injunctive relief and specific performance, do any of the following (or any combination thereof):  (i) terminate or "suspend" all the rights and obligations of Seller under this Agreement

and in and to the Qualifying Mortgage Loans and the proceeds thereof, or (ii) with respect to Participations where the related Qualifying Mortgage Loans are not subject to any applicable warehouse credit facility obligations for which such Qualifying Mortgage Loans serve as security (or other liens or restrictions that prevent Seller from granting a security interest in such Qualifying Mortgage Loans), foreclose upon the related Qualifying Mortgage Loans (including without limitation taking any actions necessary to effect such transfer pursuant to the power of attorney granted to Purchaser under this Agreement) in order to transfer all of Seller's right, title and interest in and to the related Qualifying Mortgage Loans to Purchaser.  On or after the receipt by Seller of such written notice, all rights, authority and power of Seller under this Agreement, whether with respect to the Qualifying Mortgage Loans subject to Participation interests hereunder (but solely with respect to Participations where the related Qualifying Mortgage Loans are not subject to any applicable warehouse credit facility obligations for which such Qualifying Mortgage Loans serve as security (or other liens or restrictions that prevent Seller from granting a security interest in such Qualifying Mortgage Loans)), as, the Participation interests in the Qualifying Mortgage Loans or otherwise, shall pass to and be vested in Purchaser.  Upon written request from Purchaser, Seller shall prepare, execute and deliver, any and all documents and other instruments and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Qualifying Mortgage Loans subject to the Participation interests hereunder and related documents, or otherwise, at Seller's sole expense. Seller agrees to cooperate with Purchaser in effecting the termination of Seller's responsibilities and rights hereunder, including the transfer to Purchaser, for administration by it, of all cash amounts which shall at the time be credited by Seller to the Custodial Account or thereafter received with respect to the Mortgage Loans.

(c)    Purchaser may waive any default by Seller in the performance of Seller's obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Events of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereto except to the extent expressly so waived.

**Section 7.02  Termination by Other Means**.    The respective obligations and responsibilities of Seller shall terminate with respect to any Mortgage Loan Package upon the first to occur of:  (a) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Qualifying Mortgage Loan subject to the Participation hereunder or the disposition of all REO Property in such Mortgage Loan Package and the remittance of all funds due hereunder; (b) by mutual consent of Seller and Purchaser in writing; or (c) the repurchase by Seller of all outstanding Participations in Qualifying Mortgage Loans and REO Property in a Mortgage Loan Package at a price equal the related Repurchase Price.

**ARTICLE VIII**

**MISCELLANEOUS**

**Section 8.01   Notices**.   All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

If to Seller:


[_____]




If to Purchaser:

WJB LOAN LP
c/o WJB General Partner, LLC
6465 Greenwood Plaza Blvd., 5th Floor
Centennial, Colorado 80111

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 8.02   Security Interest.**   With respect to Participations where the related Qualifying Mortgage Loans are not subject to any applicable warehouse credit facility obligations for which such Qualifying Mortgage Loans serve as security (or other liens or restrictions that prevent Seller from granting a security interest in such Qualifying Mortgage Loans), as collateral security for Seller's obligations to Purchaser under this Agreement, Purchaser shall have a first priority security interest in the following with respect to each Qualifying Mortgage Loan in which Purchaser purchased a Participation from Seller, wherever the following is located and whether the following is now owned or existing or is owned, acquired, or arises hereafter, including acquisition by contract or by operation of Law (all terms used in this Section which are defined in the UCC shall have the meanings given to such terms in the UCC): (i) all right, title and interest of Seller in and to each Mortgage Note and Security Instrument; (ii) all right, title and interest of Seller in and to each Qualifying Mortgage Loan, guaranty, loan document, title policy, insurance policy, Firm Commitment, and any other right ancillary to or securing or relating to any Mortgage Note; (iii) all accounts and receivables of Seller arising out of or relating to any and all Qualifying Mortgage Loans; (iv) all general intangibles of Seller relating to or arising out of any and all Qualifying Mortgage Loans; (v) all

of the rights of Seller to the payment of money, including tax refund and insurance proceeds, relating to any and all Qualifying Mortgage Loans or the real properties securing the same; (vi) all files, records, books, ledger cards (including computer programs, tapes and related electronic data processing software) and writings of Seller or in which it has an interest in any way relating to any and all Qualifying Mortgage Loans; (vii) all other personal property of Seller of any kind or type whatsoever relating to any and all Qualifying Mortgage Loans; and (vii) all additions, substitutions, replacements, proceeds, interest, and products of each of the foregoing described in this Section.  For this purpose, this Agreement shall constitute a security agreement in accordance with the UCC, and Purchaser shall have all the rights of a secured creditor with respect to such security.

