**<u>EXHIBIT D</u>**
**Amended Complaint**

FILED: NEW YORK COUNTY CLERK 06/30/2016 06:49 PM

NYSCEF DOC. NO. 14

INDEX NO. 651693/2016

RECEIVED NYSCEF: 06/30/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x
:
MIMS MASTER FUND, L.P.,                          :    Index No. 651693/2016
                                                 :
                         Plaintiff,              :
                                                 :
            vs.                                  :    **AMENDED COMPLAINT**
                                                 :
JOSEPH A. CAMBI,                                 :
                                                 :
                         Defendant.              :
                                                 :
-------------------------------------------------------------x

Plaintiff MIMS Master Fund, L.P. ("MIMS" or "Limited Partner"), by its

attorneys Sidley Austin LLP, as and for its Amended Complaint against defendant Joseph

A. Cambi ("Cambi" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for breach of contract arising out of the breach by

defendant Cambi of obligations under a Limited Guaranty.

2.      In December 2015, Cambi and his partner, William J. Bradley, convinced

MIMS to become a limited partner in WJB LOAN LP (the "Partnership" or "Loan LP").

WJB General Partner, LLC ("WJB GP"), an entity that, upon information and belief,

became controlled by Cambi or entities that he controls in December of 2015, was the

general partner of the Partnership. In connection with becoming a limited partner in the

Partnership, MIMS invested $10,000,000 that was to be used by the Partnership and WJB

GP to make, manage and supervise investments in mortgage-related assets on behalf of

the Partnership. As a condition precedent to and part of the consideration for MIMS's

investment in the Partnership, Cambi executed a Limited Guaranty, dated December 8,

2015 (the "Guaranty Agreement"), in favor of MIMS, pursuant to which Cambi provided

a personal guarantee to MIMS guaranteeing "the full and timely payment, performance

and observance of, and compliance with all of [WJB GP's], the Partnership's and W.J.

Bradley Mortgage Capital, LLC's [("WJB Mortgage")] obligations under or in

connection with the [Second Amended and Restated Limited Partnership Agreement of

WJB Loan LP, dated December 9, 2015 (the "Partnership Agreement" or "Loan LPA")],

including, without limitation, the full and prompt payment of all Unpaid Preferred Return

or unreturned Capital Contribution (each as defined in the WJB Loan LPA as of the date

hereof), including, without limitation, the Limited Partner's reasonable attorneys' fees

and disbursements in enforcing and collecting such amounts (collectively, the

"**Obligations**")."

      3.      Less than three months after forming the Partnership, rather than comply

with the contractual payment obligations owed to the Partnership as required by the

Partnership Agreement and by a December 9, 2015 Participation Agreement entered into

between the Partnership and WJB Mortgage (the "Participation Agreement") in

connection with the Partnership Agreement, WJB GP and WJB Mortgage willfully

breached their contractual obligations under those agreements by withholding and

participating in the diversion of funds owed to the Partnership in amounts in excess of

$2.89 million.  Since the original breach in March 2016, WJB Mortgage diverted an

additional $1.67 million from the Partnership, for a total of $4.56 million.  These amounts

were the proceeds from sales of mortgage-related loans in which the Partnership had a

participation interest, and they were required to be paid by WJB Mortgage to the

Partnership when the mortgage loans were sold in order to repurchase the Partnership's

participation interest.  WJB GP also failed to transfer cash to fund a margin shortfall of at

least $2.89 million created by certain of the mortgage loan sales and/or other transactions,

in clear breach of its obligations under the Partnership Agreement.

4.      WJB Mortgage also has refused to comply with its obligations to transfer

the documents demanded by Loan LP in order to effectuate the transfer of title to the

Partnership of loans totaling approximately $1.68 million in further breach of the

Participation Agreement – an Obligation for which Cambi is also responsible.  Indeed,

rather than transfer the requisite loans to the Partnership – loans in which a California

court issued a temporary restraining order preventing WJB Mortgage's use of the

proceeds of such loans– or pay the millions separately owed to the Partnership, WJB

Mortgage filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy

Court for the District of Delaware on April 28, 2016 (the "Petition Date").   Additionally,

WJB Mortgage has failed to pay the Partnership the interest payments received from

mortgagors attributable to the mortgage loans in which Loan LP owns Participations,

which it has kept for itself in violation of the Participation Agreement.

5.      Based on the unequivocal defaults and breaches of the Partnership-related

agreements by WJB GP and WJB Mortgage, Cambi became responsible for their

Obligations.  MIMS demanded that Cambi make payment of the Obligations of WJB GP

and WJB Mortgage to the Partnership pursuant to the Guaranty Agreement.

Notwithstanding MIMS's valid demands (which were not contractually required), Cambi

has refused to honor his own, absolute and unconditional contractual obligations by

failing to pay under the Guaranty Agreement.  Accordingly, Loan LP brings this action

seeking damages in connection with Cambi's guaranty of the obligations of WJB GP and

WJB Mortgage, together with all interest accrued and reasonable costs and expenses (including attorneys' fees) incurred in connection with enforcement of the relevant agreements.

## THE PARTIES

6.    Plaintiff MIMS Master Fund, L.P. is a Delaware limited partnership with its principal place of business at 11755 Wilshire Blvd, #1600, Los Angeles, CA 90025.

7.    Upon information and belief, defendant Joseph A. Cambi is an individual residing in Longmeadow, Massachusetts, with an address at 290 Shaker Road, Longmeadow, MA 01106.

## JURISDICTION AND VENUE

8.    MIMS brings this action to enforce its rights under the Guaranty Agreement.

9.    The Guaranty Agreement provides that New York law shall apply.

10.    The Guaranty Agreement also provides that Defendant covenants and agrees and submits to the jurisdiction of the Supreme Court of the State of New York, County of New York.