**Section 8.03   Exhibits.**  The Exhibits to this Agreement and each Trade Confirmation and Purchase Confirmation executed by Seller and Purchaser are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 8.04   General Interpretive Principles.**  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)      accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)      references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)      reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)      the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(f)      the term "include" or "including" shall mean without limitation by reason of enumeration; and

(g)      reference to this Agreement or the Related Agreements or any other document referenced herein shall include all exhibits, schedules or other supplements thereto.

**Section 8.05   Reproduction of Documents.**   This Agreement and all documents relating thereto, including (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar

process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 8.06   Further Agreements.**  Seller shall execute and deliver to Purchaser and Purchaser shall be required to execute and deliver to Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 8.07   Conflicts between Transaction Documents.**  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and either the related Trade Confirmation or related Purchase Confirmation, the terms of the related Trade Confirmation or related Purchase Confirmation, as the case may be, shall control.  In the event of any conflict, inconsistency or ambiguity between the terms and conditions of the related Trade Confirmation and the related Purchase Confirmation, the terms of the related Purchase Confirmation shall control.

**Section 8.08   Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  This Agreement shall be construed in accordance with the laws of the State of California and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of California, without regard to principles of conflicts of law.  The parties consent to the exclusive jurisdiction of the following courts in connection with any dispute between the parties arising from or in connection with this Agreement (i) United States District Court for the Central District of California; and (ii) any Superior Court of California County of Los Angeles.  The parties hereby irrevocably waive any objection to venue of any action between the parties in the courts described herein, whether pursuant to the doctrine of *forum non conveniens* or otherwise.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT, RELATED TRADE CONFIRMATION OR RELATED PURCHASE CONFIRMATION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

**Section 8.10   Severability Clause.**  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable

law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to an amendment to this Agreement which places each party in the same or as economic position as each party would have been in except for such invalidity.

Section 8.11   **Successors and Assigns.**   This Agreement shall bind and inure to the benefit of and be enforceable by Seller and Purchaser and the respective permitted successors and assigns of Seller and Purchaser.

Section 8.12   **Confidentiality.**   Neither Purchaser nor Seller shall, without the prior written consent of the other, disclose to any third party any information regarding this Agreement or the transactions contemplated herein, except to the extent that such disclosure is (i) required to effect the transactions contemplated herein or to enforce rights or defend obligations hereunder, (ii) required by law, court order or regulation, or (iii) necessary to permit the audit of the accounts of a party hereto.

Section 8.13   **Entire Agreement.**   This Agreement and the related Trade Confirmation and related Purchase Confirmation constitute the entire understanding between the parties hereto with respect to each Mortgage Loan Package and supersede all prior or contemporaneous oral or written communications regarding same.   Seller and Purchaser understand and agree that no employee, agent or other representative of Seller or Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement or the related Trade Confirmation or related Purchase Confirmation. Neither this Agreement nor the related Trade Confirmation nor the related Purchase Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both parties.

Section 8.14   **Execution of Agreement.**   For the purpose of facilitating the execution of this Agreement, this Agreement may be executed simultaneously in any number of counterparts, each of which counterpart shall be deemed to be an original and all of which shall constitute one and the same instrument.   Telecopy signatures shall be deemed valid and binding to the same extent as the original.

*(SIGNATURE PAGE TO FOLLOW)*

IN WITNESS WHEREOF, Seller and Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

SELLER:

[_____]

By:_____
Name:
Title:

PURCHASER:

**WJB LOAN LP**

By: WJB GENERAL PARTNER, LLC,
        its General Partner

By:_____
Name:
Title:

## EXHIBIT A

## COLLATERAL DOCUMENTS

1.      Mortgage Note:  The original Mortgage Note (or a lost note affidavit in a form acceptable to an Agency) bearing all intervening endorsements, endorsed "Pay to the order of_____, without recourse" and signed in the name of Seller or its nominee by an authorized officer.