11.    This Court has jurisdiction pursuant to § 5-1402 of New York General Obligations Law because the action arises out of an agreement that (i) includes a choice of law provision whereby the law of the State of New York has been selected; (ii) relates to obligations valued in excess of one million dollars; and (iii) contains a provision whereby all parties have agreed to submit to the jurisdiction of the Supreme Court of the State of New York, County of New York.

4

12.     Venue is proper pursuant to CPLR §§ 501 and 503(a) because Defendant, by agreement, irrevocably consented to venue in the Supreme Court of the State of New York, County of New York with respect to any action brought by Plaintiff concerning the subject matter of this lawsuit.

## FACTS

### A.     The Partnership Agreement

13.     In connection with and to memorialize the terms of the Partnership, on or about December 9, 2015, WJB GP and MIMS entered into the Partnership Agreement.

14.     Pursuant to Section 3.03 of the Partnership Agreement, MIMS, as the Limited Partner, contributed capital in the amount of $10,000,000 to the Partnership, $4,403,413 on December 9, 2015, $2,596,587 on December 14, 2015, and $3,000,000 on December 31, 2015.

15.     Pursuant to the Partnership Agreement, WJB GP (in its role as general partner) had specific management duties and obligations to the Partnership.

16.     In connection with those obligations, pursuant to Section 4.02(b) of the Partnership Agreement, WJB GP was required to "at all times comply with the Investment Guidelines set forth in Schedule B" to the Partnership Agreement (the "Investment Guidelines").

17.     One of the obligations contained in Section (h) of the Investment Guidelines is that the General Partner maintain a "Margin Account", which is defined in the Investment Guidelines as:

> a deposit account established and maintained by the General Partner at an insured financial institution acceptable to the Limited Partner, in the name of the Partnership and for the benefit of the Limited Partner, and subject to an account control agreement with such insured financial institution, into which amounts in respect of

5

Margin Maintenance shall be deposited or withdrawn, which shall at all times contain a balance necessary to cause the Partnership to meet the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans and Minimum Net Collateral Value Requirement tests, as such amounts shall be determined by the Limited Partner from time to time in its sole discretion. (Emphasis added.)

18.    Pursuant to Section (h)(ii) of the Investment Guidelines, titled "Margin Deficit and Margin Call":

(A) If the General Partner or the Limited Partner shall determine at any time that (x) the Net Collateral Value is less than the Minimum Net Collateral Value Requirement, or (y) the Aggregate Principal Balance of Qualifying Mortgage Loans owned by the Partnership is less than the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans (in any such case, a "Margin Deficit"), then if the General Partner has determined any such shortfall, or if the Limited Partner has determined such shortfall and has delivered notice thereof to the General Partner (a "Margin Call"), the General Partner shall transfer cash to the Margin Account such that (x) the Net Collateral Value will meet the Minimum Net Collateral Value Requirement, or (y) the Aggregate Principal Balance of Qualifying Mortgage Loans owned by the Partnership plus such cash will meet the Minimum Aggregate Principal Balance of Qualifying Mortgage Loans, as applicable.

19.    Accordingly, pursuant to Section (h)(ii) of the Investment Guidelines, if WJB GP had determined there was a Margin Deficit, WJB GP was required to transfer cash to the Margin Account of the Partnership in the amount of that Margin Deficit.

**B.    The Participation Agreement**

20.    MIMS's capital investments in the Partnership were intended to be used by the Partnership to purchase from WJB Mortgage – the Seller under the Participation Agreement – certain mortgage loans, or participation interests in mortgage loans, in which WJB Mortgage had an interest.

21.    Accordingly, in connection with and pursuant to the Partnership Agreement, on December 9, 2015, the Partnership entered into the Participation

6

Agreement with WJB Mortgage, as required by the Partnership Agreement, and in the form of the participation agreement attached as Exhibit A-3 to the Partnership Agreement, in order to facilitate the acquisition by the Partnership of participations in certain loans in which WJB Mortgage had an interest.

22.     "Participation" is defined in the Recitals to the Participation Agreement as:

> [P]articipations in all of Seller's right, title and interest in and to the related Qualifying Mortgage Loans (as defined below), in each case equal to the Participation Percentage and including all applicable warehouse credit facility obligations for which such mortgage loan packages serve as security and all of Seller's interest in any Related Agreements (as defined below) as identified in a Purchase Confirmation (as defined below) executed by Seller and Purchaser (each, a "Participation").

23.     "Purchase Confirmation" is defined in the Participation Agreement as:

> A letter agreement, substantially in the form of Exhibit B hereto, executed by Seller and Purchaser in connection with the transfer of each Mortgage Loan Package to Purchaser, which sets forth the terms relating thereto including a description of the related Qualifying Mortgage Loans (including the Mortgage Loan Schedule), the purchase price for the related Qualifying Mortgage Loans, if applicable, and the related Closing Date.

24.     "Qualifying Mortgage Loan" is defined in the Participation Agreement as:

> A Mortgage Loan: (a)(i) to be sold (and is eligible for sale) to an Issuer, (ii) for which Seller has received a Firm Commitment from an Investor, a copy of which Firm Commitment has been approved by Limited Partner and which is valid and enforceable in accordance with its terms, or (iii) such other Mortgage Loan specifically approved by the Limited Partner; (b) which is evidenced by a mortgage note, in form and substance acceptable to such Issuer or Investor, or the Limited Partner, payable to the order of Seller; (c) which is secured by a security instrument, in form and substance acceptable to such Issuer or Investor, or the Limited Partner; (d) which conforms in all respects with all the requirements of the Firm Commitment to purchase the same or all requirements of the Issuer to purchase the same or is otherwise

7

acceptable to the Limited Partner; (e) for which the related Investment Acquisition Date is more than two (2) Business Days following the origination date of such Mortgage Loan; and (f) for which the Company or an Approved Custodian has received a complete mortgage file prior to the related Investment Acquisition Date.