2.      Guarantee:  If any, the original of any guarantee executed in connection with the Mortgage Note or a true and correct electronic copy thereof.

3.      Mortgage:  The original Mortgage with evidence of recording thereon or a true and correct electronic copy thereof, or, if such original Mortgage has not been returned to Seller on or prior to the related Closing Date by the public recording office where such Mortgage has been delivered for recordation, a copy of such Mortgage certified by Seller, the originator, the escrow agent, the title insurer or the closing attorney to be a true and complete copy of the original Mortgage sent for recordation.

4.      Modifications:  The originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or a true and correct electronic copy thereof.

5.      Intervening Assignments:   The originals of all intervening assignments of Mortgage with evidence of recording thereon, provided that such originals have been returned to Seller by the public recording office where such intervening assignment of Mortgage has been delivered for recordation, or a true and correct electronic copy thereof.

6.      Title Policy:  Unless otherwise permitted by Seller's underwriting guidelines, (i) the original mortgagee title insurance policy or a true and correct electronic copy thereof, or if the original mortgagee title insurance policy was provided electronically, proof of such mortgagee title insurance policy shall be provided by Seller upon receipt of written request for such mortgagee title insurance policy from Purchaser, or (ii) if the related Mortgaged Property is located in a jurisdiction where such title insurance is not customarily provided, Seller shall provide documentation customarily provided in lieu of such mortgagee title insurance policy, in each and every case, only if such title insurance policy has been issued by the related title company on or prior to the related Closing Date.

7.      Loan Guaranty Certificate:  If applicable, the original Loan Guaranty Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

8.      Mortgage Insurance Certificate:  If applicable, the original Mortgage Insurance Certificate, if any, or a true and correct electronic copy thereof, or commercially acceptable proof thereof.

**EXHIBIT B**

**FORM OF PURCHASE CONFIRMATION**

[DATE]

**WJB Loan LP**
**c/o WJB General Partner, LLC**
**6465 Greenwood Plaza Blvd., 5th Floor**
**Centennial, Colorado 80111**

      Re:  Purchase Confirmation

Ladies and Gentlemen:

      This purchase confirmation (the "Purchase Confirmation") between [SELLER] (the "Seller") and WJB LOAN LP (the "Purchaser") sets forth our agreement pursuant to which Seller is selling or assigning, and Purchaser is purchasing or accepting, Participations in those certain mortgage loans identified in Schedule A hereto and more particularly described herein (the "Qualifying Mortgage Loans").

      The transfer of the Participations, and servicing of the Qualifying Mortgage Loans as contemplated herein shall be governed by that certain Participation Agreement, dated as of [ ], 201_, between Seller and Purchaser (as amended herein and otherwise, the "Agreement").  By executing this Purchase Confirmation, each of Seller and Purchaser again makes, with respect to itself and each Participation and Mortgage Loan subject thereto, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

      All exhibits hereto are incorporated herein in their entirety.  In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, this Purchase Confirmation shall be controlling notwithstanding anything contained in the Agreement to the contrary.  All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

      1.  Defined Terms.  As used in the Agreement, the following defined terms shall have meanings set forth below.

      a.      Participation Percentage: [     ]%

      b.      Closing Date:  [DATE].

      c.      Custodian:  [Custodian].

      d.      Index: [     ]

      e.      Missing Credit Documents: [     ]

Exhibit B-1

f.      Purchase Price:  See attached Schedule B.

g.      Loan Type:     Each Mortgage Loan is a [Conventional] [Government] Mortgage Loan and a [Adjustable Rate] [Convertible] [Fixed Rate] Mortgage Loan.

h.      Lien Position:  Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

i.      Servicer Reporting Type:  [Proprietary System].

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned.