25.     On December 9, 2015, WJB Mortgage and the Partnership entered into a Purchase Confirmation letter agreement (the "Purchase Confirmation") setting forth the agreement pursuant to which WJB Mortgage would sell or assign, and the Partnership would purchase or accept, Participations in the mortgage loans identified in Schedule A to the Purchase Confirmation and which defined the loans that constituted "Qualifying Mortgage Loans" that were to be governed by the Participation Agreement.  Subsequent thereto, and by mutual agreement of WJB Mortgage, WJB GP, the Partnership and MIMS, such Purchase Confirmation was updated and supplemented by Investment Certificates delivered electronically by WJB Mortgage and WJB GP to the Partnership and MIMS daily, in each case setting forth Participations that were transferred from WJB Mortgage to the Partnership on such day.

26.     The Qualifying Mortgage Loans in which the Partnership purchased Participations fall into two categories: (1) the "Warehouse Loans" – loans funded by a Mortgage Warehouse Facility, dated October 23, 2014 (the "TCB Warehouse Facility"), with Texas Capital Bank, National Association ("TCB"), and which are subject to, the TCB Warehouse Facility, and (2) the "Loans Held for Cash" – loans that are not subject to any warehouse facility (including the TCB Warehouse Facility).  The Partnership's participation interest in the Loans Held for Cash is between eighty-five and ninety-nine percent and the Partnership has a first priority perfected security interest in the Loans Held for Cash (pursuant to Section 8.02 of the Participation Agreement, and as a matter

of law), to the extent of its participation interests. TCB has a security interest in the Warehouse Loans, but not the Loans Held for Cash. The Partnership purchased participations in both Warehouse Loans and Loans Held for Cash.

27. Pursuant to Section 5.01 of the Participation Agreement, titled "Distributions," WJB Mortgage was required to pay the Partnership the interest payments received from mortgagors attributable to any particular period:

> On each Remittance Date, Seller shall remit to Purchaser (a) all accrued Mortgage Loan Remittance Rate due to Purchaser on Qualifying Mortgage Loans subject to Participations owned by Purchaser as of the close of business on the preceding Determination Date . . . ; minus (b) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the preceding Determination Date. . . . (Emphasis added.)

28. "Mortgage Loan Remittance Rate" is defined in the Participation Agreement as:

> With respect to each Participation, the interest rate payable to Purchaser on each Remittance Date which shall equal the Mortgage Interest Rate on the related Qualifying Mortgage Loan less the LPMI Fee, if applicable, in each case subject to the Participation.

29. "Mortgage Interest Rate" is defined in the Participation Agreement as "[t]he annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note."

30. "LPMI Fee" is defined in the Participation Agreement as:

> The portion of the Mortgage Interest Rate relating to an LPMI Loan [a loan on which Seller pays the premium due on a private mortgage insurance policy], which is set forth on the related Mortgage Loan Schedule, to be retained by Seller to pay the premium due on the PMI Policy with respect to such LPMI Loan.

31.     Pursuant to Section 5.03 of the Participation Agreement, titled "Repurchase of Participation Interests," in the event that WJB Mortgage sold or transferred any Qualifying Mortgage Loans subject to a Participation under the Participation Agreement, if WJB Mortgage did not reinvest the monies to purchase other Qualifying Mortgage Loans, WJB Mortgage was required to repurchase such Participation from the Partnership at the Repurchase Price as defined in the Participation Agreement:

> If Seller sells or transfers any Qualifying Mortgage Loans subject to a Participation hereunder, Seller shall repurchase such Participation from Purchase [sic] at the Repurchase Price. Any such repurchase pursuant to the provisions of this Section 5.03 shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price for remittance to Purchaser on the next scheduled Remittance Date. On or before the date of the repurchase, Purchaser shall promptly cooperate with Seller to arrange for the reassignment of such Participation and the delivery to Seller of any documents held by Purchaser or its designee relating to such Participation. Notwithstanding the foregoing, in lieu of remitting the Repurchase Price to the Purchaser, the Seller may reinvest such Repurchase Price in other Qualifying Mortgage Loans ("Substitute Loans"). To reinvest such Repurchase Price, the Seller must notify the Purchase [sic] and deliver a new Purchase Confirmation or Trade Confirmation relating to the Substitute Loans. Upon such reinvestment, this Agreement shall continue and be effective with respect to the Participation in the Substitute Loans. Any Repurchase Price not so reinvested shall be remitted to Purchaser.   (Emphasis added.)

32.     "Repurchase Price" is defined in the Participation Agreement as:

> With respect to any Participation, a price equal to the sum of (a) the Purchase Price for Participation, and (b) the Participation's portion of interest on the Stated Principal Balance of the related Qualifying Mortgage Loan at the time of repurchase at the Mortgage Interest Rate from the last date through which interest has been paid and remitted to Purchaser to the date of repurchase.

10

33.    "Custodial Account" is defined in the Participation Agreement as "[t]he account or accounts created and maintained in connection with servicing Qualifying Mortgage Loans pursuant to this Agreement."

34.    The Participation Agreement also established procedures should a party default under the terms of the Participation Agreement.