Confirmed and agreed:

**[SELLER]**

By:_____
Name:
Title:

Agreed and Accepted:

**WJB LOAN LP**

By:     W.J. BRADLEY MORTGAGE CAPITAL, LLC,
        its General Partner

By:_____
Name:
Title:

Exhibit B-2

**Schedule A**

**to**

**Purchase Confirmation**

Mortgage Loan Schedule

(attached)

Exhibit B-3

**Schedule B**

**to**

**Purchase Confirmation**

Calculation of Purchase Price

(attached, if applicable)

Exhibit B-4

**EXHIBIT C**

**FORM OF POWER OF ATTORNEY**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:
WJB LOAN LP
c/o WJB General Partner, LLC
6465 Greenwood Plaza Blvd., 5th floor
Centennial, Colorado 80111
Attn:  [PURCHASER CONTACT]

LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that [SELLER], a [ENTITY TYPE] organized and existing under the laws of the State of [STATE] and having its principal place of business at [SELLER ADDRESS], as the originator/seller (the "Seller") pursuant to that certain Participation Agreement, between WJB LOAN LP (the "Owner") and Seller, dated as of [DATE] (the "Agreement"), hereby constitutes and appoints the Owner, by and through the Owner's officers, Seller's true and lawful Attorney-in-Fact, in Seller's name, place and stead in connection with all Mortgage Loans and REO properties participated by Seller to Owner under the Agreement for the limited purpose of performing all acts and executing all documents in the name of Seller as may be customarily and reasonably necessary and appropriate to effectuate any transactions relating to the Mortgage Loans and Participations subject hereto, including but not limited to those enumerated below, in respect of any of the mortgages or deeds of trust (the "Mortgages" and the "Deeds of Trust" respectively) and promissory notes secured thereby (the "Mortgage Notes") in the event Seller is named therein as mortgagee or beneficiary and the Owner has, notwithstanding its status as mortgagee by virtue of endorsement of the Mortgage Note secured by any such Mortgage or Deed of Trust, not yet become the mortgagee or beneficiary of record.

This appointment shall include without limitation the following transactions:

1.      The modification or re-recording of a Mortgage or Deed of Trust, where said modification or re recording is for the purpose of correcting the Mortgage or Deed of Trust to conform same to the original intent of the parties thereto or to correct title errors discovered after such title insurance was issued

2.      The subordination of the lien of a Mortgage or Deed of Trust to an easement in favor of a public utility company of a United States governmental agency or unit with powers of eminent domain; this section shall include, without limitation, the execution of partial satisfactions/releases, partial reconveyances or the execution or requests to trustees to accomplish same.

3.      The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to real estate owned.

4.      The completion of loan assumption agreements.

5.      The full satisfaction/release of a Mortgage or Deed of Trust or full conveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

6.      The assignment of any Mortgage or Deed of Trust and the related Mortgage Note, in connection with the purchase of the mortgage loan secured and evidenced thereby.

7.      The full assignment of a Mortgage or Deed of Trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the assignment of the related Mortgage Note.

8.      With respect to a Mortgage or Deed of Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

        a.      the substitution of trustee(s) serving under a Deed of Trust, in accordance with state law and the Deed of Trust;

        b.      the preparation and issuance of statements of breach or non-performance;

        c.      the preparation and filing of notices of default and/or notices of sale

        d.      the cancellation/rescission of notices of default and/or notices of sale;

        e.      the taking of a deed in lieu of foreclosure; and

        f.      the preparation and execution of such other documents and performance such other actions as may be necessary under the terms of the Mortgage, Deed of Trust or state law to expeditiously complete said transactions in paragraphs 8(a) through 8(e), above.

9.      To take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any Mortgage Note and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Owner for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any Mortgage Note, Mortgage or Deed of Trust whenever payable.

10.     To take all other necessary and appropriate actions in connection with the foregoing.

The undersigned gives said Owner as Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney, as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall lawfully do or cause to be done by authority hereof.  This Power of Attorney shall be effective as of _____ ___, 201__.  This Power of Attorney is a power

coupled with an interest and shall be irrevocable.  Owner agrees not to exercise any of the powers granted hereunder unless an Event of Default exists under the Agreement.

IN WITNESS WHEREOF, [SELLER], as Seller pursuant to that certain Asset Purchase Agreement, dated as of [DATE], between Seller and the Owner has caused its corporate seal to be hereto affixed and these presents to be signed and acknowledged in its name and behalf by _____, its duly elected and authorized _____ this ____ day of _____, 201_.

[SELLER]


By:_____
Name:
Title:

Exhibit C-3

STATE OF _____
COUNTY OF _____

On _____ __, _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____ of _____, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that [she/he] executed that same in [her/his] authorized capacity, and that by [her/his] signature on the instrument the entity upon behalf of which the person acted and executed the instrument.

WITNESS my hand and official seal.

(SEAL)


Notary Public

Exhibit C-4