35.    First, Section 7.01(a) of the Participation Agreement provides, in relevant part, that the following shall be an Event of Default under the Participation Agreement:

> (i) any failure by Seller to remit to Purchaser any payment required to be
> made under the terms of this Agreement which such failure continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Purchaser; or
>
> * * *
>
> (v) Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

36.    Second, Section 7.01(b) established the Partnership's rights following an Event of Default, providing that:

> in addition to whatever rights Purchaser may have at law or equity to damages, including injunctive relief and specific performance, [Purchaser may] do any of the following (or any combination thereof): (i) terminate or "suspend" all the rights and obligations of Seller under this Agreement and in and to the Qualifying Mortgage Loans and the proceeds thereof, or (ii) with respect to Participations [in Loans Held for Cash] foreclose upon the related Qualifying Mortgage Loans (including without limitation taking any actions necessary to effect such transfer pursuant to the power of attorney granted to Purchaser under this Agreement) in order to transfer all of Seller's right, title and interest in and to the related Qualifying Mortgage Loans to Purchaser. On or after the receipt by Seller of such written notice, all rights, authority and power of Seller under this Agreement, whether with respect to the Qualifying Mortgage Loans subject to Participation interests

11

hereunder (but solely with respect to Participations where the related Qualifying Mortgage Loans are not subject to any applicable warehouse credit facility obligations for which such Qualifying Mortgage Loans serve as security (or other liens or restrictions that prevent Seller from granting a security interest in such Qualifying Mortgage Loans)), as, the Participation interests in the Qualifying Mortgage Loans or otherwise, shall pass to and be vested in Purchaser. <u>Upon written request from Purchaser, Seller shall prepare, execute and deliver, any and all documents and other instruments and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Qualifying Mortgage Loans subject to the Participation interests hereunder and related documents, or otherwise, at Seller's sole expense.   Seller agrees to cooperate with Purchaser in effecting the termination of Seller's responsibilities and rights hereunder, including the transfer to Purchaser, for administration by it, of all cash amounts which shall at the time be credited by Seller to the Custodial Account or thereafter received with respect to the Mortgage Loans.</u>  (Emphasis added.)

37.     In addition to its rights upon the occurrence of an Event of Default, pursuant to Section 6.01 of the Participation Agreement, the Partnership was entitled to indemnification from WJB Mortgage with respect to its defaults:

> Seller shall indemnify Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary attorneys' fees and related costs, judgments, and any other costs, fees and expenses that Purchaser may sustain due to Seller's breach of any representation, warranty, covenant or other obligation under to this Agreement.

**C.     The Guaranty Agreement**

38.     In connection with the Partnership Agreement, Cambi executed the Guaranty Agreement in favor of MIMS.  A true and correct copy of the Guaranty Agreement is attached as Exhibit A hereto.

39.     Pursuant to Section 3 of the Guaranty Agreement, Cambi "unconditionally guarantee[d] to [MIMS] and its successors and assigns the full and timely payment, performance and observance of, and compliance with all of the Obligations."

40.     Section 3 of the Guaranty Agreement also provides:

12

<u>The undersigned waives any notice of nonpayment, non-performance, non-observance, or non-compliance, or proof, notice, or demand whereby to charge the undersigned.</u> The undersigned hereby further expressly covenants and agrees that the obligation of the undersigned hereunder shall in no way be terminated or otherwise affected or impaired by reason of any assertion by Limited Partner against [WJB Mortgage, WJB GP] or the Partnership of any of the rights or remedies available to Limited Partner pursuant to the Loan LPA or allowed at law or in equity.

This Guaranty is an absolute and unconditional guaranty of payment and performance. The undersigned hereby covenants and agrees to and with Limited Partner and its successors and assigns, that the undersigned may be joined in an action or proceeding against [WJB Mortgage, WJB GP] or the Partnership in connection with the Obligations, and that recovery may be had against the undersigned in such action or proceeding or in any independent action or proceeding against the undersigned without Limited Partner or its successors or assigns first pursuing or exhausting any remedy) or claim against [WJB Mortgage, WJB GP] or the Partnership or their successors or assigns or any other remedy or claim under any other security for, or guaranty of, the obligations of [WJB Mortgage, WJB GP] or the Partnership under the Loan LPA.

(Guaranty Agreement, Ex. A, § 3 (emphasis added).)

41.     Therefore, pursuant to the Guaranty Agreement, Cambi guaranteed for the benefit of the Limited Partner that WJB GP would perform and pay its obligations under the Partnership Agreement and that WJB Mortgage would perform and pay its obligations under the Participation Agreement (which was entered into in connection with the Partnership Agreement), and agreed to be financially responsible for any payments that WJB GP or WJB Mortgage did not remit or make to the Partnership, and any other obligations that WJB GP or WJB Mortgage failed to satisfy, including MIMS's legal fees and costs incurred in connection with enforcement of or collection of such amounts.

13

42.    Pursuant to Section 3 of the Guaranty Agreement, New York law governs the Guaranty Agreement and Cambi submitted to the jurisdiction of this Court and waived his right to jury trial:

> As a further inducement to Limited Partner to make and enter into the Loan LPA, Guarantor covenants and agrees that (i) in any action or proceeding brought in respect of this Guaranty, the undersigned hereby waives trial by jury, (ii) the Supreme Court of the State of New York of the County of New York (or, in a case involving diversity of citizenship, the United States District Court for the Southern District of New York) shall have jurisdiction of any action or proceeding, and (iii) service of any summons and complaint or other process in any such action or proceeding may be made by certified mail directed to the undersigned at the address below set forth, personal service being hereby waived. This Guaranty shall be enforced and construed in accordance with the laws of the State of New York and shall be binding upon and inure to the benefit of Limited Partner and the undersigned and their respective heirs, executors, administrators, successors and assigns.

(Guaranty Agreement, Ex. A, § 3) (emphasis added).

43.    Section 3 of the Guaranty Agreement provides that the prevailing party is entitled to recover its costs and expenses, including reasonable attorneys' fees and costs, in connection with any suit to enforce the provisions of the Guaranty Agreement:

> In the event of the bringing of any action or suit by a party hereto against another party hereunder to enforce any provisions of this Guaranty, then in that event the prevailing party shall be entitled to have and recover from the other party hereto all costs and expenses of the action or suit and any appeals therefrom, including reasonable attorneys' fees and court costs and costs of expert witnesses, and fees incurred to enforce any judgment therefrom.

(Guaranty Agreement, Ex. A, § 3.)

**D.    WJB GP Breached Its Obligation to Fund the Margin Account in Connection with a Margin Deficit Under the Partnership Agreement**

44.    Starting on February 23, 2016, substantial Margin Deficits began occurring under the Partnership Agreement that were related in substantial part to WJB

14

GP's failure to ensure that WJB Mortgage paid certain amounts due and owing to the Partnership as required by the Participation Agreement when Qualifying Mortgage Loans subject to a Participation had been sold. WJB GP also failed to remit certain interest and principal payments to the Partnership that it was required to pay which also may have contributed to the Margin Deficit.

45.     As of March 11, 2016, based on the information provided by WJB GP to the Limited Partner, the Margin Deficit was $2,892,320. At all relevant times, WJB GP determined and reported the existence of an ever-increasing Margin Deficit. In response to such determinations, the Limited Partner requested that WJB GP transfer cash to the Margin Account to erase the Margin Deficit. Accordingly, pursuant to Section (h)(ii) of the Investment Guidelines, WJB GP, as the General Partner at the time, was required to transfer cash to the Margin Account of the Partnership to cover the Margin Deficit amount of $2,892,320 as of that date.

46.     WJB GP did not transfer $2,892,320 as required on March 11, 2016.

47.     On March 11, 2016, the Partnership and MIMS issued a notice of breach and demanded immediate payment of the Margin Deficit amount of at least $2,892,320 (the Margin Deficit as of March 11, 2016) into the Margin Account of the Partnership (the "March 11 Demand"). A true and correct copy of the March 11 Demand is attached to the Guaranty Demand.

48.     Pursuant to the March 11 Demand, payment was due by WJB GP on or before March 15, 2016.

15

49.    WJB GP has not made any full or partial payment in connection with the March 11, 2016 Margin Deficit, as required by the Partnership Agreement and the March 11 Demand.

50.    WJB GP's obligation to pay the Margin Deficit amount of $2,892,320 (as of March 11, 2016) into the Margin Account of the Partnership as required by Section (h)(ii) of the Investment Guidelines in the Partnership Agreement is an Obligation as defined in the Guaranty Agreement (the "WJB GP Margin Obligation").

51.    To the extent that, prior to the Petition Date, WJB Mortgage continued to engage in loan sales without paying the Repurchase Price to WJB Loan, Cambi is also responsible for the Obligations of WJB GP that arose from any such sales, including any Margin Deficits.

### E.    WJB Mortgage Defaulted On Its Repurchase Payment Obligations Under the Participation Agreement

52.    In connection with the assets of the Partnership that were subject to the Participation Agreement, pursuant to Section 5.03 of the Participation Agreement, as detailed above, in the event that WJB Mortgage sold or transferred any Qualifying Mortgage Loans subject to a Participation, WJB Mortgage was required to repurchase such Participation from the Partnership at the Repurchase Price, and the monies reflecting the Repurchase Price were to be moved to the Custodial Account for payment and remittance to the Partnership on the Remittance Date as defined in the Participation Agreement.

53.    On February 23, 2016, WJB Mortgage sold a Qualifying Mortgage Loan subject to a Participation and the Repurchase Price for that Participation was approximately $702,951 plus accrued interest (the "February 23 Participation Sale").

16

54.     On February 25, 2016, WJB Mortgage sold a Qualifying Mortgage Loan subject to a Participation and the Repurchase Price for that Participation was approximately $818,664 plus accrued interest (the "February 25 Participation Sale").

55.     Upon information and belief, WJB Mortgage sold additional Qualifying Mortgage Loans subject to Participations, and the Repurchase Price for those Qualifying Mortgage Loans totaled at least $1,370,705 plus accrued interest (the "Other Participation Sales").

56.     WJB Mortgage did not pay the Repurchase Prices for the February 23 Participation Sale, February 25 Participation Sale and Other Participation Sales into the Custodial Account for payment to the Partnership on the next Remittance Date as required by Section 5.03 the Participation Agreement.

57.     On March 11, 2016, as a result of the default by WJB Mortgage in connection with the February 23 Participation Sale, February 25 Participation Sale and Other Participation Sales, the March 11 Demand noticed WJB Mortgage's default and demanded immediate payment of the funds owed to the Partnership.  The March 11 Demand recognized that payment of the Repurchase Prices in connection with the February 23 Participation Sale, February 25 Participation Sale and Other Participation Sales would decrease the Margin Deficit by the amount of that payment.

58.     Pursuant to the March 11 Demand and Section 7.01(a)(i) of the Participation Agreement, payment was due by WJB Mortgage on or before March 15, 2016.

59.     WJB Mortgage did not made any full or partial payment in connection with the February 23 Participation Sale, February 25 Participation Sale and Other

17

Participation Sales as required by the Participation Agreement and the March 11

Demand. Failure to make payment by March 15, 2016, after receiving the March 11

Demand, as well as a subsequent admission by WJB Mortgage that is was unable to pay

its debts constituted Events of Default by WJB Mortgage pursuant to Sections 7.01(a)(i)

and 7.01(a)(v) of the Participation Agreement.

      60.    In addition to its failure to pay the Repurchase Prices for the February 23

Participation Sale, February 25 Participation Sale and Other Participation Sales, upon

information and belief, WJB Mortgage sold additional Warehouse Loans subject to

Participations before the Petition Date, and the Repurchase Price for those additional

Warehouse Loans totaled at least $1,676,405 plus accrued interest (the "Additional

Warehouse Participation Sales," together with the February 23 Participation Sale,

February 25 Participation Sale and Other Participation Sales, the "Participation Sales").

      61.    WJB Mortgage did not pay the Repurchase Prices for the Additional

Warehouse Participation Sales into the Custodial Account for payment to the Partnership

on the next Remittance Date as required by Section 5.03 the Participation Agreement.

      62.    The total amount owed to the Partnership by WJB Mortgage with respect

to the Repurchases Prices for the Participation Sales is $4,568,725.

      63.    WJB Mortgage's obligation to make payment of $4,568,725 into the

Custodial Account for payment and remittance to the Partnership as required by Section

5.03 of the Participation Agreement is an Obligation as defined in the Guaranty

Agreement (the "WJB Mortgage Repurchase Payment Obligation").

64.     Further, to the extent that WJB Mortgage continued to engage in other loan sales without paying the Repurchase Price to Loan LP, Cambi is also responsible for the Obligations of WJB Mortgage and WJB GP that arose from any such sales.

**F.      WJB Mortgage Defaulted On Its Interest Payment Obligations Under the Participation Agreement**

65.     On and after February 1, 2016, the Partnership owned Participations in one or more Qualifying Mortgage Loans for which a mortgagor owed an interest payment to WJB Mortgage.

66.     WJB Mortgage did not remit to the Partnership any Mortgage Loan Remittance Rate due to the Partnership on the Qualifying Mortgage Loans subject to Participations owned by the Partnership for any period beginning on or after February 1, 2016 as required by Section 5.01 the Participation Agreement.

67.     WJB Mortgage's obligation to make payment of the Mortgage Loan Remittance Rate due to the Partnership on the Qualifying Mortgage Loans subject to Participations owned by the Partnership for any period beginning on or after February 1, 2016 as required by Section 5.01 of the Participation Agreement is an Obligation as defined in the Guaranty Agreement (the "WJB Mortgage Interest Payment Obligation").

**G.      Cambi Breached the Guaranty Agreement by Failing to Pay the Amount of the Unpaid WJB GP Margin Obligation, WJB Mortgage Repurchase Payment Obligation and WJB Mortgage Interest Payment Obligation As Required by the Guaranty Agreement**

68.     When WJB GP failed to pay the amount of the unpaid WJB GP Margin Obligation, Cambi was required to pay the WJB Margin Obligation pursuant to Section 3 of the Guaranty Agreement.

69.     When WJB Mortgage failed to pay the WJB Mortgage Repurchase Payment Obligation and WJB Mortgage Interest Payment Obligation, Cambi was

required to pay the WJB Mortgage Repurchase Payment Obligation and WJB Mortgage Interest Payment Obligation pursuant to Section 3 of the Guaranty Agreement.

70.     Cambi did not pay the WJB Margin Obligation, WJB Mortgage Repurchase Payment Obligation or WJB Mortgage Interest Payment Obligation as required by the Guaranty Agreement, in breach of his contractual obligations.

71.     On March 14, 2016, MIMS delivered a demand for payment by Cambi of the unpaid WJB GP Margin Obligation and $2,892,320 of the WJB Mortgage Obligation[1] (the "Guaranty Demand").  The Guaranty Demand included a demand for payment of (i) $2,892,320 with respect to the Margin Deficit under the Partnership Agreement owed by WJB GP to the Partnership together with interest, (ii) the sums due and payable by WJB Mortgage to the Partnership under the Participation Agreement with interest, and (iii) reasonable costs and expenses (including all collection, enforcement, and other costs and fees) with interest incurred by MIMS in connection with collecting the WJB GP Obligation and WJB Mortgage Obligation.

72.     A true and correct copy of the Guaranty Demand, which was sent to Cambi on March 14, 2016 by First-Class Certified U.S. Mail, return receipt requested, and by electronic mail that same day is attached as Exhibit B hereto.

73.     Pursuant to the Guaranty Demand, payment was due by Cambi on or before March 17, 2016.

74.     In addition to failing to make the payments required by the Guaranty Agreement, Cambi has not made any payment requested in the Guaranty Demand, claiming, without a shred of support, that he has "lost" all his money.

---

[1] At the time of the Guaranty Demand, Loan LP was not aware of the Additional Warehouse Loan Participation Sales whose Repurchase Prices were $1,676,405.

**H.    WJB Mortgage Defaulted On Its Obligations to Transfer Certain Loans Held for Cash to the Partnership Under the Participation Agreement**

75.    Based on the Events of Default pursuant to Sections 7.01(a)(i) and 7.01(a)(v) of the Participation Agreement and WJB Mortgage's failure to cure, on March 17, 2016 (the "March 17 Termination and Demand Letter"), the Partnership exercised its rights under Section 7.01(b)(i) of the Participation Agreement and terminated WJB Mortgage's rights under the Participation Agreement, including WJB Mortgage's rights "in and to all of the Qualifying Mortgage Loans and all of the proceeds thereof." Further, as was its right, pursuant to Section 7.01(b)(ii) of the Participation Agreement, the Partnership also provided notice that it was exercising its contractual right to foreclose on the remaining Loans Held for Cash. A true and correct copy of the March 17 Termination and Demand Letter is attached to the Second Guaranty Demand.

76.    In connection with the termination, pursuant to Section 7.01(b) of the Participation Agreement, in the March 17 Termination and Demand Letter, the Partnership also requested that WJB Mortgage "immediately prepare, execute and deliver any and all documents and other instruments and do or accomplish all other acts or things necessary or appropriate to effect the purposes of this notice of termination and foreclosure, including, without limitation, [] completing the transfer and endorsement or assignment of the Qualifying Mortgage Loans subject to the participation interest hereunder and related documents, at Seller's expense…"

77.    WJB Mortgage also has refused to comply with its obligations to transfer the documents demanded by Loan LP in order to effectuate the transfer of title to the Partnership of any unsold Loans Held for Cash. Upon information and belief, the unpaid principle balance of the unsold Loans Held for Cash is $1,685,419.

21

78.     On April 12, 2016, the Partnership filed a complaint against WJB Mortgage alleging breach of contract and anticipatory breach of contract (the "California Action") in the Superior Court of the State of California, County of Los Angeles (the "California Court"), seeking, in part, to recover the Loans Held for Cash in its possession. The Partnership also filed an application for temporary restraining order related to those loans.  On April 13, 2016, over WJB Mortgage's objection, the California Court issued a temporary restraining order against WJB Mortgage preventing it from assigning, transferring, using or disposing of any of the proceeds of the Loans Held for Cash. Rather than proceed in the California Action, in an effort to escape its contractual liability to the Partnership, WJB Mortgage filed for bankruptcy.

79.     WJB Mortgage's obligation to transfer the documents reflecting Loans Held for Cash in which the Partnership held a Participation after foreclosure on those loans, as required by Section 7.01(b) of the Participation Agreement, is an Obligation as defined in the Guaranty Agreement (the "WJB Mortgage Foreclosure Obligation").

**I.      Cambi Breached the Guaranty Agreement by Failing to Pay the Amount of the Unpaid WJB Mortgage Foreclosure Obligation As Required by the Guaranty Agreement**

80.     When WJB Mortgage failed to pay the amount of the unpaid WJB Mortgage Foreclosure Obligation, Cambi was required to pay the WJB Mortgage Foreclosure Obligation pursuant to Section 3 of the Guaranty Agreement.

81.     Cambi did not pay the WJB Mortgage Foreclosure Obligation as required by the Guaranty Agreement, in breach of his contractual obligations.

82.     On June 13, 2016, pursuant to Section 3 of the Guaranty Agreement, MIMS delivered a demand for payment by Cambi of the unpaid WJB Mortgage Foreclosure Obligation (the "Second Guaranty Demand").  The Second Guaranty

Demand included a demand for payment of $1,685,419 with interest, the monetary amount of Unsold Loans Held for Cash in which the Partnership had Participations.

83.    A true and correct copy of the Second Guaranty Demand, which was sent to counsel for Cambi on June 13, 2016 by overnight and electronic mail is attached as Exhibit C hereto.

84.    Pursuant to the Second Guaranty Demand, payment was due by Cambi on or before June 13, 2016.

85.    In addition to failing to make the payments required by the Guaranty Agreement, Cambi has not made any payment requested in the Second Guaranty Demand.

## COUNT I – BREACH OF CONTRACT

86.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 85 above as if fully set forth herein.

87.    The Guaranty Agreement is a valid, binding and enforceable agreement.

88.    Pursuant to the Guaranty Agreement, Defendant Cambi "unconditionally guarantee[d] to [MIMS] the full and timely payment, performance and observance of, and compliance with all of [WJB GP and WJB Mortgage's obligations under or in connection with the Partnership Agreement]," including the WJB GP Margin Obligation.

89.    WJB GP failed to pay the WJB GP Margin Obligation of $2,892,320, the amount of the Margin Deficit as of March 11, 2016, which was required to be transferred by WJB GP into the Margin Account of the Partnership pursuant to Section (h)(ii) of the Investment Guidelines in the Partnership Agreement.

23

90.     Pursuant to the Guaranty Agreement, when WJB Mortgage did not meet its payment obligations, Cambi was himself required to pay $2,892,320 together with interest to satisfy the WJB GP Margin Obligation (however, this amount would be reduced by any corresponding payment made by Cambi in connection with satisfaction of the WJB Mortgage Repurchase Payment Obligation), and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB GP Margin Obligation.

91.     Defendant Cambi has breached his obligations under the Guaranty Agreement by failing to pay the WJB GP Margin Obligation.

92.     MIMS and the Partnership sent Defendant Cambi a written demand for payment of the WJB GP Margin Obligation, and Cambi still did not pay the WJB Margin Obligation.

93.     MIMS has been harmed and continues to be harmed by Defendant Cambi's failure to pay the WJB GP Margin Obligation.

94.     By reason of Defendant Cambi's breach of the Guaranty Agreement in connection with the WJB GP Margin Obligation, MIMS has been damaged in an amount to be determined at trial, but by at least $2,892,320, plus interest and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB GP Margin Obligation and enforcing the Guaranty Agreement.

## COUNT II – BREACH OF CONTRACT

95.     Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 94 above as if fully set forth herein.

24

96.    The Guaranty Agreement is a valid, binding and enforceable agreement.

97.    Pursuant to the Guaranty Agreement, Defendant Cambi "unconditionally guarantee[d] to [MIMS] the full and timely payment, performance and observance of, and compliance with all of [WJB GP and WJB Mortgage's obligations under or in connection with the Partnership Agreement]," including the WJB Mortgage Repurchase Payment Obligation.

98.    WJB Mortgage failed to pay the WJB Mortgage Repurchase Payment Obligation of $4,568,725, the amount of the Repurchase Prices for the Participation Sales, which was required to be transferred by WJB Mortgage into the Custodial Account for payment and remittance to the Partnership pursuant to Section 5.03 of the Participation Agreement.

99.    Pursuant to the Guaranty Agreement, when WJB Mortgage did not meet its payment obligations, Cambi was himself required to pay $2,892,320, together with interest, and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting that portion of the WJB Mortgage Repurchase Payment Obligation.

100.    Defendant Cambi has breached his obligations under the Guaranty Agreement by failing to pay the WJB Mortgage Repurchase Payment Obligation.

101.    MIMS and the Partnership sent Defendant Cambi a written demand for payment of $2,892,320 of the WJB Mortgage Repurchase Payment Obligation, and Cambi still did not pay the WJB Mortgage Repurchase Payment Obligation. [2]

---

[2] At the time of the Guaranty Demand, Loan LP was not aware of the Additional Warehouse Loan Participation Sales whose Repurchase Prices were $1,676,405.

102.    MIMS has been harmed and continues to be harmed by Defendant Cambi's failure to pay the WJB Mortgage Repurchase Payment Obligation.

103.    By reason of Defendant Cambi's breach of the Guaranty Agreement in connection with the WJB Mortgage Repurchase Payment Obligation, MIMS has been damaged in an amount to be determined at trial, but by at least $4,568,725, plus interest and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB Mortgage Repurchase Payment Obligation and enforcing the Guaranty Agreement.

## COUNT III – BREACH OF CONTRACT

104.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 103 above as if fully set forth herein.

105.    The Guaranty Agreement is a valid, binding and enforceable agreement.

106.    Pursuant to the Guaranty Agreement, Defendant Cambi "unconditionally guarantee[d] to [MIMS] the full and timely payment, performance and observance of, and compliance with all of [WJB GP and WJB Mortgage's obligations under or in connection with the Partnership Agreement]," including the WJB Mortgage Foreclosure Obligation.

107.    WJB GP failed to pay the WJB Mortgage Foreclosure Obligation.

108.    Pursuant to the Guaranty Agreement, when WJB Mortgage did not meet its payment obligations, Cambi was himself required to pay $1,685,419, the amount of Unsold Loans Held for Cash in which the Partnership has a Participation, together with interest, and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting that portion of the WJB Mortgage Foreclosure Obligation.

109.    Defendant Cambi has breached his obligations under the Guaranty Agreement by failing to pay the WJB Mortgage Foreclosure Obligation.

110.    MIMS sent Defendant Cambi a written demand for payment of the WJB Mortgage Foreclosure Obligation, and Cambi still did not pay the WJB Mortgage Foreclosure Obligation.

111.    MIMS has been harmed and continues to be harmed by Defendant Cambi's failure to pay the WJB Mortgage Foreclosure Obligation.

112.    By reason of Defendant Cambi's breach of the Guaranty Agreement in connection with the WJB Mortgage Foreclosure Obligation, MIMS has been damaged in an amount of at least $1,685,419 plus interest and its reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB Mortgage Foreclosure Obligation and enforcing the Guaranty Agreement.

## COUNT IV – BREACH OF CONTRACT

113.    Plaintiff repeats and realleges all of the allegations set forth in paragraphs 1 through 112 above as if fully set forth herein.

114.    The Guaranty Agreement is a valid, binding and enforceable agreement.

115.    Pursuant to the Guaranty Agreement, Defendant Cambi "unconditionally guarantee[d] to [MIMS] the full and timely payment, performance and observance of, and compliance with all of [WJB GP and WJB Mortgage's obligations under or in connection with the Partnership Agreement]," including the WJB Mortgage Interest Payment Obligation.

27

116.    WJB Mortgage failed to pay the WJB Mortgage Interest Payment Obligation, in an amount to be determined at trial, which represents the "accrued Mortgage Loan Remittance Rate due to [the Partnership] on Qualifying Mortgage Loans subject to Participations owned by [the Partnership]," which WJB Mortgage failed to remit to the Partnership as required by Section 5.01 of the Participation Agreement starting February 1, 2016.

117.    Pursuant to the Guaranty Agreement, when WJB Mortgage did not meet its payment obligations, Cambi was himself required to pay the WJB Mortgage Interest Payment Obligation, and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB Mortgage Interest Payment Obligation.

118.    Defendant Cambi has breached his obligations under the Guaranty Agreement by failing to pay the WJB Mortgage Interest Payment Obligation.

119.    MIMS has been harmed and continues to be harmed by Defendant Cambi's failure to pay the WJB Mortgage Interest Payment Obligation.

120.    By reason of Defendant Cambi's breach of the Guaranty Agreement in connection with the WJB Mortgage Interest Payment Obligation, MIMS has been damaged in an amount to be determined at trial, plus interest and reasonable costs and expenses (including all collection, enforcement, and other costs and fees) incurred by MIMS in connection with collecting the WJB Mortgage Interest Payment Obligation and enforcing the Guaranty Agreement.

WHEREFORE, Plaintiff MIMS respectfully requests that, upon a final determination by this Court, judgment be entered in its favor and against Defendant as follows:

a.  on Count I of the Complaint for breach of contract, awarding damages in the amount of at least $2,892,320, plus accrued and unpaid interest;

b.  on Count II of the Complaint for breach of contract, awarding damages in the amount of at least $4,568,725, plus accrued and unpaid interest; [3]

c.  on Count III of the Complaint for breach of contract, awarding damages in the amount of at least $1,685,419, plus accrued and unpaid interest;

d.  on Count IV of the Complaint for breach of contract, awarding damages in an amount to be determined at trial, plus accrued and unpaid interest;

e.  awarding damages in the amount of MIMS's reasonable costs and expenses, including attorneys' fees and costs, incurred in connection with collecting the WJB GP Margin Obligation, WJB Mortgage Repurchase Payment Obligation, WJB Mortgage Foreclosure Obligation and WJB Mortgage Interest Payment Obligation; and

f.  awarding damages in the amount of all MIMS' costs and disbursements, including reasonable attorneys' fees and costs, that MIMS incurs in this action; and

g.  granting MIMS such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
June 30, 2016

SIDLEY AUSTIN LLP


By: /s/ John G. Hutchinson
John G. Hutchinson
(jhutchinson@sidley.com)
Marissa Alter-Nelson
(malternelson@sidley.com)
787 Seventh Avenue
New York, New York  10019

---

[3] Any payments made in connection with Count II will reduce the amount owed under Count I and vice versa.

29

Telephone:  +1 212 839-5300
Facsimile:  +1 212 839-5599

*Attorneys for Plaintiff MIMS Master Fund,
L.P.*

30